# EXHIBIT A

Adam R. Fox (State Bar No. 220584)
Adam.Fox@squirepb.com
Emily L. Wallerstein (State Bar No. 260729)
Emily.Wallerstein@squirepb.com
Marisol C. Mork (State Bar No. 265170)
Marisol.Mork@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA  90071
Telephone:   1 213 624 2500
Facsimile:    1 213 623 4581

David S. Elkins (State Bar No. 148077)
David.Elkins@squirepb.com
Joseph P. Grasser (State Bar No. 255156)
Joseph.Grasser@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, CA  94304
Telephone:   1 650 856 6500
Facsimile:    1 650 843 8777

Attorneys for Defendants and Counterclaimants
ZIPPMARK, INC. AND ZIPPO
MANUFACTURING COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOEC, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ZIPPMARK, INC., et al.,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO. 2:14-CV-02596 RGK (FFMX)<br><br>**EXPERT REPORT OF HAL PORET**<br>**[FED. R. CIV. P. 26(a)(2)]** |

**EXPERT REPORT OF HAL PORET IN MATTER OF
LOEC, INC. v. ZIPPMARK, INC. ET AL.**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**SURVEY TO DETERMINE WHETHER THERE IS A LIKELIHOOD OF
REVERSE CONFUSION BETWEEN THE MARK BLU ON ZIPPO
LIGHTER PACKAGING AND BLU ELECTRONIC CIGARETTES**

REPORT PREPARED FOR:
Squire Patton Boggs (US) LLP
600 Hansen Way
Palo Alto, CA 94304
Attorneys for
Zippo Manufacturing Company
and ZippMark, Inc.

PREPARED BY:
Hal Poret
ORC International
315 Park Avenue South, 14th Floor
New York, NY   10010

9 February 2015

Exhibit A, Page 22

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE ---------------------------------------------- 1
STUDY AUTHORSHIP AND RESPONSIBILITY----------------------------- 2
STUDY DESIGN------------------------------------------------------------------- 3
SUMMARY OF FINDINGS ---------------------------------------------------- 16
METHODOLOGY----------------------------------------------------------------- 17
    THE RELEVANT UNIVERSE OF INTEREST ------------------------- 17
    SAMPLING PLAN------------------------------------------------------------ 21
    DOUBLE-BLIND INTERVIEWING ------------------------------------- 23
    INTERVIEWING PROCEDURES----------------------------------------- 23
    DATA PROCESSING -------------------------------------------------------- 23
    INTERVIEWING PERIOD--------------------------------------------------- 24
    QUALITY CONTROL ------------------------------------------------------- 24
DETAILED FINDINGS ------------------------------------------------------- 26

APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRES/INSTRUCTIONS
APPENDIX C :   MATERIALS REVIEWED/FEES CHARGED
APPENDIX D:   SCREENSHOTS OF SURVEY (to be provided electronically)
APPENDIX E:   SURVEY DATA (to be provided electronically)
APPENDIX F:   IMAGES USED IN SURVEY (to be provided electronically)

## *BACKGROUND AND PURPOSE*

Zippo Manufacturing Company, based in Bradford, Pennsylvania, is the company that developed, makes and sells its iconic windproof, flip-top lighter.[1] The company uses the mark BLU in connection with its butane torch flame lighter and certain other products.  Below is what I understand to be an example of how that mark appears in commerce.



I understand that LOEC, Inc. ("LOEC"), a subsidiary of Lorillard, Inc., sells and promotes electronic cigarettes and related products[2] using a mark (blu) that Zippo contends in a lawsuit is so similar to its own BLU mark such that use of the former creates a likelihood of reverse confusion – i.e., that prospective consumers of Zippo's products bearing the BLU mark will mistakenly believe that the Zippo product comes from or is otherwise affiliated with or approved by the company that puts out LOEC's "Blu" electronic cigarettes.  Below is what I understand to be an example of how LOEC uses the "Blu" mark on products in commerce in the U.S.

---

[1] Company website at http://www.zippo.com/about/article.aspx?id=1574.
[2] http://www.blucigs.com/about/.



Squire Patton Boggs (US) LLP, counsel for Zippo Manufacturing Company and for its affiliate ZippMark, Inc. (collectively "Zippo"), retained me to design and conduct a reverse confusion study to determine the extent to which, if at all, consumers are likely to confuse the BLU mark as used in connection with Zippo lighters with Blu electronic cigarettes.

This report contains details regarding the methodology, design, execution and results of such survey.  As discussed in more detail below, the survey results indicate a likelihood of reverse confusion.

## STUDY AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented by ORC International under the supervision of Hal L. Poret, Senior Vice President.

I have personally designed, supervised, and implemented approximately 700 surveys regarding the perceptions and opinions of consumers.  Over 200 have involved consumer perception with respect to trademarks, and over 200 of the 700 surveys have been conducted online.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been

Exhibit A, Page 25

accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

Hal Poret

Dated:  February 9, 2015

## *STUDY DESIGN*

A total of 400 respondents participated in this online survey among lighter consumers.[3]

The survey followed the well-accepted *Eveready* format for measuring likelihood of confusion,[4] in which respondents were shown a Zippo lighter product bearing Zippo's BLU mark and were then asked a series of questions to determine whether they confuse the product with Blu electronic cigarettes.

All respondents in the survey were assigned to either a Test Group or a Control Group. The sole difference between these two groups was the stimuli seen by respondents. Test Group participants were shown images of packaging for a Zippo lighter that included Zippo's BLU mark, while Control Group respondents were shown identical packaging with the BLU mark removed.

As this was an online survey, all instructions and questions were displayed on respondents' computer screens.

<u>Test Group</u>

200 respondents participated in a Test Group in which they were shown packaging for a Zippo BLU lighter displaying Zippo's BLU mark.

After initial screening questions, all participants assigned to the Test Group were first given the instructions reproduced on the top of the following page.

---

[3] See the section of this report titled Relevant Sample Universe of Interest for more detail on who qualified for and was included in this survey.

[4] *Union Carbide Corp. v Ever-Ready, Inc.*, 531 F 2d 366 (7th Cir. 1976)

In a moment you will see four images of a lighter and its package.

You will first see the front of the package for the lighter.  Please click the arrows to the side of the image to scroll through the three additional images of the lighter and its package.

Please look at the lighter as you ordinarily would if you were considering purchasing it.

On the next screen respondents were shown the following instruction and four images were visible, one at a time, as respondents scrolled through using the arrows to the right and left of each image:

Please take your time to look at all four images of this lighter.



 

Exhibit A, Page 28



2 of 4 images

 



3 of 4 images

 



4 of 4 images



These images appeared large and easy to read on users' computer screens; their size is reduced here to fit onto a printed page.

Beneath the images on the same screen, respondents were instructed:

> When you are ready to move on with the survey, please select "continue," or if you are unable to view the images, please indicate so.

- Continue
- Unable to view the images

Respondents could only continue after they had scrolled through all four images and had spent a minimum of 15 seconds on this screen. Additionally, respondents who indicated they were not able to view the images did not continue with the survey and subsequently were not included in the final number of completed interviews.[5]

---

[5] Two potential respondents indicated they were unable to view the images.

Exhibit A, Page 30

Next, respondents were prompted:

> On the next screens you will be asked some questions about this lighter.



> If for any question we ask you, you do not know or have no opinion, please indicate so. Please do not guess.
>
> Please select "continue" to move on with the survey.

The images of the lighter were no longer visible on subsequent screens.

On a new screen, respondents were then asked:

> Do you have a belief about what company or brand puts out the lighter you were just shown?
>
> • Yes, I do
> • No, I do not
> • Don't know/No opinion

This was a "filter" question, a conservative measure to ensure that only respondents who first answer that they have a belief about the source are asked to name the source.

Those who answered "yes, I do" were then asked:

> What company or brand do you believe puts out the lighter you were just shown?

Respondents could type in any answer, or they could select "Don't know."

Any respondent who typed in an answer was then asked:

> What makes you think the lighter you were just shown is put out by _____ (*the answer entered by respondents on the previous screen was inserted here in the question text*)?

Respondents could type in any answer, or they could select "Don't know."

Next, all respondents were asked:

> Do you think the company or brand that puts out the lighter you were shown also puts out any other products that you are aware of?
>
> - Yes, I do
> - No, I do not
> - Don't know/No opinion

Those who answered "yes, I do" were then asked:

> You answered that you think the company or brand that puts out the lighter you were shown also puts out other products that you are aware of.
>
> What other products?  Please be as specific as possible and identify both the brand and type of product, if you know.

*If you are thinking of more than one product, please enter each in a separate box. You may use as many or as few of the boxes as you would like.*

Respondents were provided ten spaces in which they could type in up to ten answers, or they could select "Don't know."

Those who typed in one answer or more were then asked:

> Each product you mentioned is listed below.
>
> For each, please tell us your reasons for thinking that product is put out by the same company or brand that puts out the lighter you were shown.
>
> Please be as specific and detailed as possible.

Respondents could type in any reason.

Meanwhile, respondents who previously answered that they thought the company or brand that puts out the lighter also puts out other products, but who then selected "Don't know" when asked to identify those products, were instead asked:

> What made you answer that you think the company or brand that puts out the lighter you were shown also puts out other products that you are aware of?

Respondents could type in any answer in response to this question.

Next, all respondents were asked:

Exhibit A, Page 33

Do you think the lighter you were shown is affiliated with or approved by any other company or brand?

- Yes, I do
- No, I do not
- Don't know/No opinion

Respondents who answered "yes, I do" were then asked:

You answered that you think the lighter you were shown is affiliated with or approved by another company or brand.

What other company or brand?

*If you are thinking of more than one company or brand, please enter each one in a separate box. You may use as many or as few of the boxes as you would like.*

Respondents were provided five spaces in which they could type in up to five answers, or they could select "Don't know."

Those who typed in one answer or more were then asked:

Each company or brand you mentioned is listed below.

For each one, please tell us what products that company or brand puts out and your reasons for thinking that the lighter you were shown is affiliated with or approved by that company or brand.

Please be as specific and detailed as possible.

Respondents could type in any reason.

Meanwhile, respondents who previously answered that they thought the lighter is affiliated with or approved by another company or brand, but who then

selected "Don't know" when asked to identify what other company or brand, were instead asked:

> What made you answer that you think the lighter you were shown is affiliated with or approved by another company or brand?

Respondents could again enter any answer.

This concluded the survey for Test Group participants.

<u>Control Group</u>

As mentioned earlier, a Control Group consisting of 200 unique respondents was included in the survey.  The survey taken by Control Group respondents was identical to that for the Test Group, with the sole exception that Control Group respondents were shown the following images of the Zippo packaging in which the allegedly confusing BLU mark was removed:



1 of 4 images

 

Page **12** of **54**



2 of 4 images

 



3 of 4 images

 

Page **13** of **54**



4 of 4 images



The purpose of exposing Control Group respondents to and questioning them about the packaging with the Blu mark at issue removed was to measure survey noise – i.e., the rate at which respondents would make a connection between the Zippo lighter product and e-cigarettes for reasons other than common use of the BLU mark, such as because both are smoking-related products.

Identical packaging with the BLU mark removed was selected as a control because it shares the same characteristics as the Test images while removing the common element that is the cause of the alleged confusion.[6] Therefore, any differences in the results between the Test and Control Groups must be attributed specifically to the BLU mark.  This makes it an effective control for measuring the tendency of respondents to guess or mistakenly connect a Zippo lighter with e-cigarettes for reasons unrelated to the marks at issue.

---

[6] While in a forward confusion survey, the allegedly infringing junior mark would be removed, in a reverse confusion survey, the senior mark must be removed in order to test for noise.

It should be noted that, in this instance, removing the mark entirely rather than
replacing it with a different mark was both appropriate and conservative.
Removing the mark creates a neutral situation in which the tendency of
respondents to mention e-cigarettes in response to questioning about a Zippo
lighter can be measured without being influenced by arbitrary factors.

Accordingly, the percentage of Control Group respondents who connect the
Zippo lighter with e-cigarettes represents the survey noise level.

Screenshots of the survey are provided in Appendix D.

## *SUMMARY OF KEY FINDINGS*

1) 10% of all 200 Test Group respondents were clearly confused in the sense of mistakenly believing that the Zippo Blu lighter shown comes from the same company that makes, or is otherwise affiliated or approved by, Blu e-cigarettes.  An additional 2.5% of respondents gave answers that may indicate confusion.

2) The confusion rate among the 164 Test Group respondents who were aware of Blu as a brand of e-cigarettes ranged from 12.2 to 14.6%, depending on whether the additional potentially confused responses are counted.

3) The confusion rate among the 85 Test Group respondents who currently use electronic cigarettes ranged from 18.8% to 21.2%, depending on whether the additional potentially confused responses are counted.

4) None of the Control Group respondents who viewed the Zippo lighter without the BLU mark mentioned e-cigarettes or anything referring to Blu e-cigarettes.  Accordingly, the Test Group rates mentioned above are also net confusion rates.

5) Based on the net survey results, it is my opinion that there is a substantial and meaningful likelihood of reverse confusion.

See Detailed Findings section below for additional information on results.  The full data will be provided in its original electronic form in Appendix E.

## *METHODOLOGY*

### THE RELEVANT UNIVERSE OF INTEREST

The universe for this survey consisted of consumers who have purchased a lighter for at least $20 in the past twelve months, or who are likely to purchase a lighter in the next twelve months and would consider paying at least $20.  As Zippo lighters bearing the BLU mark are substantially more expensive than the most basic lighters, which can retail for under $5, requiring that respondents spend $20 or more ensured that they are prospective purchasers of the type of higher quality, more expensive lighter sold in connection with the BLU mark and not simply any lighter.

The following screening questions were employed to ensure the final survey sample was comprised of respondents from the appropriate sample universe.

First, after some initial demographic questions, all potential respondents were asked:

> Which of the following, if any, have you purchased in the past 12 months? *Please select all that apply.*

Respondents could select as many as applied to them from the following list of randomized response options or "None of these."

- Lighter
- Memory card
- Ear bud headphones
- Shot glasses

The items other than "lighter" were included on this list in order to mask the intended topic of the survey from respondents.

Respondents who selected lighter were then asked:

What is the highest price range you have considered paying for a lighter? *Please select one.*

- Under $10
- $10 to $19.99
- $20 to $29.99
- $30 to $39.99
- $40 to $49.99
- $50 or over

Respondents who answered that they have purchased a lighter in the past 12 months and considered paying at least $20 for the lighter were then considered part of the sample universe and qualified to take the survey.

Next, all respondents were asked:

Which of the following, if any, are you likely to purchase in the next 12 months?

*Please select all that apply.*

Respondents could select as many as applied to them from the same list of response options they saw earlier or they could select "None of these."

Respondents who answered "Lighter" in response to this question were then asked:

What is the highest price range you would consider paying for a lighter?
*Please select one.*

- Under $10
- $10 to $19.99
- $20 to $29.99
- $30 to $39.99
- $40 to $49.99
- $50 or over

Respondents who answered that they are likely to purchase a lighter in the next 12 months and would consider paying at least $20 for the lighter were also considered part of the sample universe and qualified to take the survey.

In addition to these initial screening questions, all qualified respondents were also asked the following questions upon completion of the main survey:

Which of the following, if any, do you currently use?
*Please select all that apply.*

The following table displays the response options that were shown in a randomized order and how many respondents in each Group selected each:

| Which of the following, if any, do you currently use? | | | | |
|---|---|---|---|---|
| | Test Group | | Control Group | |
| | No. | % | No. | % |
| Cigarettes | 183 | 91.5% | 183 | 91.5% |
| Electronic cigarettes (e-cigarettes) | 85 | 42.5% | 86 | 43% |
| Cigars | 55 | 27.5% | 40 | 20% |
| Pipe tobacco | 20 | 10% | 17 | 8.5% |
| None of these | 7 | 3.5% | 6 | 3% |

All respondents were also asked:

Which of the following brands of electronic cigarettes (e-cigarettes), if any, have you heard of or seen?

The following table displays the response options that were shown in a randomized order and how many respondents in each Group selected each:

| Which of the following brands of electronic cigarettes (e-cigarettes), if any, have you heard of or seen? | Test Group | | Control Group | |
|---|---|---|---|---|
| | No. | % | No. | % |
| Blu | 164 | 82.0% | 155 | 77.5% |
| V2 | 42 | 21.0% | 45 | 22.5% |
| Vapor Fi | 38 | 19.0% | 33 | 16.5% |
| Halo | 36 | 18.0% | 46 | 23.0% |
| Jazz | 14 | 7.0% | 6 | 3.0% |
| Apollo | 15 | 7.5% | 10 | 5.0% |
| None of these | 22 | 11.0% | 26 | 13.0% |

The purpose in asking these questions was to identify sub-groups of respondents who are users of electronic cigarettes or have heard specifically of Blu e-cigarettes in order to allow additional analysis among these specific respondents if so desired.

The reason these questions were asked at the end of the survey as opposed to during the screening portion was to avoid biasing respondents during the main survey by mentioning e-cigarettes or indicating that Blu is a brand of e-cigarettes specifically.

As is standard practice, respondents who work or have someone in their immediate household who works in advertising or market research were screened out. For the purposes of this survey, respondents who work, or have someone in their household who works, for a company that makes or sells lighters or lighter-fluid were also screened out.

The actual wording of the screening questions used is shown in Appendix B.

**SAMPLING PLAN**

The sampling plan involved a random selection of consumers who are part of an online panel.

Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Research Now, a leading supplier of online sample for surveys. I have worked with Research Now on many surveys and have found their procedures and panels to be highly reliable. Research Now has a large and diverse panel consisting of millions of Americans and is highly regarded as a reputable source of respondents for online surveys within the field of market research. Research Now utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Research Now employs a "by-invitation-only" panel recruitment model to enroll pre-validated individuals and, therefore, maintains a panel comprised of the most credible survey takers who are less prone to self-selection bias. Quality and integrity of their research panel is also obtained and maintained in the following ways.

- They require a double opt-in and agreement to provide truthful and well-considered answers to online market research surveys. First, potential

panelists opt-in during the enrollment process, and then they are sent a follow-up email confirmation that requests the potential panelist to click a link to validate the opt-in. Then, he or she is sent a follow-up email providing access to their member account and they can begin receiving surveys.

- A unique email address is required to opt-in to the panel and physical addresses provided by panelists in the US are verified against government postal information.

- Research Now implements data quality measures by focusing on identifying and pursuing panelists who exhibit suspicious behaviors. This is done by identifying members through routine review of behaviors and sometimes with the help of their clients, and then evaluating a wider set of behaviors, particularly their profile information and survey performance.

Research Now also employs a "Three Strikes Policy" in which panelists who commit survey offenses, such as speeding, inattentiveness, poor quality open ends, answering inconsistencies, and selecting dummy answers, are flagged with an "offense" code.  Panelists who are flagged three times for such offenses are disqualified from panel membership and future surveys.

The final breakdown of survey respondents in each Group is as follows:

| Final Number of Respondents by Age & Gender in Each Group | | |
|---|---|---|
| | __Male__ | __Female__ |
| 21 – 29 | 14 | 18 |
| 30 – 39 | 29 | 26 |
| 40 – 49 | 23 | 21 |
| 50 – 59 | 25 | 18 |
| 60 and older | 16 | 10 |

Survey invitations were sent across the U.S. in geographic proportion to Census
data.  This resulted in the following breakdown by Region:

| Respondents by Region | % |
|---|---|
| Midwest | 19% |
| Northeast | 20% |
| South | 19% |
| West | 25% |
| Southeast | 18% |

## DOUBLE-BLIND INTERVIEWING

It is important to point out that the study was administered under "double-
blind" conditions.  That is, both the respondents to the survey and those
involved in providing the sample and administering the online interviews
(Decipher, Inc. and Research Now) were kept uninformed (or "blind") as to the
purpose and sponsorship of the study.

## INTERVIEWING PROCEDURES

The online survey was programmed and hosted by Decipher, Inc., a company
specializing in web survey programming and data collection and processing.
My staff and I thoroughly tested the programmed survey prior to any potential
respondents receiving the invitation to participate in it.

## DATA PROCESSING

Data was collected by Decipher and made available to ORC International
through an electronic portal on an ongoing basis.  The data set showing each
respondent's answers to all questions will be provided in electronic form.

Exhibit A, Page 46

## INTERVIEWING PERIOD

Interviewing was conducted from December 3, 2014 through December 17, 2014.

## QUALITY CONTROL

Several measures were implemented in order to ensure a high level of quality control and validation with respect to respondents taking the survey.

Upon entering the survey, all respondents were initially asked to enter their age followed by their gender on the next screen. This information was checked against the sample provider's (Research Now's) demographics on record for each respondent and any respondent providing an incorrect or inconsistent age or gender was terminated and unable to access the survey.  This ensured that the survey was being taken by an actual live person and that each person was paying a certain level of attention to the survey questions and taking a certain level of care in entering responses.

All respondents were also instructed to select the answer choice "South" from a list of four directions in order to continue.  This question permitted additional screening out of respondents who were paying insufficient attention or clicking responses indiscriminately.

Respondents who passed the survey screening criteria were also instructed to carefully read these instructions:

- Please take the survey in one session without interruption.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.

Exhibit A, Page 47

- If you normally wear glasses or contact lenses when viewing a computer screen, please wear them for the survey.

Two options were provided in response to these instructions: 1) I understand and agree to the above instructions, and 2) I do not understand or do not agree to the above instructions.  Only respondents who understood and agreed to this were able to continue on to the main section of the survey.

Additionally, the survey program was set up in such a way as to restrict respondents from taking the survey via a mobile device (i.e., anything other than a desktop or laptop/notebook computer). This contributed to ensuring respondents could easily and clearly view the images and each question and corresponding response options.  Restricting respondents from taking the survey on a mobile device also helped minimize the likelihood of outside distractions while taking the survey.

Finally, a review of all open-ended responses was conducted in order to identify any respondents who may have entered non-responsive or nonsense comments or not given serious thought to the survey questions. As is standard procedure, respondents who gave non-responsive or nonsense comments were removed.[7]

---

[7] Eighteen such respondents were removed from this survey.

## DETAILED FINDINGS

**I.        Initial Confusion – Who Makes the Product**

Of the 200 Test Group respondents 92% (184) initially answered "yes, I do" when asked whether or not they had a belief about what company or brand puts out the lighter they were shown.

When these respondents were then asked to identify the company or brand they believe put out the lighter, 2 (1% of all 200 Test Group respondents) identified Blu e-cigarettes.  The following table displays the verbatim results for these respondents:[8]

| Resp. ID | Q220 – Company or brand: | Q225 – Reason why: |
|---|---|---|
| 149 | Zippo Blu E-cig | It looks like the brands. |
| 1948 | Zippo,  Blu ecigs | Zippo is clearly shown on the packaging, and I use Blu ecigs, which their brand is also shown on the packaging. |

Three additional respondents gave answers that included "blu" or "Blue." In order to be conservative, however, I did not count these respondents as confused because they gave no additional indication in their answer to this question that they were thinking of Blu e-cigarettes:

- Resp. ID 1456 answered "Blue" and gave the reason, "Because it says so on the logo"

- Resp. ID 1807 answered "zippo blu" and gave the reason, "I own zippo lighters there the best"

---

[8] All answers in this report are shown verbatim, including with typos and other errors as inputted by respondents.

- Resp. ID 2014 answered, "7zippo blue" and gave the reason, "its put out by zippo and it says zippoblu."

Meanwhile, no respondents in the Control Group identified Blu e-cigarettes, or anything that could be possibly indicate they were thinking of Blu e-cigarettes.

## II.     Additional Confusion – Same Company/Brand as Other Products

When respondents were asked if they thought the company or brand that puts out the lighter also puts out any other products that they were aware of, 59% (118 out of 200) of Test Group respondents answered "yes, I do."

When asked to identify what other products, an additional 7 Test Group respondents answered that the same company puts out e-cigarettes/electronic cigarettes or Blu e-cigarettes specifically.  The verbatim responses for these respondents are shown in the following table:

| Resp. ID | Q235 – Other Brands/Products Made/Distributed By Same Company | Q237- Reason why they think so |
|---|---|---|
| 17 | its called a tru blue electonic cigertaic | I have one of the tru blue electric cigs |
| 307 | blu electronic cigs | because product packaging showed both names |
| 375 | Electronic cigarettes – disposable | I buy Blu eCigs a lot. |
| 1446 | e-cigs | And I know Blu makes e-cigs, I have seen and purchased them. |
| 2283 | e cigarettes | Its the same logo ive seen on e cigarettes |
| 2629 | blu eltric smoke | i have this product so i know |
| 2738 | e-cigarettes | Blu makes electronic cigarettes |

These answers all strongly indicate a belief that the Zippo BLU lighter comes from the same company that makes Blu electronic cigarettes.  Even with respect to respondent 2283, who did not specifically mention "Blu" in his answer, it is appropriate to count this respondent as confused based on answering that the same company makes e-cigarettes.  Although it is theoretically possible that a respondent could name e-cigarettes for a reason other than the use of BLU on the Zippo lighter, this is exactly what the Control Group accounts for.  Accordingly, any tendency of respondents to name e-cigarettes for reasons not reflecting trademark confusion would be measured in the Control Group and deducted from the Test Group result.

Two additional respondents (IDs 1922 and 1952) identified "blu" in response to this question, giving the following reasons: "it says," and "they make refillable lighters."  In order to be conservative, these respondents are not included in the confusion level since neither specifically mention e-cigarettes or gives other reasons to believe their mention of "Blu" reflects confusion with Blu e-cigarettes.

An additional respondent (ID 48) answered that the same company makes "electronic cigarettes" in response to this question and when asked why answered that "I thought they do."  This response would be appropriate to count as potentially confused (pending accounting for similar answers in the Control Group).  This respondent also, however, did not answer at the end of the survey that they have heard of the Blu brand of electronic cigarettes.  While this could have been an oversight on the respondents part in failing to notice or select that answer, this does raise doubt as to whether this respondent was thinking of Blu e-cigarettes.

Adding the 7 respondents who were clearly confused to the initial 2 respondents who identified Blu e-cigarettes as the source of the product brings the confusion level up to 4.5% (9 out of 200) (or 5% if respondent 48 were counted).

Meanwhile, none of the Control Group respondents mentioned e-cigarettes or anything that could be interpreted as identifying Blu electronic cigarettes.

### III.   Additional Confusion -- Affiliation or Approval

When asked whether or not they thought the lighter was affiliated or approved by any other company or brand, 25% (50 out of 200) of the Test Group answered "yes, I do."

When asked to identify what other company or brand they thought the lighter was affiliated with or approved by, an additional 11 respondents gave answers indicating they were thinking of Blu electronic cigarettes.

The verbatim answers for these 11 respondents are shown in the following table:

| Resp. ID | Q245 – Affiliated With or Approved By | Q247 – Reason why: |
|---|---|---|
| 208 | blu electronic cigarettes | spelling of name |
| 233 | blu | electronic cig |
| 280 | blu cigatettes | on the box |
| 333 | Blu | its said blu and they make e cigs |
| 347 | Blu e cigs | Blu puts out an e cig but now I'm thinking zippo would not be affiliated with BLU since you don't need a lighter for an e cig |
| 386 | blu e-cigarettes | the name matches & the logo looks similar to blu's |
| 1456[9] | Dragon / Blue | Nothing / Nothing |
| 1584 | blu cigarettes | |
| 1795 | Blu | electronic cigarettes, the lighter packaging had the blu logo on the box. I don't understand the affiliation since you don't need a lighter for an e-cig. |
| 3099 | Blu | The logo  Blu  is used in a ash less cigarette |
| 3325 | Blue E Cigarettes ? (the  blue  logo looks like the e-cig / blu-cig brand. | I have JUST seen a cigarette or e-cigarette ad in the liquor store with that Blue logo of some sort. |

Adding these 11 respondents to the previous 9 respondents who identified Blu Cig/electronic cigarettes brings the total confusion level among the Test Group to 10% (20 out of 200).

---

[9] Respondent 1456 who was previously not included in the initial confusion level after answering that the lighter is put out by "Blue" is at this point added to the confusion. This respondent identifies both "Dragon" and "Blue" in response to what other companies or brand the lighter is affiliated with or approved by. In addition to the Blu Cig electronic cigarette brand, Dragon is another brand of e-cig (www.dragonecigarettes.com).  The fact that the respondent named another brand of e-cigarettes strongly suggests that the reference to "Blu" is a reference to an e-cigarette brand as well.

Exhibit A, Page 53

In addition, the following 4 respondents identified "blu" in response to this question; however, in order to be conservative none of these respondents are added to the total confusion level since none of them specifically mentioned Blu Cigs or electronic cigarettes:

| Resp. ID | Q245 – Affiliated With or Approved By | Q247 – Reason why: |
|---|---|---|
| 155 | Blu | The big huge Blu logo on the front of the box |
| 2031 | Blu | it was mentioned on the package |
| 2892 | Blu | Name on packaging |
| 3178 | Blu | Butane. |

While these respondents did not specifically mention "e-cigarettes," they named "Blu" as a company or brand that the product is affiliated with or approved by, and all four indicated at the end of the survey that "Blu" is a brand of e-cigarettes that they are aware of.  At least in the case of the first three respondents, the further reference to "Blu" appearing on the packaging makes it reasonably likely that they are referring to plaintiff's Blu brand.

If those three respondents (155, 2031 and 2892) were counted as confused, the total confusion rate would be 11.5%.

If respondent #48 (mentioned earlier) and respondent #3178 were also counted, the total confusion rate would be 12.5%.

Meanwhile, none of the Control Group respondents at any point in the survey gave an answer that mentioned e-cigarettes or could be interpreted as identifying Blu electronic cigarettes.

Accordingly, the total net confusion rate would be in the range of 10% to 12.5%
depending on how the few noted respondents whose answers are uncertain are
classified.

### IV.    Total Confusion Among E-Cigarette Users

Among the Test Group, 85 answered that they currently use electronic cigarettes/e-cigarettes.  Of these 85 respondents, 18.8% (16 out of 85) are among those 20 respondents included in the total confusion level – i.e. 18.8% of respondents who currently use e-cigarettes identified the Zippo BLU lighter to come from the same source as Blu electronic cigarettes or to be affiliated with or approved by Blu e-cigarettes.  This figure would be 21.2% (18 of 85) if the additional respondents noted above who are also electronic cigarette users (48 and 2031) are counted.

### V.    Total Confusion Among Those Who Have Heard Of Blu Brand

Among the Test Group, 164 respondents answered at the end of the main question series that they had awareness of the Blu brand of electronic cigarettes/e-cigarettes.  Calculated among this group of respondents the total level of confusion would result in 12.2% (20 out of 164). This figure would be 14.6% (24 of 164) if the additional respondents noted above who named Blu in the affiliation/approval question and are aware of Blu as an e-cigarette brand (155, 2031, 2892 and 3178) are counted.

### VI.    Conclusion

Based on these results, it is my opinion that there is a substantial and meaningful likelihood of reverse confusion – i.e, that prospective consumers of the Zippo BLU lighter will mistakenly believe that it comes from the same source as, or is otherwise affiliated with or approved by, Blu e-cigarettes.

# APPENDIX A

# CURRICULUM VITAE OF STUDY'S AUTHOR

### Hal L. Poret
(hal.inc42@gmail.com; 914-772-5087)

## Education

| 1998 | Harvard Law School, J.D., *cum laude* |
|------|----------------------------------------|

- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

| 1995 | S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude* |
|------|----------------------------------------------------------|

- Statistics
- Taught calculus/precalculus/statistics

| 1993 | Union College, B.S. in Mathematics with honors, *magna cum laude* |
|------|--------------------------------------------------------------------|

- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

## Employment

2004  -     Senior Vice President, ORC International

- Designed, supervised, and analyzed over 700 consumer surveys, including Trademark, Trade Dress, Advertising Perception, Fraud/Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 50 U.S. District Court litigations and proceedings in front of TTAB, NAD and the FTC.
- Review and comment on third party surveys

2003 – 2004   Internet Sports Advantage

- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003   Attorney, Foley Hoag & Eliot, Boston, MA

- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.
- Advised clients in the selection, adoption, use, licensing, and protection of trademarks/trade dress; represented clients in trademark/trade dress litigations, administrative proceedings before the Trademark Trial and Appeal Board and United States Patent and Trademark Office, and domain name proceedings under the Uniform Domain-Name Dispute-Resolution Policy.

*Testimony at Trial or by Deposition*

(Party who retained me shown in bold)

| 2015 | **Church & Dwight** v. SPD (Deposition) | USDC Southern District of NY |
| 2014 | Scholz v. **Goudreau** (Deposition) | USDC District of Mass |
| 2014 | **Economy Rent-A-Car** v. Economy Car Rentals (TTAB Testimony) | USPTO |
| 2014 | Weber v. **Sears** (Deposition) | USDC Northern District of IL |
| 2014 | Native American Arts v. **Stone** (Deposition) | USDC Northern District of IL |
| 2014 | Gravity Defyer v. **Under Armour** (Trial) | USDC Central District of CA |
| 2014 | **Adams** v. Target Corporation (Deposition) | USDC Central District of CA |
| 2014 | PODS v. **UHAUL** (Deposition and trial) | USDC Middle District of FL |
| 2014 | Flushing v. **Green Dot Bank** (Deposition) | USDC Southern District of NY |
| 2014 | Amy's Ice Creams v. **Amy's Kitchen** (Deposition) | USDC Western District of TX |
| 2014 | **Quoc Viet** v. VV Foods (Deposition) | USDC Central District of CA |
| 2014 | **Unity Health** v. UnityPoint (Deposition) | USDC Western District of WI |
| 2014 | In re: NCAA Student-athlete litigation (Deposition and Trial) | USDCNorthern District of CA |

Exhibit A, Page 59

| 2014 | Spiraledge v. **SeaWorld**<br>(Deposition) | USDC Southern District of CA |
|---|---|---|
| 2014 | **Diageo N.A. v.** Mexcor<br>(Deposition and trial) | USDC Southern District of TX |
| 2014 | **Pam Lab** v. Virtus PharmaceuticalUSDC<br>(Deposition and trial) | USDC Southern District of FL |
| 2014 | **Estate of Marilyn Monroe** v. AVELA<br>(Deposition) | USDC Southern District of NY |
| 2014 | Kelly-Brown v. **Winfrey, et al.**<br>(Deposition) | USDC Southern District of NY |
| 2014 | Virco Mfg **v. Hertz & Academia**<br>(Deposition) | USDC Central District of CA |
| 2014 | In re: Hulu Privacy Litigation<br>**(Deposition)** | USDC Northern District of CA |
| 2013 | **Jackson Family Wines** v. Diageo<br>(Deposition) | USDC Northern District of CA |
| 2013 | Bubbles, Inc. v. **Sibu, LLC.**<br>(Deposition) | USDC Eastern District of VA |
| 2013 | Clorox v. **Industrias Dalen**<br>(Deposition) | USDC Northern District of CA |
| 2013 | Globefill v. **Elements Spirits**<br>(Deposition and trial) | USDC Central District of CA |
| 2013 | Active Ride Shop v. **Old Navy**<br>(Deposition and trial) | USDC Central District of CA |
| 2013 | **Macy's Inc**. v. Strategic Marks LLC.<br>(Deposition) | Northern District of CA |
| 2013 | Karoun Dairies, Inc. v. **Karoun Dairies, Inc.**<br>(Deposition) | Southern District of CA |

| | | |
|---|---|---|
| 2013 | **Kraft Foods** v. Cracker Barrel Old Country (Deposition and Trial) | Southern District of NY |
| 2013 | **Bayer Healthcare** v. Sergeants Pet Care USDC (Deposition and Trial) | Southern District of NY |
| 2013 | JJI International v. **The Bazar Group, Inc.** (Deposition) | USDC District of RI |
| 2013 | **Fage Dairy USA** v. General Mills (Deposition) | Northern District of NY |
| 2013 | Gameshow Network v. **Cablevision** (Deposition) | F.C.C. |
| 2013 | Telebrands v. **Meyer Marketing** (Deposition) | USDC Eastern District of CA |
| 2012 | Marketquest v. **BIC** (Deposition) | USDC Southern District of CA |
| 2012 | **Hornady** v. DoubleTap (Deposition) | USDC District of Utah |
| 2012 | **Briggs/Kohler** Opposition to Honda (Deposition) | TTAB |
| 2012 | **Apple** v. Samsung (Deposition and Trial) | USDC Northern District of CA |
| 2012 | Forest River v. **Heartland** (Deposition) | USDC Northern District of IN |
| 2012 | SPD v. **Church & Dwight** (Deposition) | USDC District of NJ |
| 2012 | Brighton Collectibles v. **Texas Leather** (Deposition) | USDC Southern District of CA |
| 2012 | **Cytosport** v. Vital Pharmaceuticals (Deposition) | USDC Eastern District of CA |

Exhibit A, Page 61

| | | |
|---|---|---|
| 2012 | Authors Guild v. **Google** (Deposition) | USDC Southern District of NY |
| 2012 | Clear Choice v. **Real Choice** (Opposition testimony) | TTAB |
| 2011 | **Borghese** v. Perlier et al. (Deposition) | USDC Southern District of NY |
| 2011 | My Favorite Company v. **Wal-Mart** (Deposition) | USDC Central District of CA |
| 2011 | **PepsiCo** v. Pirincci (Opposition testimony) | TTAB |
| 2011 | **GAP Inc.** v. G.A.P. Adventures (Trial) | USDC Southern District of NY |
| 2011 | **Merck Eprova** v. Brookstone (Deposition and trial) | USDC Southern District of NY |
| 2011 | Wella, Inc. v. **Willagirl LLC** (Deposition) | USDC Southern District of NY |
| 2011 | Bauer Bros. v. **Nike** (Deposition) | USDC Southern District of CA |
| 2011 | **Aviva Sports** v. Manley (Deposition) | USDC District of Minnesota |
| 2011 | **American Express** v. Black Card LLC (Deposition) | USDC Southern District of NY |
| 2011 | Gosmile v. **Dr. Levine** (Preliminary Injunction Trial) | USDC Southern District of NY |

*Presentations*

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May 9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference, Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute) (September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006

*Publications/Papers*

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

The Mark (Survey Newsletter; three editions 2009)

<u>Hot Topics in Trademark Surveys</u> (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

<u>The Mark</u> (Survey Newsletter, 2008)

<u>Trademark and Advertising Survey Report</u> (Summer 2007)

<u>Avoiding Pitfalls in Dilution Surveys under TDRA</u> (AIPLA Spring Conference, Boston, May 2007)


*Commentary*

<u>Comment on Hotels.com case</u> (on TTABLOG.COM, July 24, 2009)

<u>Comment on Nextel v. Motorola</u> (on TTABLOG.COM, June 19, 2009)

<u>PLI All-Star Briefing Newsletter,</u> "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)


*Professional Memberships/Affiliations*

Council of American Survey Research Organizations

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

Exhibit A, Page 65

# APPENDIX B

# INSTRUCTIONS/QUESTIONNAIRES

SCREENER

**[PROGRAMMER: DO NOT ALLOW RESPONDENTS TAKING SURVEY ON ANY MOBILE DEVICE TO ENTER THE SURVEY. ONLY ALLOW DESKTOP, LAPTOP/NOTEBOOK COMPUTERS.]**

**BASE: ALL RESPONDENTS**

100.    Please enter your age **[PROGRAMMER: TERMINATE IF DOES NOT MATCH PANELIST'S PRELOAD OR IF UNDER 21.  CALCULATE AGE RANGES TO DETERMINE OPEN QUOTAS FOR AGE PRIOR TO CONTINUING.  CODE AGE RANGE BASED ON AGE]**

1.  21-29
2.  30-39
3.  40-49
4.  50-59
5.  60+

**BASE: ANY NON-TERMINATES**

105.    Are you… [TERM IF DOESN'T MATCH PANEL DEMO]
1. Female
2. Male

**BASE: ANY NON-TERMINATES**

Q.115. In what state do you live?
[PROGRAMMER: Drop down menu of states. Include an option for "Other" and terminate if this option is selected.]

**BASE: ANY NON-TERMINATES**

Q150   Do you or does anyone in your household work for a company or store that makes or sells any of the following?
**[RANDOMIZE]**
*Please select all that apply.*
1.  Lighters or lighter-fluid → **term if selected**
2.  Memory cards or flash drives
3.  Speakers or headphones
4.  Barware or glassware
5.  None of these **[ANCHOR; EXCLUSIVE]**

**BASE: ANY NON-TERMINATES**

160.  Do you or does anyone in your household work in either advertising
or market research?
*Please select all that apply.*
 [RANDOMIZE]
1.    Yes, advertising [TERMINATE]
2.    Yes, market research [TERMINATE]
3.    No, neither of these **[ANCHOR; EXCLUSIVE]**


**BASE: ANY NON-TERMINATES**
Q170   Which of the following, if any, have you purchased in the past 12 months?
*Please select all that apply.*
**[RANDOMIZE]**
1.   Lighter
2.   Memory card
3.   Ear bud headphones
4.   Shot glasses
5.   None of these **[ANCHOR; EXCLUSIVE]**


**BASE: 170=1**
Q172   What is the highest price range you have considered paying for a lighter?
*Please select one.*

1.   Under $10
2.   $10 to $19.99
3.   $20 to $29.99
4.   $30 to $39.99
5.   $40 to $49.99
6.   $50 or over


**BASE: ANY NON-TERMINATES**
Q175   Which of the following, if any, are you likely to purchase in the <u>next</u> 12
months?
*Please select all that apply.*
**[SHOW LIST IN SAME ORDER AS 170]**


**BASE: 175=1**
Q180   What is the highest price range you would consider paying for a lighter?
*Please select one.*

1.   Under $10
2.   $10 to $19.99

3.  $20 to $29.99
4.  $30 to $39.99
5.  $40 to $49.99
6.  $50 or over

**[MUST SELECT 170=1 or 175=1 TO CONTINUE]**
**[PROGRAM VARIABLE FOR THOSE WHO SELECT 172=3-6 AND/OR 180=3-6]**
**[TERMINATE IF RESPONDENTS DOES NOT SELECT OPTIONS 3-6 IN Q172 AND/OR Q180 – PROGRAM CHANGE ON 12/4/14.]**

**BASE: ANY NON-TERMINATES**
195.    Please select South from the following list in order to continue with this survey.
        [RANDOMIZE]
        1.  North
        2.  South **[must select to continue]**
        3.  East
        4.  West

**ASK IF: HAS NOT TERMINATED**
197.    You have qualified to take this survey.  Before continuing, please carefully read these instructions:

*       Please take the survey in <u>one</u> session without interruption.

*       While taking the survey, please do not consult any other websites or other electronic or written materials.

*       Please answer all questions on your own without consulting any other person.

*       If you normally wear glasses or contact lenses when viewing a computer screen, please wear them for the survey.

        1.  I understand and agree to the above instructions
        2.  I do not understand or do not agree to the above instructions
            **[TERMINATE]**

**[EACH RESPONDENT SHOULD BE ASSIGNED TO ONE CELL ONLY]**
**[RANDOMIZE CELL ASSIGNMENT FILLING AGE/GENDER QUOTAS EVENLY FOR EACH CELL]**

Exhibit A, Page 69

> MAIN QUESTIONNAIRE: ONLY QUALIFIED RESPONDENTS CONTINUE BEYOND THIS POINT.

**ASK: ALL QUALIFIED RESPONDENTS**

Q200   In a moment you will see four images of a lighter and its package.

You will first see the front of the package for the lighter.  Please click the arrows to the side of the image to scroll through the three additional images of the lighter and its package.

Please look at the lighter as you ordinarily would if you were considering purchasing it.

**ASK: ALL QUALIFIED RESPONDENTS**

Q205   Please take your time to look at all four images of this lighter.

[CELL 1: PROGRAM IMAGES 100A-D BELOW THE FIRST LINE OF TEXT SO THAT RESPONDENT CAN SCROLL THROUGH ALL FOUR BY CLICKING ARROWS TO THE SIDES OF THE IMAGES]
[CELL 2: PROGRAM IMAGES 200A-D BELOW THE FIRST LINE OF TEXT SO THAT RESPONDENT CAN SCROLL THROUGH ALL FOUR BY CLICKING ARROWS TO THE SIDES OF THE IMAGES]
**[PROGRAMMER: DO NOT ENABLE THE CONTINUE BUTTON FOR AT LEAST 15 SECONDS AND ONLY AFTER ALL 4 IMAGES HAVE BEEN VIEWED.]**

When you are ready to move on with the survey, please select "continue," or if you are unable to view the images, please indicate so.

1. Continue
2. Unable to view the images [TERMINATE]

[NEXT TO THE CONTINUE BUTTON AT THE BOTTOM OF THE SCREEN INSERT: *The continue button will remain disabled for 15 seconds in order to ensure you have had enough time to view the image. After 15 seconds you will be able to continue.*]

**ASK: ALL QUALIFIED RESPONDENTS**

Q207   On the next screens you will be asked some questions about this lighter.

[CELL 1: DISPLAY IMAGE #100A BELOW THE FIRST LINE OF TEXT AND ABOVE THE LAST LINE OF TEXT]

Exhibit A, Page 70

[CELL 2: DISPLAY IMAGE #200A BELOW THE FIRST LINE OF TEXT AND ABOVE THE LAST LINE OF TEXT]

If for any question we ask you, you do not know or have no opinion, please indicate so. Please do not guess.

Please select "continue" to move on with the survey.

**ASK: ALL QUALIFIED RESPONDENTS**
Q210   Do you have a belief about what company or brand puts out the lighter you were just shown?

1. Yes, I do
2. No, I do not **[skip to 230]**
3. Don't know/No opinion **[skip to 230]**

**ASK: 210=1**
Q220   What company or brand do you believe puts out the lighter you were just shown?

**[SMALL TEXT BOX & INCLUDE A "Don't know" BUTTON]**
97. Don't know **[EXCLUSIVE]**

**ASK: ENTERED TEXT IN 220**
Q225   What makes you think the lighter you were just shown is put out by _____ **[pipe in answer from 220]**?

**[LARGE TEXT BOX & INCLUDE A "Don't know" BUTTON]**
98. Don't know **[EXCLUSIVE]**

**ASK: ALL QUALIFIED RESPONDENTS**
Q230   Do you think the company or brand that puts out the lighter you were shown also puts out any other products that you are aware of?

1. Yes, I do
2. No, I do not **[skip to 240]**
3. Don't know/No opinion **[skip to 240]**

**ASK IF: Q230=1**
Q235   You answered that you think the company or brand that puts out the lighter you were shown also puts out other products that you are aware of.

What other products?  Please be as specific as possible and identify both the brand and type of product, if you know.

*If you are thinking of more than one product, please enter each in a separate box. You may use as many or as few of the boxes as you would like.*

**[INCLUDE 10 SMALL TEXT BOXES & INCLUDE A "Don't know" BUTTON]**
97. Don't know **[EXCLUSIVE]**

<u>**ASK IF: Q235=ENTERED TEXT**</u>
Q237   Each product you mentioned is listed below.

For each, please tell us your reasons for thinking that product is put out by the same company or brand that puts out the lighter you were shown.

Please be as specific and detailed as possible.

**[LIST EACH PRODUCT ENTERED IN Q235 AND TO THE RIGHT OF EACH PROVIDE A LARGE TEXT BOX. ABOVE THE LARGE TEXT BOXES DISPLAY, "Reasons:"]**

<u>**ASK IF: Q235=97 (DON'T KNOW)**</u>
Q237   What made you answer that you think the company or brand that puts out the lighter you were shown also puts out other products that you are aware of?

**[LARGE TEXT BOX]**

<u>**ASK: ALL QUALIFIED RESPONDENTS**</u>
Q240   Do you think the lighter you were shown is affiliated with or approved by any other company or brand?

1.  Yes, I do
2.  No, I do not
3.  Don't know/No opinion

<u>**ASK IF: Q240=1**</u>

Q245   You answered that you think the lighter you were shown is affiliated with or approved by another company or brand.

What other company or brand?

*If you are thinking of more than one company or brand, please enter each one in a separate box. You may use as many or as few of the boxes as you would like.*

**[5 SMALL TEXT BOXES & INCLUDE A "Don't know" BUTTON]**
97. Don't know **[EXCLUSIVE]**


**ASK IF: Q245=ENTERED TEXT IN AT LEAST ONE BOX**
Q247   Each company or brand you mentioned is listed below.

For each one, please tell us what products that company or brand puts out and your reasons for thinking that the lighter you were shown is affiliated with or approved by that company or brand.

Please be as specific and detailed as possible.

**[LIST EACH COMPANY/BRAND ENTERED IN Q245 AND TO THE RIGHT OF EACH PROVIDE A LARGE TEXT BOX. ABOVE THE LARGE TEXT BOXES DISPLAY, "Products/Reasons:"]**

**ASK IF: Q245=97 (DON'T KNOW)**
Q250   What made you answer that you think the lighter you were shown is affiliated with or approved by another company or brand?

**[LARGE TEXT BOX]**

**ASK: ALL QUALIFIED RESPONDENTS**
Q275   Which of the following, if any, do you currently use?
*Please select all that apply.*
**[RANDOMIZE]**
1. Cigarettes
2. Cigars
3. Pipe tobacco
4. Electronic cigarettes (e-cigarettes)
5. None of these **[ANCHOR; EXCLUSIVE]**


**ASK: ALL QUALIFIED RESPONDENTS**

Exhibit A, Page 73

**ASK: 275=4**

Q300   Which of the following brands of electronic cigarettes (e-cigarettes), if any, have you heard of or seen?

**[RANDOMIZE]**

1. Blu
2. Jazz
3. V2
4. Vapor Fi
5. Halo
6. Apollo
7. None of these **[ANCHOR; EXCLUSIVE]**

# APPENDIX C

# MATERIALS REVIEWED/FEES CHARGED

In connection with designing the survey and preparing this report, I reviewed the following materials:  (1) Complaint for Declaratory Judgment; (2) Zippmark's Answer & Counterclaim in Reply for Cancellation of Trademark; (3) Zippo and Zippmark's Answer & Counterclaim for Trademark Infringement; (4) blucigs.com website; (5) Zippo.com website.  I also reviewed the results of Google searches for Zippo Blu lighters.

The fee charged for the survey and preparation of this report is $50,000. Additional work in connection with this matter will be billed at my ordinary rate of $575/hr.

# APPENDICES D-F

## SCREENSHOTS OF SURVEY & DATA FILE & IMAGES
### (provided electronically)

## **PROOF OF SERVICE**

The undersigned certifies and declares as follows:

I am a resident of the State of California and over 18 years of age and am not a party to this action.  My business address is 600 Hansen Way, Palo Alto, California 94304.  On February 9, 2015, I served a copy of the foregoing document, EXPERT REPORT OF HAL PORET, on the following:

> Allan Gabriel
> agabriel@dykema.com
> Walead Esmail
> wesmail@dykema.com
> Dykema Gossett LLP
> 333 South Grand Avenue, Suite 2100
> Los Angeles, CA  90071
> (P) 213-457-1800
> (F) 213-457-1850

Service was accomplished as follows:

☒ **By E-mail.**  Pursuant to the parties agreement, by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2015.

/s/ *Daniela Fontana*
Daniela Fontana

147522/1/PALOALTO

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304