# EXHIBIT H

# INTA

## COURTS & TRIBUNALS SUBCOMMITTEE

## REPORT ON BEST PRACTICES IN CONDUCTING SURVEYS
## IN TRADEMARK MATTERS

All information provided by the Courts & Tribunals Subcommittee of the International Trademark Association in this document is provided to the public as a source of general information on trademark and related intellectual property issues. In legal matters, no publication, whether in written or electronic form, can take the place of professional advice given with full knowledge of the specific circumstances of each case and proficiency in the laws of the relevant countries. While efforts have been made to ensure the accuracy of the information in this document, it should not be treated as the basis for formulating business decisions without professional advice. We emphasize that trademark and related intellectual property laws vary from country to country, and between jurisdictions within some countries. The information included in this document will not be relevant or accurate for all countries or states.

**Table of Contents**

INTRODUCTION AND SUMMARY .................................................................. 1

SURVEY BEST PRACTICES ........................................................................ 2

    Examples of when a survey might be useful .............................................. 2

    Tips for designing a useful survey .......................................................... 2

OVERVIEW OF JURISDICTIONS ................................................................. 5

APPENDIX 1: USA ...................................................................................... 7

APPENDIX 2: CANADA ............................................................................. 16

APPENDIX 3: MEXICO .............................................................................. 27

APPENDIX 4: SOUTH AMERICA – OVERVIEW .......................................... 29

APPENDIX 5: ARGENTINA ........................................................................ 30

APPENDIX 6: BOLIVIA ............................................................................. 31

APPENDIX 7: BRAZIL ............................................................................... 32

APPENDIX 8: COLOMBIA ......................................................................... 34

APPENDIX 9: PANAMA ............................................................................. 36

APPENDIX 10: PERU ................................................................................. 37

APPENDIX 11: URUGUAY ......................................................................... 38

APPENDIX 12: VENEZUELA ...................................................................... 39

APPENDIX 13: BELGIUM .......................................................................... 40

APPENDIX 14: FRANCE ............................................................................ 42

APPENDIX 15: GERMANY ......................................................................... 46

APPENDIX 16: ITALY ............................................................................... 50

APPENDIX 17: OHIM ................................................................................ 52

APPENDIX 18: RUSSIA ............................................................................. 63

APPENDIX 19: SPAIN ............................................................................... 65

APPENDIX 20: UK (REGISTRY) AND ENGLAND & WALES (COURT) ........... 69

APPENDIX 21: ISRAEL .............................................................................. 74

APPENDIX 22: SOUTH AFRICA ................................................................. 83

APPENDIX 23: INDIA ................................................................................ 85

APPENDIX 24: JAPAN ............................................................................... 89

APPENDIX 25: MALAYSIA ........................................................................ 91

APPENDIX 26: AUSTRALIA ...................................................................... 94

Exhibit H, Page 230

APPENDIX 27: NEW ZEALAND ........................................................................ 102

APPENDIX 28: OTHER JURISDICTIONS ......................................................... 106

Sample Questions To Obtain Further Information In Each Jurisdiction .................................. 107

INTA COURTS & TRIBUNALS SUBCOMMITTEE MEMBERS 2008-2009 ...................... 108

INTA COURTS & TRIBUNALS SUBCOMMITTEE MEMBERS TASK FORCE 2 ............. 111

INTA COURTS & TRIBUNALS SUBCOMMITTEE MEMBERS TASK FORCE 2 ............. 113

Acknowledgements ............................................................................................... 114

## INTRODUCTION AND SUMMARY

Consumer perception lies at the heart of trademark law, but identifying precisely what that perception might be in a form which satisfies judicial inquiry can prove elusive.  Many parties turn to market surveys.  By simply asking individuals what is their response to certain stimuli and recording the results, the hope is that an understanding can be gained of how a mark is perceived by consumers in the marketplace.  Unfortunately however, surveys are often found by courts and tribunals to be so poorly designed and lacking in objectivity that they are given little weight and rendered useless as evidence.  As a consequence, parties frequently waste significant time and money and place an unnecessary burden on the legal infrastructure.

To try and address this inefficient use of resources, members of the International Trademark Association's (INTA) Courts & Tribunals Subcommittee sought details from practitioners across the world as to whether any official guidance or useful case law had been published in their jurisdiction as to how to properly conduct a survey.  By understanding the best practices adopted by courts and tribunals in survey design, execution and presentation, the intention is that a framework for authoritative and universal guidance could be developed.  This will allow a degree of harmonization and prove a persuasive tool for those countries where guidance is under-developed or non-existent.

This report strives to draw together the threads from across the world so that they are all contained in a single patchwork document.  It offers examples of when evidence might be used, guidelines as to how a useful report might be prepared and an overview of the position in 28 countries.  Finally, the appendix provides practitioners with detailed guidance and reference to case law in specific countries.

Reassuringly, common themes have emerged.  In particular, it is clear that the approach to the design, execution and presentation of an influential trademark survey is reasonably universal, perhaps due to its basis upon scientific principles.  In an encouraging sign, there is a definite drive from the judiciary in several jurisdictions to keep costs to a minimum, for instance encouraging co-operation between the parties and the preparation of joint surveys with costs sanctions for failure to do so.  The 'Best Practices' in this report follow the distillation of these common themes.

In general, common law jurisdictions such as England & Wales, the United States of America, Canada and Australia have substantially greater guidance available, reflecting a well-developed practice of using surveys as evidence.  In other countries guidance tends to be fairly limited, if indeed there is any at all.  That may change over time as local jurisprudence develops, but the issue is likely to be fertile ground for development for some time.  This report has accordingly been drafted with a view to being updated periodically.

## SURVEY BEST PRACTICES

### Examples of when a survey might be useful

The most common circumstances when survey evidence might be required in trademark matters include the following:

i)      to overcome registry objections that a sign is descriptive or otherwise non-distinctive and cannot function as a trademark because it does not indicate origin;

ii)      to support a claim that a trademark has an enhanced degree of recognition among consumers and deserves superior protection, for example famous marks;

iii)      to support or contest an assertion that a likelihood of confusion exists between certain marks, for example during opposition proceedings; or

iv)      to support or contest an allegation of infringement, passing off or unfair competition.

### Tips for designing a useful survey

The following general principles establish the basis on which survey evidence is likely to be most useful in trademark matters.

**I.**      **Ensure that the survey population has been properly defined and chosen.**

     A.      Factors to address in determining the survey population include:

         1)      appropriate number or participants (the larger the better, but 300 participants at minimum; in some jurisdictions, at least 1,000 is needed);

         2)      appropriate profile, including sex, age, occupation, background (i.e., the survey sample should be representative of the pertinent population);

         3)      appropriate geographic representation; and

         4)      targeting all actual/prospective purchasers.

     B.      The method of sampling (probability vs. non-probability) must be justifiable, and precautions should be taken to decrease the likelihood of sample bias.

     C.      A control group should be used in surveys to record consumer impressions.

**II.**      **Ensure that questions are properly formulated and presented.**

     A.      Questions should be clear, unambiguous, concise and unbiased.

     B.      It is acceptable to use "filter" questions to help reduce the likelihood of guessing. However, where employed, filter questions must not be too restrictive so as to result in under-reporting of opinions. "Quasi-filter" questions, which adopt "don't know" or "no opinion" options, are recommended.

     C.      Questions should be appropriately open or closed-ended in nature, depending on the circumstances:

         1)      open-ended for surveys assessing what comes first to respondents' mind;

2

2)    close-ended for surveys assessing choices between well-defined options or obtaining ratings on a clear set of alternatives.

At times, combining open and closed-ended questions can maximize appropriate freedom of expression.  Leading questions should be avoided.

D.    The order of the questions (or answers, if close-ended) should be rotated and distributed randomly to avoid artificial inflation of a certain choice due to the order of questions or answers.

E.    Attorneys should only be involved with survey design to the extent needed to ensure that relevant questions are directed to a relevant population.

F.    Control questions should be used in surveys to record consumer impressions.

G.    Questions should be pre-tested to confirm clarity and ease of use.

H.    Each question should only address one variable.

**III.    Ensure that interviews are conducted with the goal of maintaining objectivity.**

A.    Attorneys should not participate in survey administration.

B.    The entities conducting the interviews should be independent and objective and not affiliated with the matter in any way.

C.    Preventing or minimizing the exposure of a survey's sponsor, or the purpose of the survey, increases the likelihood of objectivity.

**IV.    Ensure that data are properly collected and coded.**

A.    Procedures should be implemented to ensure data are entered accurately.

B.    Detailed instructions delineating the standards for coding answers to open-ended questions should be distributed to the scorers.

C.    In order to ensure consistency and accuracy, two (2) trained scorers should independently score the same responses.

D.    All verbal exchanges should be recorded verbatim and all original answers should be retained.

**V.    Ensure that data are properly analyzed.**

A.    Those individuals who design, conduct and analyze the survey should be appropriately trained and qualified.  Some training in general interviewing techniques is recommended for most survey interviews.  Training time should increase with the complexity of the interviews/difficulty in subject matter.

B.    Interviewers should receive detailed written instructions on everything to be said to respondents (including when, what, and how they should probe in response to an answer, if at all), the materials used in the survey, and how they are to complete the interview form.

C.    All instructions should be made available to the court and, where the survey cannot be instructed jointly, the opposing party.

D.    Results must be statistically significant.

3

**VI.**   **Ensure that survey reports are appropriately detailed.**

    A.    For presentation to the court or tribunal, the following information should be provided:

        1)    the purpose of the survey;

        2)    a definition of the target population;

        3)    a description of the sampled population;

        4)    a description of the sample design;

        5)    a description of the results of sample implementation;

        6)    the exact wording of the questions used;

        7)    a description of any special scoring methods;

        8)    estimates of sampling error;

        9)    clearly labeled statistical tables;

        10)    copies of interviewer instructions, questions, validation results and code books; and

        11)    objective criteria on how potential respondents could react.

Finally, as outlined in the INTA's resolution of 22 September 2008, 'Adverse Inference for Failure to Conduct Likelihood of Confusion Survey' (http://www.inta.org/Advocacy/Pages/BoardResolutions.aspx), the mere fact that a party does not produce a survey as evidence should not lead to an adverse inference about likelihood of confusion in a dispute.  It is thus important to note that this report does not assert that a party MUST produce a survey; rather, it lays out guidelines addressing how, if one is produced, it can be achieved most effectively.

4

## OVERVIEW OF JURISDICTIONS

| Jurisdiction | Are surveys admissible? | Can surveys be influential? | Approximate survey cost |
|---|---|---|---|
| **North America** | | | |
| USA | Yes | Yes | $25,000 to $150,000 |
| Canada | Sometimes | Yes, if they are reliable and relevant | Unknown |
| Mexico | Yes | Yes | Unknown |
| **South America** | | | |
| Argentina | No | No | N/a |
| Bolivia | Yes | Unknown | Unknown |
| Brazil | Yes | Yes, if conducted by a court expert | Unknown |
| Colombia | Yes | Yes | Unknown |
| Panama | Yes | Yes, if probative | Unknown |
| Peru | Yes | Yes | Unknown |
| Uruguay | Unknown | Unknown | Unknown |
| Venezuela | Unknown | Unknown | Unknown |
| **Europe** | | | |
| Belgium | Yes | Yes | Unknown |
| France | Yes | Yes | Unknown |
| Germany | Sometimes | Yes | Unknown |
| Italy | Yes | Yes, if it is objective | Unknown |
| OHIM | Yes | Yes | Unknown |
| Russia | Yes | Yes, if prepared in accordance with official guidance | US$20,000 |
| Spain | Yes | Yes, if it is probative | Unknown |
| UK (registry) | Sometimes | Yes, if it complies with strict guidelines | Unknown |
| England & Wales | Sometimes, where permission is granted | Yes, if it complies with strict guidelines | Unknown |
| **Middle East** | | | |
| Israel | Yes | Yes | Unknown |
| **Africa** | | | |
| South Africa | Yes | Yes, if it is probative | Unknown |
| **Asia** | | | |
| India | Yes | Sometimes | Unknown |
| Japan | Sometimes, under very strict conditions | Yes | Unknown |
| Malaysia | Yes | Yes, if it complies with strict guidelines | Unknown |

5

| Oceania | | | |
|---|---|---|---|
| Australia | Yes | Yes, if it is probative | Unknown |
| New Zealand | Yes | Yes, if it is probative | Unknown |

6

**APPENDIX 1: USA**

| Jurisdiction: | United States of America |
|---|---|
| Summary: | Substantial guidance is available to ensure survey evidence is admissible. U.S. jurisprudence has dictated that particular types of surveys are suitable for particular types of issues (*e.g.* likelihood of confusion, genericness, etc.). Survey costs in the U.S. can be substantial. |
| Official guidance: | *Manual for Complex Litigation* published by the Federal Judicial Center |
| Relevant caselaw: | See discussion below. |
| Approximate cost to produce | Costs for a pilot survey, which generally includes less than 75 respondents, can range from $10,000 to $50,000. While pilot surveys are generally not admissible at trial, they can be useful in determining the viability of methodology and in obtaining initial feedback on the survey's substantive results.<br><br>Costs for a complete survey, with expert reports suitable for use at trial can range from $25,000 to $150,000. |

## Official Guidance

According to the Federal Judicial Center's *Manual for Complex Litigation* ("*MCL*"), a survey's admissibility under Federal Rule of Evidence 703 depends on whether its sampling methods conform to generally recognized statistical standards.[1]  The *MCL* identifies the following four factors as relevant to assessing a survey's admissibility:

(1) whether the population was properly chosen and defined;

(2) whether the sample chosen was representative of that population;

(3) whether the data gathered were accurately reported; and

(4) whether the data were analyzed in accordance with accepted statistical principles.[2]

Additionally, the *MCL* advises judges to consider the following three factors in assessing a survey's validity:

(5) whether the questions asked were clear and not leading;

---

[1]  MANUAL FOR COMPLEX LITIGATION § 11.493 (4th ed. 2004).

[2]  *Id.*

7

(6) whether the survey was conducted by qualified persons following proper interview procedures; and

(7) whether the process was conducted so as to ensure objectivity (e.g., determine if the survey was conducted in anticipation of litigation and by persons connected with the parties or counsel or by persons aware of its purpose in the litigation).[3]

For each of these seven *MCL* survey factors, highlighted below are several "best practices" of which attorneys should be mindful. These best practices were obtained from and addressed at length in Shari Seidman Diamond's *Reference Guide on Survey Research*, published by the Federal Judicial Center.[4]

Factor 1:     Whether the population was properly chosen and defined.

➢ <u>Choosing and Defining the Population</u>.  A survey's relevance is dependent upon the identification of the target population, which consists of all the elements whose characteristics or perceptions the survey is intended to represent. In trademark litigation, the target population may include all prospective and actual purchasers of the plaintiff's and defendant's goods. Properly defining the population is important because there may be systematic differences in the responses of members and non-members of a population – e.g., prospective purchasers may know more about a class of products than consumers who never considered purchasing a product.[5]

Factor 2:     Whether the sample chosen was representative of that population.

➢ <u>Sampling Frame Approximation of the Population</u>.  To the extent the sampling frame – i.e., the source(s) from which the sample is actually drawn – is under-inclusive or over-inclusive in relation to the population, then the survey report should contain (1) a description of the target population, (2) a description of the survey population actually sampled, (3) a discussion of the difference between the two populations, and (4) an evaluation of the likely consequences of that difference.[6]

➢ <u>Sample Selection</u>.  If probability sampling is too expensive or not practical for a trademark litigant (as is usually the case), then non-probability sampling must be used. In non-probability sampling, respondents are not selected randomly from the entire target population. Therefore, the expert should be prepared to justify the method used to select respondents and precautions should be taken to decrease the likelihood of sample bias. Such precautions, in the example of mall intercept surveys, include randomly sampling from various mall locations and at different times, and training recruiters to approach potential responders based on a random act (e.g., every *nth* person entering the mall through a particular door) and avoiding natural tendencies, e.g., preferably approaching friendly-looking people.[7]

---

[3]  *Id.*

[4]  Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229 (2d ed. Fed. Jud. Ctr. 2000), *available at* www.fjc.gov/public/pdf.nsf/lookup/sciman04.pdf/$file /sciman04.pdf.

[5]  *Id.* at 239-40.

[6]  *Id.* at 240-42.

[7]  *Id.* at 242-44, 246-47.

➢ Nonresponse Level and Representativeness.  Nonresponsiveness is often not random, even when respondents are selected randomly from the entire target population.  Methods to increase response rates include making several attempts to contact potential respondents and providing financial incentives for participating in the survey.  Tolerable levels of nonresponse should be measured (e.g., using survey guidelines published by the former U.S. Office of Statistical Standards) and the survey expert should be prepared to provide evidence on the potential impact of nonresponse on the survey results.  Nonresponse levels based on absent or incomplete responses to sensitive or difficult questions may be cured by recontacting respondents to obtain the missing data and using other respondent's answers to predict missing responses.[8]

➢ Ensuring Participation by Qualified Respondents.  Potential respondents should be screened with initial questions to determine the eligibility to participate in the survey.  Screening questions should not convey information that will affect respondents' answers in the main survey.  Determining whether to include potential respondents should be based on objective criteria, and clearly conveyed by written instructions to administers of the screening questions.  These instructions, the completed screening questionnaires, and the completed interview form of each respondent should be made available both to the court and to the opposing party.[9]

Factor 3:        Whether the data gathered were accurately reported.

➢ Accurate Data Recording.  Data must first be recorded, edited, and coded before any analysis can usually occur.  Procedures to ensure accurate data entry include (1) checks for completeness, (2) checks for reliability and accuracy, and (3) implementing established rules for resolving inconsistencies.  Further, responses should be verified by duplicate entry and comparison, and data-entry personnel should be unaware of the purposes of the survey.[10]

➢ Accurate Coding of Data.  Detailed instructions clearly delineating the standards for coding answers to open-ended questions should be distributed to scorers, and two trained scorers should independently score the same responses to verify consistency.[11]

Factor 4:        Whether the data were analyzed in accordance with accepted statistical principles.

➢ Expert Skill and Training.  Experts who design, conduct, or analyze the study must demonstrate an understanding of survey methodology, including sampling, instrument design (questionnaire and interview construction), and statistical analysis.  Graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, marketing, communication sciences, statistics, or a related discipline is recommended, including coursework in survey research methods, sampling, measurement, interviewing,

---

[8]   *Id.* at 245-46.

[9]   *Id.* at 247-48.

[10]  *Id.* at 268.

[11]  *Id.*

9

and statistics.  To the extent the survey involves technical subject matter or a specialized population, additional training may be required.[12]

Factor 5:        Whether the questions asked were clear and not leading.

➢ Clear, Precise, and Unbiased Questions.  Questions that are unclear, imprecise, or biased affect a survey's validity by distorting responses or inflating random error. Administering pilot tests to a small sample of eligible respondents is a method to determine if questions are confusing or difficult to answer.  Rephrasing questions to increase clarity and correct misunderstandings based on the results of a pilot test can improve overall survey quality.[13]

➢ Filter Questions to Reduce Guessing.  Because of the likelihood that some respondents will have no opinion on the issue being investigated, if no filter questions are used and every respondent is asked every substantive question, then guessing is very likely occur. However, using "full-filter" questions – e.g., asking the respondent if he or she has an opinion on the issue and only asking the substantive question to those respondents who do – usually produces an underreporting of opinion.  Balancing the tension between imprecision (no filter questions) and underreporting ("full-filter" questions) is best accomplished through "quasi-filter" questions, which provide a "don't know" or "no opinion" option as part of the question or as one of the answer choices.[14]

➢ Open-Ended and Closed-Ended Questions.  Although open-ended questions are preferred by many courts because they tend to be less leading, whether to use open- or closed-ended questions depends on what type of information is being sought.  Open-ended questions are suggested for surveys assessing what comes first to a respondent's mind, while closed-ended questions are suggested for surveys assessing choices between well-defined options or obtaining ratings on a clear set of alternatives.[15]

➢ Probes to Clarify Answers.  With open-ended questions, interviewers may be instructed to follow-up ambiguous or incomplete answers with probes to clarify responses.  If probes are used, interviewers must record verbatim every part of the exchange or risk calling the survey's reliability into question.  Further, interviewers should be given explicit instructions and trained on *when* they should probe (for consistency), *what* they should say in the probing (e.g., a simple probe such as "anything else?" versus a follow-up substantive question), and *how* to deliver a probe to avoid influencing the response.[16]

➢ Avoiding Order Effects.  Responses can be influenced by both the order in which questions are asked and the order in which response choices are offered in closed-ended questions.  In general, order effects on lines of questions are less likely if questions proceed from being general to more specific in nature.  The order in which response choices are presented should be rotated and distributed randomly among respondents so

---

[12]  *Id.* at 238.

[13]  *Id.* at 248-49.

[14]  *Id.* at 249-51.

[15]  *Id.* at 251-53.

[16]  *Id.* at 253-54.

10

that no particular response choice has an artificially inflated rate of being chosen, e.g., because it was always the first of three choices listed.[17]

➢ Testing Causal Propositions and Control Methodology. In surveys to record consumer impressions, control methodology should be used to determine the relative influence of preexisting impressions (or other background noise) on respondents' answers compared to that of the stimulus (e.g., trademark, commercial) being examined. By implementing a control group (administering a control stimulus to a separate group of respondents) or control questions (asking all respondents one or more control questions) response levels can be measured against a baseline level of error associated with a particular question.[18]

Factor 6:     Whether the survey was conducted by qualified persons following proper interview procedures.

➢ Selection and Training of Interviewers. Interviewers should receive detailed written instructions on everything they will say to respondents, any stimulus materials they will use in the survey, and how they will complete the interview form. These instructions should be made available to the court and opposing party. Interviewers should also be instructed to record verbatim all verbal exchange between them and the respondent, including whether they repeat a question. Some training in general interviewing techniques is required for most interviews, and training time should increase with the complexity of the interviews (e.g., if probes or complicated skip patterns are used). Likewise, interviewers responsible for last-stage sampling (i.e., selecting particular respondents to interview) may require additional training to avoid interviewer bias. All interviewer training should include instructions on the settings within which interviews are to occur (e.g., interviewing one respondent at a time, away from other respondents).[19]

➢ Procedures to Minimize Error and Bias. Three procedures can be used to ensure the survey instrument was implemented in an unbiased fashion and according to instructions:

(1) Monitor. Reliable implementation can be confirmed by supervisor monitoring of interviews while they are taking place.

(2) Validate. Recontacting respondents to ask whether the initial interviews occurred and to determine whether they were qualified to participate. Although this method does not determine whether the initial interview as a whole was conducted properly, it serves to warn interviewers that their work is being checked and it may uncover gross failures in survey administration. Surveys conducted for litigation purposes are subject to a heightened standard of validation, which may include independent validation by a third party of at least 50% of the interviews.

---

[17] *Id.* at 254-55.

[18] *Id.* at 256-60.

[19] *Id.* at 264-65.

11

(3) <u>Compare</u>.   Response patterns or inconsistencies may be identified by comparing the interviews and responses recorded by each interviewer.[20]

Factor 7:   Whether the process was conducted so as to ensure objectivity (e.g., determine if the survey was conducted in anticipation of litigation and by persons connected with the parties or counsel or by persons aware of its purpose in the litigation).

> <u>Attorney participation</u>.   Attorneys should not participate in survey administration, including the conducting of interviews and tabulating the results.  Attorneys should only be involved with survey design to the extent needed to ensure relevant questions are directed to a relevant population.[21]

> <u>Objectivity of Interviewers and Responders</u>.  Objectivity in survey administration is best ensured when neither the interviewers nor the respondents know the sponsor or purpose of the survey (i.e., a "double-blind" survey).  To this end, the survey instrument should not include any explicit clues (e.g., questionnaire printed on sponsor's letterhead) or implicit clues (e.g., reversing the usual order of "yes" and "no" check boxes on critical questions to increase the likelihood that "no" will be checked) as to the sponsorship, purpose, or expected responses.  To the extent the disclosure of a survey's sponsor is required (e.g., with some government surveys), additional interviewer training may minimize the inadvertent communication of preferred answers to respondents.[22]

<u>Survey Reports</u>

> The expert survey report presented at trial should provide detailed information on at least the following topics:

(1) The purpose of the survey;

(2) A definition of the target population and a description of the population that was actually sampled;

(3) A description of the sample design, including the method of selecting respondents, the method of interview, the number of callbacks, respondent eligibility or screening criteria, and other pertinent information;

(4) A description of the results of sample implementation, including (a) the number of potential respondents contacted, (b) the number not reached, (c) the number of refusals, (d) the number of incomplete interviews or terminations, (e) the number of noneligibles, and (f) the number of completed interviews;

(5) The exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits;

(6) A description of any special scoring (e.g., grouping of verbatim responses into broader categories);

---

[20]   *Id.* at 267.

[21]   *Id.* at 237-38.

[22]   *Id.* at 238, 266.

12

(7) Estimates of the sampling error, where appropriate (i.e., in probability samples);

(8) Statistical tables clearly labeled and identified as to the source of data, including the number of raw cases forming the base for each table, row, or column; and

(9) Copies of interviewer instructions, validation results, and code books. presented by the expert.[23]

## Relevant Caselaw: Survey Format

Varied survey methodologies are suitable for use in U.S. litigation, and the particular survey methodology that should be used depends on the legal issues at hand. There are particular survey formats to be used when addressing likelihood of confusion, secondary meaning and genericness, respectively. Each of these will now be explored below.

➢ **Likelihood of confusion surveys** generally follow two main formats:
- Ever-Ready Format: This survey format does not inform respondents what the senior mark is, but assumes that respondents are aware of the mark from their prior experiences.[1] In an Ever-Ready format survey, respondents are asked to name the company that they think puts out the junior mark, and then asked why they think that, and whether they can name any other products made by that brand. This format is often used in cases where the brand owner makes some products that the putative infringer does not make and the senior mark is strong and widely recognized.
- Squirt Format: This survey format presents respondents with both of the conflicting marks and does not assume respondent is familiar with the senior mark.[2] The marks may be presented in the form of a product line-up, which includes an array of branded products, including the brands in question. In a Squirt format survey, respondents are asked if they think that goods or services bearing marks A and B are from the same source or different sources and then asked what makes them think that. U.S. courts are split as to whether the Squirt format properly replicates market conditions because the format artificially informs respondent about a mark that they may not necessarily know and then asks about connections with that mark.[3]
- Percentage Figures: While U.S. courts are split as to what survey percentage is

---

[23] *Id.* at 270-71.

[1] *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366 (7th Cir. 1976)

[2] *SquirtCo. v. Seven-Up Co*., 628 F.2d 1086 (8th Cir, 1980)

[3] *See. e.g. National Distillers Prods. Co. v. Refreshment Brands Inc*., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) (criticizing surveys where respondents are artificially made aware as being inferior to those that assume awareness). Conversely,  some courts see nothing inherently wrong with this type of survey. *See e.g. Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc*., 618 F.3d 1025, 1037-38 (9th Cir 2010) (admitted and analyzed an internet survey that showed pictures of both plaintiff's and defendant's branded products and asked questions about them).

persuasive in evidencing, or dispelling, a likelihood of confusion, survey percentages demonstrating confusion over 50% are almost always viewed by the courts as persuasive evidence of likelihood of confusion.[4] Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of likelihood of confusion.

➤ **Secondary Meaning Surveys**
  - Designations that are not inherently distinctive require proof of secondary meaning, and survey evidence is often used in the United States to prove its existence.[5] In a secondary meaning survey, respondents are asked whether they associate the claimed trademark with a product of one company or more than one company, and then are asked why they think that.[6] To be useful in establishing the existence of secondary meaning, secondary meaning surveys should reveal that respondents understand the designation to identify a single source, not that the party seeking trademark rights is listed as the first among several sources with which respondents associate the designation.[7] It is improper to first ask if the respondent is "familiar" with the subject's products shown in a line up, and then remove those respondents who are not.[8] Generally, proof of secondary meaning is sufficient if it shows that a "significant" or "substantial part" of the buying class use the designation to identify a single source.
  - Percentage Figures:  U.S. courts are inconsistent as to the percentage of persons who attribute the designation to identify a single source that is sufficient to constitute a "significant" amount. For example, survey results showing 25% significance and 10% significance have been held insufficient proof of secondary meaning in a term.[9]

➤ **Genericness**
  - The main issue in surveys for determining whether a term is capable of functioning as a  trademark or whether it is a generic name is the target group's understudying of the designation. Consumer surveys are widely accepted and encouraged by U.S. Courts in cases involving genericness claims. [10] In a genericness survey, respondents are asked questions that specifically ask whether

---

[4] *Sears, Roebuck & Co. v. Johnson*, 219 F.2d 590 (3rd Cir. 1955).

[5] *Aetna Health Care Systems, Inc. v. Health Care Choice, Inc*., 231 USPQ 614 (N.D. Okla 1986); *In re Certain Vacuum Bottles & Components Thereof*, 219 USPQ 637 (Int'l Trade Comm'n 1982); *Brown v. Quiniou*, 744 F. Supp. 463 (S.D.N.Y. 1990).

[6] *Storck USA L.P. v. Farley Candy Co., Inc.,* 797 F. Supp. 1399 (N.D. Ill. 1992).

[7] *American Flange & Manufacturing Co. Inc. v. Rike Corp*., 80 USPQ 1397 (TTAB 2006)

[8] *I.P. Lund Trading ApS v. Kohler Co.* 118 F. Supp. 92 (D. Mass 2000) (noting that asking further questions to only those who are familiar "stacks the deck" in plaintiff's favor).

[9] *See e.g. Zippo Mfg. Co. v. Rogers Imports, Inc*. 216 F. Supp. 670 (S.D.N.Y. 1963) (survey evidence that 25% of respondents associate plaintiff's designation with a single source was insufficient proof of secondary meaning); *Roselux Chemical Co. v. Parsons Ammonia Co*., 299 F.2d 855 (CCPA 1962) (survey evidence that only 10%  of respondents associate plaintiff's designation to a descriptive term was insufficient proof of secondary meaning).

[10] See. e.g. *Gimex, Inc. v. JS&A Group, Inc*., 213 USPQ 1005 (N.D. Ill 1982) (noting that a litigant who does not introduce a survey to support a generic challenge may be viewed as less than serious by many judges)

14

they understand the term as a product or as a brand.  Most genericness surveys provide an alternative to allow participants to answer that they view the name as both a product and a brand.[11]  In addition, most surveys allow for follow up questions in the instance of answers that essentially respond, "I don't know."

- <u>Percentage Figures</u>: Unlike surveys for likelihood of confusion or secondary meaning, the percentage of individuals who identify the name with a product, rather than a particular brand, must be greater than 50%.[12]

---

[11] *J & J Snack Foods, Corp. v. Nestle USA, Inc.,* 149 F. Supp. 2d 136 (D.N.J. 2001).

[12] *Id.* Despite figures essentially showing that 60% of participants did not believe that subject mark belonged to a particular brand or company, the court declined to find that the mark was generic.

15

**APPENDIX 2: CANADA**

| | |
|---|---|
| Jurisdiction: | Canada |
| Summary: | Substantial guidance is available to ensure survey evidence is admissible. |
| Official guidance: | *Canadian Intellectual Property Office Trademarks Examination Manual*, September 1996<br><br>http://www.cipo.ic.gc.ca/eic/site/cipointernet-internetopic.nsf/vwapj/1996manuel-exam-exam-manual-eng.pdf/$file/1996manuel-exam-exam-manual-eng.pdf<br><br>Recommended best practices<br><br>http://www.mria-arim.ca/STANDARDS/PublishResultsENG.asp |
| Relevant case law: | There is substantial case law as discussed in more detail below. |
| Approximate costs to produce survey: | No information available. |

**Overview**

The standard for admissibility of survey evidence is high. A court will consider expert evidence, including interpretations of market survey evidence, in any context only if it is:

1  relevant;

2  necessary in assisting the trier of fact;

3  not excluded by any exclusionary rule; and

4  comes from a properly qualified expert.

The probative value of survey evidence is weighed against its:

1  reliability;

2  validity; and

3  relevance.

16

National standards have been established on the production of reliable survey evidence and organizations which consistently meet the standards are awarded a "Gold Seal" certificate.

**Case law**

Development of the law on survey evidence in Canada

Canada retained its skepticism about the hearsay nature of surveys until around 1970. Before this point in almost every case where survey evidence had been offered regarding the opinions of some segment of the public, the court rejected it as inadmissible. The one known exception where a survey had been admitted prior to 1970 is the case of *Aluminum Goods Ltd. v. Registrar of Trade marks*[1324]. The *Schenley* case[1425] marked an important turning point in Canadian judicial attitude, whereby a properly conducted survey was treated as readily helpful to a determination of the issues.

*Canadian Schenley Distilleries Ltd. v. Canada's Manitoba Distillery Ltd* (1975), 25 C.P.R. (2d) 1 (Fed. T.D.)

> **Circumstances**: Appeal from a finding of the Registrar of Trade Marks that there was no likelihood of confusion between the applicant's and the opponent's marks. The Registrar found the survey to be hearsay and attached to it no probative weight.
>
> **Effect**: Survey evidence is an exception to the hearsay rule. The court held that market surveys can be admitted if properly conducted and put forward not to prove the truth of the statements but to show the basis of an expert's opinion or an assessment of the results of a survey.

*Sun Life Assurance Co. of Canada v. Sunlife Juice Ltd.* (1988) 22 C.P.R. (3d) 244.

> **Circumstances:** The issue was whether the Sunlife Juice's use of the Sun Life Assurance's mark was confusing.
>
> **Effect:** The judge admitted the survey evidence. He found it scientifically and impartially conducted and stated that it was necessary in order to determine whether there is likely to be confusion.

*Joseph E. Seagram & Sons Ltd. v. Seagram Real Estate Ltd.* (1990), 33 C.P.R. (3d) 454.

> **Circumstances**: Opposition to applicant's mark based on a likelihood of confusion. Opponent argued that the mark was not distinctive. The Registrar rejected the opposition. On appeal, the opponent submitted a market survey into evidence.

---

[1324] [1954] Ex. C.R. 79, 14 Fox Pat. C. 41, at 45 (Exch.).

[1425] *Canadian Schenley Distilleries Ltd. v. Canada's Manitoba Distillery Ltd.* (1975), 25 C.P.R. (2d) 1 (F.C.T.D.).

Exhibit H, Page 248

**Effect**: The court rejected the admission of the survey in this case because of a lack of relevance. However, it recognized the admissibility of market surveys stating that that the general principle is that the admissibility and probative value of a survey is dependent on its relevance to the issues before the court and the manner in which the poll was conducted; for example, the time period over which the survey took place, the questions asked, where they were asked and the method of selecting the participants.

*Opus Building Corp. v. Opus Corp.*

**Circumstances:** Opus Building Corp. applied for an order to expunge Opus Corp's registered trademark on the ground that it was not distinctive of its services and on the ground that it had abandoned use of the mark. The court admitted the results of a survey which showed the distinctiveness of Opus Building Corp's mark in comparison to that of Opus Corp's.

**Effect:** The court found the survey admissible for the following reasons:
(1) it was conducted by an expert in the field of public opinion research;
(2) the sampling was from the appropriate "universe";
(3) it was designed and conducted, and the resulting data was processed, in a professional manner, independent of both the applicant and its counsel;
(4) it was not geographically restricted;
(5) it was conducted in both official languages and involved both male and female respondents;
(6) it was put forward as the basis on which the expert assessed the 'recognisability' of the word OPUS in the survey "universe."

*Mattel, Inc. v. 3894207 Canada Inc.* 2006 SCC 22.

**Circumstances:** Mattel opposed the applicant's registration of the mark "Barbie's" in association with restaurant services arguing a likelihood of confusion.

**Effects:** While the Court rejected the survey evidence in this case, it recognized that recent practice is to admit evidence of a survey of public opinion, presented through a qualified expert, provided its findings are relevant to the issues and the survey was properly designed and conducted in an impartial manner. With respect to the issue of relevance, the Court held that the survey evidence must be both reliable and valid in order to be admitted. Survey evidence can be used on issues of confusion and distinctiveness.

**Hyperlink**: http://scc.lexum.org/en/2006/2006scc22/2006scc22.pdf.

*Masterpiece Inc. v. Alavida Lifestyles Inc.* 2011 SCC 27.

**Circumstances:** Masterpiece Inc's application to expunge Alavida's registration was dismissed by the trial judge who concluded that no likelihood of confusion existed. The decision was upheld on appeal but the SCC held that Alavida's registration should be

18

expunged. Both parties had submitted survey evidence but the Court found both surveys to be unnecessary.

**Effects:** The Court held that for expert evidence to be accepted it must meet the 4 requirements of the *Mohan* test (citing *R v. Mohan,* (1994) 2 S.C.R. 9). These four requirements are
(1) relevance;
(2) necessity in assisting the trier of fact;
(3) the absence of any exclusionary rule; and
(4) a properly qualified expert.

The Court stated that surveys can be properly admitted to provide evidence on the issue of confusion and put particular emphasis on the "necessary" and "relevancy" requirements of the Mohan test. The Court found that where the "casual consumer" is not expected to be particularly skilled or knowledgeable, and there is a resemblance between the marks, expert evidence which simply assesses that resemblance will not generally be necessary. However, surveys have the potential to provide empirical evidence which demonstrates consumer reactions in the marketplace. This evidence is not something which would be generally known to a trial judge, and thus unlike other expert evidence, it would not run afoul of the "necessary" requirement. The Court stated that the use of survey evidence should still be applied with caution.

**Hyperlink:** http://scc.lexum.org/en/2011/2011scc27/2011scc27.pdf

Weighing probative value of survey evidence

A court will only consider expert evidence, including interpretations of market survey evidence, in any context if it is (1) relevant; (2) necessary in assisting the trier of fact; (3) is not excluded by any exclusionary rule; and (4) comes from a properly qualified expert.

Reliability, validity and relevance are the three useful criteria by which the probative value of survey evidence may be weighed[2156]. Organizations in Canada have published standards for producing reliable surveys[2167]. The Canadian Market Research industry has introduced an audited "Gold Seal" certification process to identify those organizations that consistently implement the published national standards.

**Reliability**

*Sample Size*

Using a large sample size will not necessarily change the "best estimate" obtained by the survey of the true population parameter; it will only change the precision – the size of the

---

[1526] *Mattel, Inc. v. 3894207 Canada Inc.*, [2006] S.C.J. No. 23, [2006] 1 S.C.R. 772 (S.C.C.).

[1627] The Canadian national professional society has published recommended best practices online at: < http://www.mria-arim.ca/STANDARDS/PublishResultsENG.asp>.

19

margin of error surrounding the estimate.  *Advertising Standards Canada* has published guidelines recommending a minimum sample size of 300 for large populations[1728].

*Choice of Pertinent Population*

The choice of survey universe depends on the population considered pertinent to the study.  The universe should include only those people whose views are relevant to a determination of the legal issue.

The identification of the "pertinent population" for a survey has proven to be one of the most critical aspects affecting the weight that courts have accorded a survey.  Surveys have been excluded where the population from which the sample was drawn was not considered to be the pertinent population[1829].

*The Survey Sample Should be Representative of the Pertinent Population*

Perfect random sampling of the Canadian population by telephone is impossible.  Mall surveys have been criticized as unrepresentative[1930].  At the time of writing, the Standards Committee of the Canadian Market Research and Intelligence Association expresses particular reservations about internet surveys based on large "sign-up" panels that offer incentives for continuing participation[2031].  There is an emerging trend toward "hybrid" methods of combining two sampling techniques if one technique is feared to exclude too important a segment of the pertinent population.

*Geographic Representativeness*

Whether results from major geographic groups in Canada can generally be applied to all of Canada is a matter for expert judgment and judicial discretion.  Trademark law does not necessarily require the whole of the pertinent population to be addressed for a survey to produce a relevant determination of a material part of the fact situation.

*Formulation of Questions*

The very act of asking the question can put an idea in consumers' minds that they may not have previously contemplated. A research designer must avoid leaping to a single direct closed-ended question on the main issue.  A research designer should establish whether the issue is even part of the consumer's impression.  Three ways of achieving this are as follows: asking a graduated series of questions which first establish whether the issue is even part of the consumer's impression, assuring in the introduction to the questionnaire that respondents are free to say that

---

[1728] Online at: <http://www.adstandards.com/en/Resources/guidelinesCompAdvertising-en.pdf> (last accessed March 18, 2008).

[1829] *Joseph E. Seagram & Sons v. Canada (Registrar of Trade Marks)*, [1990] F.C.J. No. 909, 33 C.P.R. (3d) 454 (F.C.T.D.); *New Balance Athletic Shoes, Inc. v. Mathews*, [1992] T.M.O.B. No. 358, 45 C.P.R. (3d) 140 (T.M.O.B.); *National Hockey League v. Pepsi-Cola Canada Ltd.*, [1992] B.C.J. No. 1221, 42 C.P.R. (3d) 390,. at 405 (B.C.S.C.); *McDonald's Corp. v. Coffee Hut Stores Ltd.*, [1994] F.C.J. No. 638, 55 C.P.R. (3d) 463, at 475 (F.C.T.D.).

[1930] *Joseph E. Seagram & Sons Ltd. v. Canada (Registrar of Trade Marks)*, [1990] F.C.J. No. 909, 33 C.P.R. (3d) 454, at 473 (F.C.T.D.); *National Hockey League v. Pepsi-Cola Canada Ltd.*, [1992] B.C.J. No. 1221, 42 C.P.R. (3d) 390, at 403 (B.C.S.C.).

[2031] Draft Canadian industry guidelines for professional conduct, posted online at: <http://www.mria-arim.ca/INDMEMBERSONLY/PDF/ProposedQualityStandard.pdf> (last accessed March 18, 2008).

they have no opinion on any given question, or offering an explicit "don't know" option in the list of possible responses offered to survey participants.

Courts have expressed preference for open-ended questions as they tend to be less leading[3212]. However, the risks of the suggestive nature of closed-ended questions can be mitigated by suitable control conditions, order rotations, and carefully managed question wording.

*Control of Non-Sampling Error*

Non-sampling error refers to the variability in the survey process that may naturally arise from the differences among interviewers and data analysts, or from different levels of diligence exercised over every aspect of controllable quality.  Some aspects of generally expected standards of quality control: interviewers should be well-trained, but should have no knowledge of the litigation or purpose of the survey; questionnaires should be pre-tested to confirm clarity and ease of administration; effort should be invested to optimize response rates; a portion of interviews should be monitored or verified for consistency; the expert should be involved hands-on for credibility; the time period for the survey should not be biased by seasonality or changing markets[3223]; and a portion of data entry, if applicable, should be verified to guard against human error.

*The Special Case of Coding Reliability*

It is necessary to categorize answers or parts of answers to open-ended questions into common themes or content through content analysis.  Coding involves some element of subjectivity, no matter how well-trained or experienced the coder.  Market research industry guidelines require a minimum of ten (10) percent of each coder's work to be verified.  Coding should be recognized as a summarization process for the benefit of the non-technical reader.

*Full Disclosure*

According to international professional standards, marketing research must always be carried out objectively, and in accordance with established scientific principles.  The assurance of reliability requires full disclosure of all procedures and results, or access upon request to all raw data, so that another scientist can attempt to replicate the results.

**Validity**

Validity is about the extent to which the survey captures a person's true opinions or behaviour. To maximize validity, surveys should: avoid inducements to response biases; avoid ambiguous wording and undue complexity; avoid distortions out-of-context[3234]; control against irrelevant reasons for responses[3245]; avoid order bias in the choice options; avoid open-ended word

---

[2132] S.S. Diamond, "Part II. Science and the Scientific Method: Chapter 7. Survey Research" (2005) 1. mod. Sci. Evidence § 7 2.1, at § 7.4.0.

[2233] *R. v. R. Hammer Ltd.*, [1987] F.C.J. No. 148, 87 D.T.C. 5139 (F.C.T.D.) (giving little weight to survey evidence gathered outside of the relevant season).

[2334] *Joseph E. Seagram & Sons Ltd. v. Canada (Registrar of Trade Marks)*, [1990] F.C.J. No. 909, 38 F.T.R. 96 (F.C.T.D.) (stating that the court was not persuaded by the survey, expressing concern "that the questions and responses were given in an artificial environment which can hardly be described as reflective of reality").

[2435] *Labatt Brewing Co. v. Molson Breweries*, [1996] B.C.J. No. 2191, 73 C.P.R. (3d) 544 (B.C.S.C.) (ruling Labatt's survey evidence inadmissible for the absence of a control condition, among other weaknesses).

21

associations[3256]; pre-test questionnaires to ensure that respondents understand them in the way they were intended; avoid drawing conclusions from the null hypothesis, which has no bearing on confusion[3267]; make alternatives explicit, with the possible exception of "don't know;" and permit appropriate freedom of expression, combining open-ended and closed-ended questions[3278].

## Relevance

Relevance is the lawyer's responsibility, in setting a mandate for evidence to be collected, to ensure that a sound and defensible connection exists between the burden in law and his or her instruction to his or her experts.  Relevance depends on that connection.

### Standard of admissibility for survey evidence

Courts have imposed high standards of admissibility for survey evidence[3289].  In Canada, they include the requirement to disclose, among other things, the method of recording data, the raw data itself, the questions asked, how they were asked[4290], the instructions to the interviewer, and arguably the instructions to the survey expert[4301].  In short, a party who tenders a survey must disclose a great deal about how the survey was conducted, much of which will come out of otherwise privileged material.  It is a practical requirement that makes privilege a somewhat superfluous issue.

## Trademark Proceedings

### Likelihood of Confusion and Survey Evidence

The likelihood of confusion as to the economic origin of the goods is determined by an assessment based on the likely public reaction to the two marks.  Surveys may be used to determine this assessment by reference to the average consumer.  Specifically, survey evidence can be helpful with respect to the extent to which trademark has become known, the degree of resemblance between the trademarks or trademark names in appearance or sound or in the ideas suggested by them, and whether confusion is likely to occur in the marketplace.

---

[2536] *Walt Disney Productions v. Fantasyland Hotel Inc.*, [1994] A.J. No. 484, 20 Alta. L.R. (3d) 146 (Alta. Q.B.), affd. [1996] A.J. No. 415, 38 Alta. L.R. (3d) 441 (Alta. C.A.) (holding that the survey evidence showing an association between the hotel and plaintiff did not by itself lead to a conclusion of confusion).

[2637] *Kirkbi A.G. v. Ritvik Holdings Inc.*, [2002] F.C.J. No. 793 (F.C.T.D.) (deciding that a named source survey was evidence of non-confusion with no expert report to explain the error to the court).

[2738] *New Balance Athletic Shoes Inc. v. Matthews*, [1992] T.M.O.B. No. 358, 45 C.P.R. (3d) 140, at 147 (T.M.O.B.).

[2839] In the leading case on the admissibility of survey evidence, *Canadian Schenley Distilleries Ltd. v. Canada's Manitoba Distillery Ltd.* (1975) 25 C.P.R. (2d) 1 (F.C.T.D.), Cattanach J. established a set of criteria to consider, saying at 9: "In my view the admissibility of survey evidence and the probative value of that evidence when admitted is dependent on how the poll was conducted, the questions asked, how they were asked and how they were framed and what purpose the evidence is to be used for."

[2940] *Salada Foods Ltd. v. W.K. Buckley Ltd.*, [1973] F.C.J. No. 17, [1973] F.C. 120 (F.C.T.D.).

[3041] *Joseph E. Seagram & Sons Ltd. v. Canada (Registrar of Trade Marks)* (*sub nom. Joseph E. Seagram & Sons Ltd. v. Seagram Real Estate Ltd.*), [1990] F.C.J. No. 909, 38 F.T.R. 96 (F.C.T.D.). See also *Walt Disney Productions v. Fantasyland Hotel Inc.*, [1994] A.J. No. 484, 20 Alta. L.R. (3d) 146 (Alta. Q.B.), affd. [1996] A.J. No. 415, 38 Alta. L.R. (3d) 441 (Alta. C.A.).  One of the criticisms of the procedure was that the interviewer knew the client's identity.  This suggests a need for independence between the front-line interview team and the client, in order to avoid even inadvertent bias in the tone of questioning survey respondents.

Exhibit H, Page 253

*Resemblance*

A survey should be designed to elicit a consumer's first impression by the use of open-ended questions, in other words, see what the stimulus would evoke in the mind of the person to which it is exposed[4312]. For example, the question "What first comes to mind when you see this?" may be asked. After the respondent has provided an answer to the open-ended question, a probing question as to the respondent's first answer should be introduced. This probing question can provide insight into why the respondent did, or did not, mention the plaintiff's mark. In summary, an inference of resemblance or other form of linkage from a word-association question should be reinforced by additional evidence of respondents' states of mind.

*Confusion*

A likelihood of confusion survey, based on the named-source test (the hypothesis being that the owner of the senior mark will be named) is only effective if the manufacturer/owner source is a recognized name. The named-source design would not be effective in the situation where the consumer is still likely to be confused as to the source, but where the name of the source is unknown.

In addition, a likelihood of confusion survey must be designed such that a true cause and effect inference can be drawn. For example, in <u>*Cartier Inc. v. Cartier Optical Ltd*</u>.[4323], the defendant operated and advertised using the mark "Lunettes Cartier" in association with eyeglasses. The plaintiff, a well-known jewelry company, provided a survey in which respondents were shown actual advertisements with the impugned mark. The respondents were asked to name the manufacturing company behind the product shown in the advertisement. More than half of the respondents had the opinion that the company was named "Cartier." However, in this survey, the expert must be able to rule out the possibility that when people were asked to name the manufacturing company, they were not simply repeating the name on the advertisement. Thus, surveys must be designed so that it can be unambiguously concluded that respondents answering a question meant the company rather than the name on the advertisement. A further "probe" question may be used to mitigate this problem and to ensure an understanding of what the respondents meant.

Surrounding Circumstances

The trier of fact in a trademark dispute is required to take into consideration any other surrounding circumstances that may be relevant to determining whether there is a likelihood of confusion.

*Doctrine of Foreign Equivalents*

Under United States trademark law, the doctrine of foreign equivalents holds that foreign language word marks must be translated into the English language as part of the comparison of meaning. The Federal Court of Canada has to date rejected this doctrine's application in Canada[4334], as has the Trademarks Opposition Board[4345]. Although not significantly altering the

---

[3142] *Canada Post Corp. v. Mail Boxes Etc. USA Inc.* [1996] T.M.O.B. No. 238, 77 C.P.R. (3d) 93, at 103 (T.M.O.B.).

[3243] [1988] F.C.J. No. 266, 20 C.P.R. (3d) 68, at 77-78 (F.C.T.D.).

[3344] *Krazy Glue Inc. v. Group Cyanomex S.A. de C. V.*, [1992] F.C.J. No. 957, 45 C.P.R. (3d) 161, at 173 (*sub nom. Jadow (B.) & Sons Inc. v. Grupo Cyanomex, S.A. de C. V.*) (F.C.T.D.).

23

state of law with respect to the applicability of the doctrine of foreign equivalency, the holding of the Federal Court in the decision of _Cheung Kong (Holdings) Ltd. v. Living Realty Inc_[4356]_._ is worth making note of, as this decision appears to narrow the holding of the court in _Krazy Glue_. The court in _Cheung_ interpreted the _Krazy Glue_ decision to not categorically rule out the possibility that, on the appropriate evidence, the existence of a substantial number of speakers of a particular language among the consumers of the wares could not have displaced the linguistic knowledge that can be attributed to the population as a whole.  In effect, by selecting a group of consumers who were able to translate both marks into a common language, the court arrived at the same conclusion that they would have with respect to confusion, had they applied the doctrine of foreign equivalents and assessed confusion amongst the population as a whole.

### Historic Terms

The average Canadian is not assumed to know the historic meaning of some words.  For example, when deciding whether there was a likelihood of confusion between Iron Duke and Grand Duke, a Canadian court noted that Iron Duke was historically applied to the Duke of Wellington, who lived some 180 years ago.  It was not "_obvious. . . that Canadian consumers would associate the term 'IRON DUKE' with the Duke of Wellington._"[4367]   The issue of meaning attributed to possibly historic terms is an area well suited to survey evidence.

### Two Official Languages

Because Canada is a bilingual nation and the Trademarks Act creates a national register of trademarks, the criteria of section 6(5) of the Trademarks Act must be analyzed with respect to both the English and French languages.  If an English-speaking individual would be confused, but a French-speaking consumer would not because of a difference in pronunciation or meaning attributed to the word mark in the two languages, this should be sufficient for a finding of a likelihood of confusion overall[4378].

### Bilingual Version Test

Aside from assessing if the average anglophone or francophone would find two marks confusing, the court should consider whether or not the average bilingual person would be confused[4389].  However, the bilingual version test is not determinative in deciding the question of confusion as "_the criteria laid down in s. 6(5) must also be applied before arriving at the ultimate or final_

---

[3445] _Krazy Glue Inc. v. Group Cyanomex S.A. de C. V._, [1989] T.M.O.B. No. 241, 27 C.P.R. (3d) 28, at 37 (T.M.O.B.), affd. [1992] F.C.J. No. 957, 45 C.P.R. (3d) 161 (_sub nom. Jadow (B.) & Sons Inc. v. Grupo Cyanomex, S.A. de C. V._) (F.C.T.D.).

[3546] [1999] F.C.J. No. 1966, [2000] F.C. 501 (F.C.T.D.).

[3647] _Corby Distilleries Ltd. v. Wellington County Brewery Ltd._, [1995] F.C.J. No. 264, 59 C.P.R. (3d) 357 (_sub nom. Wellington County Brewery Ltd. v. Corby Distilleries Ltd._) (F.C.T.D.).

[3748] See _Assessoires d'auto Nordiques Inc. v. Canadian Tire Corp._, [2005] T.M.O.B. No. 43 (T.M.O.B.), quoting _Smithkline Beecham Corp v. Pierre Fabre Medicament_, [2001] F.C.J. No. 225, 11 C.P.R. (4th) 1 (F.C.A.).

[3849] For _e.g._, _Gilbey Canada Inc. v. Joseph E. Seagram & Sons Inc._, [1986] T.M.O.B. No. 69, 8 C.P.R. (3d) 571, at 572 (T.M.O.B.); _Vins La Salle Inc. v. Vignobles Chantecler Ltée_ (1985), 6 C.P.R. (3d) 533 (T.M.O.B.); _Ferrero S.p.A. v. Produits Preddy Inc._, [1986] F.C.J. No. 964, 20 C.P.R. (3d) 61, at 65 (F.C.T.D.), affd. (1988), 22 C.P.R. (3d) 346, 24 C.I.P.R. 189 (F.C.A.); _Au Petit Goret (1979) Inc. v. Courtex Courtier en Alimentation_, [2000] T.M.O.B. No. 7, 5 C.P.R. (4th) 250 (T.M.O.B.); _SmithKline Beecham Corp. v. Pierre Fabre Medicament_, [2001] F.C.J. No. 225, 11 C.P.R. (4th) 1, at paras. 7-8 (F.C.A.); see also _Accessoires d'auto Nordiques Inc. v. Canadian Tire Corp._, [2005] T.M.O.B. No. 43, at para. 27 (T.M.O.B.).

24

*determination*"[390].   Survey evidence may be particularly helpful in showing whether the bilingual version test has been satisfied.

## Family of Marks Doctrine

When trademarks that have a common component or characteristic are all registered in the name of one owner, the situation gives rise to the presumption that these marks form a family of marks used by the one owner, and that the registration of such marks is tantamount to a single registration combined of those several marks[401].   The existence of a family of marks has been held to be a most material consideration when determining likelihood of confusion[412]. Generally, when there exists a family of marks, the owner is entitled to a broader ambit of protection for the common characteristic than would otherwise be the case if there existed only one registration[423].A party seeking to take advantage of the wider scope of protection accorded to a family of trademarks must first establish use of the trademarks that comprise the family. Survey evidence may be particularly well suited for examining the issue of whether a family of marks does in fact exist.

## Reputation, Distinctiveness and Secondary Meaning

Establishment of reputation, distinctiveness, or secondary meaning in a name or mark determines the owner's latitude in protecting it.

### Survey Approaches – Reputation and Distinctiveness

Survey evidence may be used to establish either remarkably high or relatively small, geographically limited awareness of a name or mark[434].

### Survey Approaches – Secondary Meaning

Surveys in disputes regarding secondary meaning of a word or term must test whether the relevant population associates the terms with a particular source.   For example, in *Carling Breweries Ltd. v. Molson Cos. Ltd.*,[445], Molson sought to register CANADIAN as a trademark for use in association with beer.  Molson had been using CANADIAN in association with beer products since 1959.  Carling Breweries opposed the registration on the ground that the word "Canadian" is a word in common use by manufacturers of beers, serves to distinguish the place of origin of the product, and is not distinctive of wares of any particular entity.

---

[3950] *Ferrero S.p.A. v. Produits Freddy Inc.*, [1986] F.C.J. No. 964, 20 C.P.R. (3d) 61, at 65 (F.C.T.D.), affd. (1988), 22 C.P.R. (3d) 346, 24 C.I.P.R. 189 (F.C.A.).

[4051] *Aciers v. Registrar of Trade Marks*, [1977] F.C.J. No. 179, 39 C.P.R. (2d) 284, at 287 (F.C.T.D.); *Stiefel Laboratories (Can.) Ltd. v. I.C.N. Canada Ltd.*, [1977] Q.J. No. 101, 38 C.P.R. (2d) 182 (Que. S.C.); *McDonald's Corp. v. Yogi Yogurt Ltd.*, [1982] F.C.J. No. 701, 66 C.P.R. (2d) 101, at 112-13 (F.C.T.D.); *Kimberly-Clark of Canada Ltd. v. Molnlycke AB*, [1982] F.C.J. No. 4, 61 C.P.R. (2d) 42, at 47-48 (F.C.T.D.).

[4152] *McDonald's Corp. v. Yogi Yogurt Ltd.*, [1982] F.C.J. No. 701, 66 C.P.R. (2d) 101, at 112-13 (F.C.T.D.).

[4253] See, *e.g., Panavision Inc. v. Matsushita Electric Industrial Co.*, [1992] F.C.J. No. 19, 40 C.P.R. (3d) 486, at 496 (*sub nom. Matsushita Electric Industrial Co. v. Panavision Inc.*) (F.C.T.D.).

[4354] RUTH CORBIN & A. KELLY GILL, SURVEY EVIDENCE AND THE LAW WORLDWIDE 182 (2008).

[4455] *[1984] F.C.J. No. 186, 1 C.P.R. (3d) 191 (F.C.T.D.), affd. [1988] F.C.J. No. 10, 93 N.R. 25 (F.C.A.).*

25

In response to Carling's opposition to its proposed registration of "Canadian," Molson filed survey evidence seeking to establish that the word "Canadian" had become distinctive of its beer product by reason of its extensive use and advertising.  The survey evidence entailed having interviewers pose as restaurant and bar customers, who asked the servers for "a Canadian."  In the majority of cases, they were served a Molson's beer of the brand.  The opposition was initially decided in Molson's favor.

On appeal to the Federal Court, Carling successfully overturned the Opposition Board's decision.  Justice Strayer raised doubts about the value of the survey research, and put more stock in criticisms of the research raised by the opponent's expert.  One of the more significant criticisms was that the restaurant servers are used to deciphering limited cues about what people want when they order, and so are an inappropriate population for distinctiveness.  Another criticism was that the request for a "Canadian" was made in the context of requests by other people at the table for other brands of beer.  This context of ordering by brand was thought to give too significant a clue to the servers about the nature of the product being ordered.  What Molson's ought to have done, suggested Strayer J., was to survey the actual consumer who used the product in order to determine whether "Canadian" had become distinctive of Molson[5456].

---

[45][56] *[1984] F.C.J. No. 186, 1 C.P.R. (3d) 191, at 197-98 (F.C.T.D.), affd. [1988] F.C.J. No. 10, 93 N.R. 25 (F.C.A.).*

26

## APPENDIX 3: MEXICO

| | |
|---|---|
| Jurisdiction: | Mexico |
| Summary: | Survey evidence is permissible under Mexican Industrial Property Law. |
| Official guidance: | None available |
| Relevant case law: | No specific guidance but some limited examples of where it has been used successfully are available. |
| Approximate costs to produce survey: | No information available. |

**Overview**

Mexican Industrial Property Law allows a party to rely on market survey evidence.  Instances are rare but have been known in the context of:

1   an application for a Declaration of Notoriety or Fame;

2   prosecution of a trademark application;

3   cancellation actions;

4   brand valuation;

5   infringement litigation; and

6   enforcement actions.

**Case law**

In respect of the Declaration of Notoriety or Fame, the petitioner must file the following information:

1. market research indicating a sector of the public, i.e. actual or potential consumers, who recognize the well-known or famous mark in connection with those products or services to which it is applied;

Exhibit H, Page 258

2. market research indicating a sector of the public, other than actual or potential consumers, who recognize the well-known or famous mark in connection with those products or services to which it is applied;

3. market research indicating business circles dealing with the type of goods and/or services to which the mark is applied who recognize the well-known or famous mark in connection with those products or services to which it is applied; and

4. the geographic area in which the mark is known.

Examples of when market survey evidence has been used can be found in the public records available at the Mexican Trade Mark Office for the following cases of Declaration of Notoriety or Fame:

| Reg No. | Trademark | Type of Declaration |
|---------|-----------|---------------------|
| 739383 | ANDREA | Well-known mark |
| 164548 | BARCEL | Well-known mark |
| 1039899 | CINEPOLIS | Famous mark |
| 95836 | GANSITO | Famous mark |
| 261268 | MARINELA | Famous mark |
| 848424 | RED BULL | Famous mark |

28

## APPENDIX 4: SOUTH AMERICA – OVERVIEW

Except for Argentina, where courts have expressly rejected opinion poll surveys as a means of proving likelihood of confusion, most Latin American countries accept the use of surveys in litigation but they are _not_ commonly used, at least not to the extent that say, they are used in the US.

Throughout Latin America, IP attorneys in trademark disputes, have not been encouraged to present likelihood of confusion type of surveys because the judges in these countries take a more active role in determining whether the marks are similar or not, according to his or her own impressions as a consumer. However opinion-poll type surveys have been used more widely to support a claim that a trademark is famous. One way or the other, most Latin American courts _allow_ the parties to present opinion poll surveys but trademark attorneys use this tool in fewer than 10% of trademark cases. In some countries e.g. Colombia this can be a bit higher, perhaps in up to 30% of cases.

The high cost for this type of survey is another reason why parties choose not to present opinion poll surveys. In Chile, this kind of survey cannot be obtained for less than US$10,000, which is likely to be the cost of the lawsuit in its entirety (for one of the parties).

The way the judiciary seems to value surveys varies from country to country: Colombia and Peru believe a judge would give a lot of weight to a survey, if presented (making the survey responsible for 80% or above of the final outcome). Brazil, Chile and Uruguay believe the judge would give a balanced weight to a survey, if presented (50%). Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua and Venezuela believe the judge would give little or no weight at all to a survey, if presented (less than 30%).

29

**APPENDIX 5: ARGENTINA**

| Jurisdiction: | Argentina |
|---|---|
| Summary: | There is no legislation, official guidance nor case law for the use of market survey evidence in trademark matters in Argentina.  The courts have expressly rejected opinion poll surveys as a means of proving likelihood of confusion. |
| Official guidance: | None. |
| Relevant case law: | None. |
| Approximate cost to produce a survey: | No information available. |

**APPENDIX 6: BOLIVIA**

| | |
|---|---|
| Jurisdiction: | Bolivia |
| Summary: | Survey evidence may be submitted but there is little guidance as to in what form and to what extent it will be permitted. |
| Official guidance: | None. |
| Relevant case law: | None. |
| Approximate cost to produce a survey: | No information available. |

Decision 486 (Andean Community Law which is applicable in Bolivia) states what kind of evidence might be used in order to prove use but does not mention the use of surveys.

> *Article 167 - The holder of a registration shall be responsible for the burden of proof regarding the usage of the trademark. The usage of a trademark may be attested by commercial invoices, accounting documents or auditing certificates that demonstrate the regularity and quantity in which the goods identified by the trademark are marketed.*

31

**APPENDIX 7: BRAZIL**

| Jurisdiction: | Brazil |
|---|---|
| Summary: | Survey evidence is admissible but its probative value is open to scrutiny and may be criticized if the expert is not appointed by the court. |
| Official guidance: | Limited – well known marks only. |
| Relevant case law: | None. |
| Approximate cost to produce a survey: | No information available. |

**Overview**

Survey evidence is admissible but its probative value is open to scrutiny and may be criticized if the expert is not appointed by the court.

**Official guidance**

Brazilian Patent and Trade Mark Office's Resolution Nº 121/05 05 (Art. 4, items 3 and 4) issued on June 9th, 2005 by the National Institute of Industrial Property – INPI, provides guidelines to apply for the "highly-renowned" declaration of a trademark.

According to Brazilian law, the "highly-renowned" status of a trademark is declared by the Brazilian Patent and Trade Mark Office and, once the mark is declared as "highly-renowned", it enjoys a special protection in all fields of activities. Still according to the law, the marks must be registered in Brazil to deserve such a protection.

The declaration is applied for on an opposition (against a pending application) or on Administrative Nullity Proceedings (against a granted registration).

According to the Brazilian Patent and Trade Mark Office's resolution, the owner of the trademark is entitled to submit evidence intended to prove the "highly-renowned" status of the mark, including, but not limited to market surveys to identify the following:

32

1   percentage of users or potential users of the goods and services identified by the mark who, immediately and spontaneously, identify the trademark with the products or services to which the trademark applies, or that recognize the trademark as a result of its tradition and quality;

2   percentage of users of other market segments who, immediately and spontaneously, identified the trademark with the goods covered by it; and

3   percentage of users of other market segments who, immediately and spontaneously, identify the trademark with the products or services to which the trademark applies, or that recognize the trademark as a result of its tradition and quality.

**Case law**

Some decisions have been rendered to recognize the "highly-renowned" status of marks in Brazil.

In judicial cases the survey is typically conducted by a court expert after one of the parties requests it to the judge. Besides this, it is also possible that the party conducts the survey independently, thru a specialized individual or entity, and attaches it to the case files. In this case, however, even being admitted as evidence, the other party may challenge the validity of the survey under the argument that it was not conducted by an impartial expert appointed by the judge. As a result, the market survey has limited acceptance in judicial cases when it is not conducted by a court expert.

33

## APPENDIX 8: COLOMBIA

| | |
|---|---|
| Jurisdiction: | Colombia |
| Summary: | Survey evidence is accepted in all manner of trademark matters. |
| Official guidance: | Some limited guidance available. |
| Relevant case law: | Yes, limited. |
| Approximate cost to produce a survey: | No information available. |

**Overview**

Despite any express provision in Colombian or Andean Community legislation, market research and consumer survey evidence are taken into account by the Columbian Patent and Trade Mark Office as well as the Columbian courts for all manner of trademark actions.

For instance, several Prejudicial Interpretations of the Andean Community Tribunal of Justice, as well as in several Resolutions issued by the PTO have been issued which allow survey evidence to prove the notoriety of a trademark.

**Case law**

Resolution N° 14 dated July, issued in connection with dossier No. 08 – 13355, and Prejudicial Interpretation issued under procedure No. 107-IP-2011.

Resolution No. 51330 dated 24 September 2010 issued in connection with dossier No. 2006074219.  In this case, market surveys supported the evidence provided by the company Productos Familia S.A., in order to demonstrate the notoriety of its trademark FAMILIA no. 266420, in Class 16, in connection with "*toilet paper, paper napkins, and paper towels*", took place on 2010. The PTO declared the notoriety of such sign.

Resolution N° 52838 dated 21 October 2009, by means of which supported among others in the TOP OF MIND Surveys and market research studies, the PTO recognized the notoriety of

34

trademark COLMENA in the name of FUNDACIÓN SOCIAL, to cover financial services in Class 36, issued under dossier N° 08 – 13355.

<u>Resolution No. 028644</u> dated 7 September 2007, by means of which the PTO declared the notoriety of trademark JUAN VALDEZ.

35

## APPENDIX 9: PANAMA

| Jurisdiction: | Panama |
|---|---|
| Summary: | Survey evidence is admissible and governed by the Procedural Code on documentary evidence. |
| Official guidance: | No specific guidance. |
| Relevant case law: | Yes but very limited. |
| Approximate cost to produce survey: | No information available. |

**Overview**

Survey results are commonly used as evidence in opposition and cancellation proceedings at court but rarely in prosecution before the Panama Patents and Trade Marks Office. The probative value of the evidence is assessed according to the Procedural Code.

**Case law**

*Sanrio Company Ltd. vs. Jocker Trading Corp, 30 September 2002* CHOCOCAT & Device in class 18, 25 and 28

The Court accepted a worldwide poll from the Internet site Brandchannel.com made between November 15 and December 31, 2001 in which the trademarks Hello Kitty and its friends are emphasized.  It helped to prove the degree of diffusion of Sanrio's goods and figures.  The applicant filed a withdrawal of its identical trademarks Chococat.

36

**APPENDIX 10: PERU**

| | |
|---|---|
| Jurisdiction: | Peru |
| Summary: | Survey evidence is admissible but economics dictates that they are used infrequently. |
| Official guidance: | None. |
| Relevant case law: | Limited examples - no official general precedent. |
| Approximate cost to produce survey: | No information available. |

37

## APPENDIX 11: URUGUAY

| Jurisdiction: | Uruguay |
|---|---|
| Summary: | No guidance is available. |
| Official guidance: | None. |
| Relevant case law: | None. |
| Approximate cost to produce survey: | No information available. |

38

**APPENDIX 12: VENEZUELA**

| Jurisdiction: | Venezuela |
|---|---|
| Summary: | No guidance is available. |
| Official guidance: | None. |
| Relevant case law: | None. |
| Approximate costs to produce survey: | No information available. |

39

## APPENDIX 13: BELGIUM

| Jurisdiction: | Belgium |
|---|---|
| Summary: | Survey evidence is admissible. |
| Official guidance: | Some limited guidance published by the Benelux Office for Intellectual Property on the examination of trademarks on absolute grounds: *Directives en matière de critères d'examen des marques pour motifs absolus*. |
| Relevant case law: | Some limited case law. |
| Approximate costs to produce survey: | No information available. |

**Overview**

Despite a lack of domestic legislation or official guidance on the issue, survey evidence is accepted in the Belgian courts and in proceedings before the Benelux Office for Intellectual Property.  It is often used to prove that a trademark has acquired the necessary acquired distinctiveness for registration or that it has a certain reputation. No permission is required to rely on market survey evidence.

**Official guidance**

In its guidelines for the examination of trademarks on absolute grounds, *Directives en matière de critères d'examen des marques pour motifs absolus*, of 1 January 2009, the Benelux Office for Intellectual Property merely states that one may consider performing a market survey in order to verify whether a trademark has acquired distinctiveness through use.

**Case law**

In *Tempur Benelux B.V. / Bemo N.V.* Brussels Court of Appeal of 31 January 2012, survey evidence was used before the Belgian courts to prove the reputation of a mark.

In Case *BVBA Nightlink / Benelux Organisatie voor de Intellectuele Eigendom* of 6 October 2009, the Brussels Court of Appeal accepted market surveys to prove acquired distinctiveness

40

through use of trademarks and acknowledged that such a survey was not mandatory to prove such distinctiveness.

41

## APPENDIX 14: FRANCE

| Jurisdiction: | France |
|---|---|
| Summary: | Survey evidence is admissible at the judge's discretion. No specific domestic legislation or official guidance exists. |
| Official guidance: | None. |
| Relevant case law: | No specific guidance but examples of where it has been used successfully are available. |
| Approximate costs to produce survey: | No information available. |

**Overview**

In general, parties may submit survey evidence in support of their position. However, a judge has ultimate discretion over its relevance and admissibility. As a consequence, a survey should form part of a broader body of evidence.

Survey evidence tends to be confined to the establishment of a mark as well-known or in response to a claim for invalidity.

**Official guidance**

No official guidance exists.

**Case law**

Market survey evidence as proof of use

Court of Appeal, Lyon, 23 February 2012, *Cour d'appel Lyon, Chambre civile 1 A, JurisData 2012-006655, LexisNexis*:

In the above case, the court established notoriety of a mark invoked in an action based on its lack of use. A survey conducted by recognized institutes proved the high recognition level of the mark PARIS 1ère. Nevertheless, the word mark PARIS 1ère is rarely

42

mentioned in the exhibits provided by the owner of the mark who does business using the other contested figurative marks. It was necessary to show the notoriety of the figurative mark in order to prove the likelihood of confusion in a trademark infringement action.

Market survey evidence within invalidity proceedings

Court of Appeal, Paris, 10 September 2010, *Cour d'appel Paris, Pôle 5, chambre 2, JurisData 2010-018216*:

In this case, a survey was used to prove the validity of the figurative trademark KAROMAT.

In this poll conducted on a sample of consumers, the question was "Does the association of the colors yellow and black depict a mark of high pressure washers or cleaning appliances utilizing steam or apparatus for polishing soil or vacuum or sweeping?". 40 % of respondents replied affirmatively, referring to the mark in question.

However, the court found that the question was not objective enough since it implies that the combination of yellow and black is a trademark and that 40% constitutes a minority.

For these reasons, the court did not consider the identification function of the trademark in question fulfilled and the trademark was invalidated.

Market survey evidence in establishing the notoriety of a trademark

(*article L.713-5 of the French Intellectual Property Code* which relates to the special protection regarding well-known marks and various goods or services involved)

The courts do not usually refer solely to market survey evidence to prove the notoriety of a trademark. Notoriety is more frequently established by the long-standing use of the mark, the duration of the use, the budget assigned to advertising in papers and on TV, etc.

However, where the result of the survey is very low, between 0 and 10%, or very high, more than 90%, the courts may rely solely on this type of survey to judge the notoriety of the mark.

Tribunal de grande instance, Valence, 2 November 2004, *1ère chambre, Société des produits Nestlé SA (Suisse), Nestlé France vs Eyguebelle and Brasserie Distillerie du Mont-Blanc (RG2000/00953)*

In the above mentioned case the court used two elements in order to establish the notoriety of the mark MONT BLANC:

- A survey conducted in 1996 showed that the mark MONT BLANC had a customer awareness rate of 96%; and

43

- the media considered the mark as a genuine institution thanks to its long-standing use and its power to suggest childhood memories

Court of Appeal, Paris, 12 May 2004, *Cour d'appel Paris, 4ème chambre, section A, RG 2003/03335*

In this September 2003 case, a survey failed to prove the notoriety of the mark EBEL since less than 0.5 % of respondents to a survey replied "the mark EBEL" to the question "What marks designating clock and watch making goods do you know?". Moreover, only 9% mentioned "the mark EBEL" in reply to the question "Among these marks of clock and watch-making goods, which are the ones (names of marks) you know?".

The same survey was conducted in February 2004 and the percentages were 1% and 10%.

Due to the low consumer awareness rate, the judge did not consider that the mark EBEL was notorious.

Tribunal de grande instance, Paris, 14 November 2000, *3ème chambre, The Hilton International Co and SA Hilton International (France) vs SA Raclet*

A survey was used to prove the notoriety of the mark HILTON.

The decision followed both from a poll of the French public conducted in 1994 and from the wide dissemination of the advertisement done by Hilton, from press inserts and from a large marketing budget that the mark HILTON enjoyed prestige thanks to a long-standing consistent and significant use.

For these reasons using the mark HILTON to designate tents affects the attractive power of the mark owned by The Hilton International Co (tarnishment) and constitutes unjustified use of the protected mark by virtue of Article L.713-5.

Tribunal de grande instance, Paris, 19 March 1997, *3ème chambre, SA Jean Patou vs Société Zag Zeitschriften Verlag AG (Suisse) and Jurg Marquard Verlagsgesellschaft (Allemagne)*

The court in this case held that market survey results and the lack of investment in advertising did not prove the notoriety of the mark in question. Therefore, the plaintiff could not invoke article L.713-5 to invalidate a mark designating different goods (magazines).

The holding relied on the results of a survey conducted on a sample of 1,000 persons that found that the word JOY was not spontaneously perceived as a mark for the respondents. Another survey showed that 8% of the 2,354 respondents reported knowing the trademark JOY but that only 29% associated this mark with a perfume.

44

<u>Market survey evidence in establishing degeneration of a trademark</u>

*Article L.714-6 of the French Intellectual Property Code*

Court of Appeal, Paris, 31 October 2007, <u>*Alexandre Cammas et MMM! SARL vs Fleury Michon Traiteur SAS et Joël Robuchon*</u> *(Cour d'appel Paris, 4ème chambre, section A, RG                                                                                               2006-18963)*
<u>*http://www.legifrance.gouv.fr/affichJuriJudi.do?oldAction=rechJuriJudi&idTexte=JURI TEXT000018634243&fastReqId=1874475471&fastPos=1*</u>

In addition to the reference to the word mark in a dictionary and in press articles, a survey was used to prove that in the public's mind, the word FOODING refers to a new culinary trend (almost three-quarters of respondents to the poll). Thus, the judge ruled the degeneration of the mark FOODING, designating restaurant services in particular.

45

**APPENDIX 15: GERMANY**

| | |
|---|---|
| Jurisdiction: | Germany |
| Summary: | Substantial guidance is available to ensure survey evidence is admissible. |
| Official guidance: | *Examination Directive for Trademark Applications - Prüfungsrichtlinie für Markenanmeldungen,* part 5.17, available via the German Patent and Trademark Office (Deutsches Patent- und Markenamt) - www.dpma.de. |
| Relevant case law: | There is substantial case law as discussed in more detail below. |
| Approximate costs to produce survey: | No information available. |

**Overview**

Market surveys may be used as evidence in a broad range of trademark matters, including to establish whether there is a likelihood of confusion, whether a mark is sufficiently distinctive for registration, a mark's notoriety, whether a mark has a secondary meaning or has acquired distinctiveness and whether a trademark has been used as a sign of origin. A court will consider survey evidence only where it will assist the judge.

**Official guidance**

Market survey evidence to overcome objections to registration

Examination Directive for Trademark Applications - *Prüfungsrichtlinie für Markenanmeldungen*, part 5.17, available via the German Patent and Trademark Office (Deutsches Patent- und Markenamt) - www.dpma.de.

The Directive refers to the criteria of market surveys for proving acquired distinctiveness by use, Art. 7 par 3 CTMR. The requirements and demands on the market survey are

46

described in detail. However, still recent case law has to be considered and reviewed by an expert before making such survey.

The Federal Patent Court explicitly refers to possible flaws which have to be avoided in market surveys: cf. *Federal Patent Court (BPatG), GRUR* 2004, 61 *- BVerwGE.*

Further case law of interest with regard to the requirements of secondary meaning/acquired distinctiveness are as follows: *BPatG, GRUR* 2007, 324 – Kinder; BPatG, GRUR-Prax 2010, 30 – *ROCHER Kugel; BPatG, GRUR-Prax* 2010, 5629 – *Die Post*; German Federal High Court *(BGH), BIPMZ* 2001, 322, 324 – *REICH UND SCHÖN*; European Court of Justice (ECJ), C-108/97, GRUR 1999, 723, 727 – *CHIEMSEE*; BPatG GRUR 2007, 324, 328 – *Kinder schwarz-rot;* BGH GRUR 2009, 954 – *Kinder III,* No. 27, 33 ff.); BGH GRUR 2007, 1071 – *Kinder II,* No. 30.

*For s*hape trademarks see *BGH GRUR* 2007, 780 – *Pralinenform,* No. 37; *BGH GRUR* 2008, 510 – *Milchschnitte,* No. 25; *BGH GRUR* 2007, 235 – *Goldhase,* No. 25: qualified by *Frankfurt Appeal Court (OLG Frankfurt a. M.) GRUR*-RR 2008, 191, 192 – *Goldhase II;*

For colour trademarks see *BGH GRUR* 2004, 151, 153 – *Farbmarkenverletzung I; Hamburg Appeal Court (OLG Hamburg)* WRP 2009, 638, 643 – *NIVEA-Blau*.

## Case law

If a party seeks to rely on market survey evidence, two aspects must be considered:

   1   the circumstances in which evidence will be considered; and

   2   the form the evidence should take.

In what circumstances will market survey evidence be considered?

   1   Likelihood of confusion

Survey evidence will only be considered in cases where the expertise of the judges does not suffice to understand the consumer perception of the signs in question:

German Federal High Court (BGH), GRUR 2005, 423, 426 – *Staubsaugerfiltertüten*; BGH GRUR 2004, 239 – *DONLINE - market survey regarding dialect pronunciation;*

see also

European Court of Justice (ECJ), GRUR Int. 1999, 734 – *Lloyd,* No. 23, 24. Regarding the question whether a denial of an offered market survey provides a ground of appeal: BGH, GRUR 2006, 937 – *Ichthyol,* No. 27.

47

2   Notoriety/degree of distinctiveness

The question of notoriety is normally assessed by the court with help of provided proof of advertisement and turnover figures, cf. ECJ, GRUR Int. 2000, 73 − *General Motors Corporation*, No. 27; BGH: I ZB 48/05 − *Bull-cap*, No. 18, *notoriety of energy drink "RED BULL"*.

However, a market survey might be used as supplementary evidence in order to prove notoriety, cf. e.g. *ECJ, GRUR* 1999, 723 − *Chiemsee*, No. 53; *BGH GRUR* 2011, 1043 − *TÜV II*, No. 41, 48,

A market survey should be requested by the court in cases where there are indications that the expertise of the judges does not suffice for proper evaluation, cf. *BGH GRUR* 2008, 917 − *EROS*, No. 42; or where the legal assessment of the degree of distinctiveness is considerably difficult, as for example in cases of combined signs, cf. *BGH GRUR* 2008, 710 − *VISAGE*, No. 29, 38 et seq.

3   Trademark use − use as a sign of origin

Only in exceptional cases does the court consider market surveys in order to legally assess the question of trademark use; cf. e.g. *BGH GRUR* 2008, 505 − *TUC-Salzcracker*, No. 11.

4   Secondary Meaning/Acquired distinctiveness

In these cases market surveys are regularly allowed (see below).

<u>If a court will consider market survey evidence what form should it take?</u>

The preparation of a market survey is a difficult task where the concrete circumstances and the relevant case law have to be considered in detail. Guiding principles can be found in the following decisions:

1   Likelihood of confusion, cf. *BGH GRUR* 2006, 79, 82 − *Jeans I, No. 36; BGH GRUR* 2008, 505 − *TUC-Salzcracker*, No. 30.

2   Notoriety/Degree of distinctiveness:

*BGH GRUR* 2005, 513, 514 − MEY/Ella May*; BGH GRUR* 2004, 331, 332 − *Westie-Kopf*; *BGH GRUR* 2006, 760 − *LOTTO*, No. 23; *BGH GRUR* 2007, 1066 − *Kinderzeit*, No. 35; *BGH GRUR* 2009, 954 − *Kinder III*, No. 26; *BGH GRUR* 2008, 505 − *TUC-Salzcracker*, No. 29; *BGH GRUR* 2007, 1066 − *Kinderzeit*, No. 36; *BGH GRUR* 2007, 1071 − *Kinder II*, No. 30; *BGH GRUR* 2007, 235 − *Goldhase*, No. 25.

3   Use as a sign of origin:

48

*BGH GRUR* 2010, [138] − *ROCHER-Kugel*, No. 51; Federal Patent Court (BPatG) GRUR 2007, [324], [327] − *Kinder schwarz-rot*.

  4   Secondary meaning/acquired distinctiveness: see below.

Market surveys alone are unlikely to suffice as evidence. Mostly, market surveys are considered by the court as a supplementary argument only and further evidence should be provided.

Market survey evidence within opposition or invalidity proceedings

The use of market surveys in opposition and invalidity proceedings is not excluded. The Trademark Offices may consider all aspects which are credibly shown to the court, including possible market surveys regarding the degree of distinctiveness/notoriety of a trademark and respective scope of protection; cf. *European Court of Justice (ECJ) MarkenR* 2008, 261 − *Ferrero Deutschland*, No. 54/55; *BPatG, BeckRS* 2009, 03165 − *BAMBOLA − BamBoo*.

49

**APPENDIX 16: ITALY**

| | |
|---|---|
| Jurisdiction: | Italy |
| Summary: | Survey evidence is admissible but is likely to be disregarded if it lacks objectivity. |
| Official guidance: | None. |
| Relevant case law: | There is some limited case law as discussed in more detail below. |
| Approximate costs to produce survey: | No information available. |

**Overview**

Surveys are submitted to Italian judicial authorities as means of evidence in a broad range of trademark matters: secondary meaning (hence in invalidity proceedings) and possible deceitfulness and lack of use (both bringing to revocation thus invalidity proceedings again). A number of decisions have stated they play an important role in assessing the connection between a sign and a company and in the bringing confirmation of the change in the perception of the public of a certain word, from descriptive to distinctive. Surveys are widely used to support claims of prior local use, notoriousness and also the validity and essence of shape trademarks.

No domestic legislative source has specifically addressed the issue of market surveys in Italy. However, there are several key cases which set out the relevant criteria to be met. Opposition proceedings in Italy are relatively new so it is no surprise there is no availability of administrative precedents.

**Official guidance**

No official guidance exists.

**Case law**

50

<u>Market survey evidence as proof of use</u>

The Court of Justice of the European Union has indicated that national judicial authorities can request market surveys (C-108/97 e C-109/97) in their proceedings. This means that they can even be used as an instrument of assessment by the judge (i.e. as an assessment by an expert appointed by the judge). As a means of evidence brought by the party this instrument is commonly accepted and there is no need for permission to file this evidence in the proceeding. The judges are not compelled to stick to the conclusions resulting in the surveys, whose questions are often partial.

<u>Market survey evidence within opposition or invalidity proceedings</u>

In a case regarding the alleged deceitfulness of the trademark "*Parmacotto" (Rovagnati vs. Parmacotto, Court of Appeal of Bologna,* October 26 2000, published on Il Diritto Industriale no. 3/2001, pag. 247) a survey has been considered inadequate for the following reason. The survey was based on a numerical criterion without specifying the nature and quality of sample, the education and cultural level, the habits and expenditure power. In other words the judge was not put in the condition to build up his own concept of "average consumer" since the sample was not disaggregate enough. Under these conditions there is a risk the conclusions be tailored on the basis of the will of the claimant so the Court has disregarded the output of the survey.

In another case regarding the trademark "ZIPPO", (Court of Appeal of Milan of May 10 2002, published on *Giurisprudenza Annotata di Diritto Industriale*,4499/1) it is stated that evidence of non-use can be given also through "serious, precise and consistent presumptions". This was deemed not the case with reference to a case of a market survey conducted on a non-reliable sample, which did not include large distribution consumers.

51

**APPENDIX 17: OHIM**

| | |
|---|---|
| Jurisdiction: | European Union (OHIM) |
| Summary: | Survey evidence is commonly used for a broad range of purposes. |
| Official guidance: | [OHIM Manual of Trade Mark Practice](OHIM Manual of Trade Mark Practice) |
| Relevant case law: | Yes, judicial guidance is available. |
| Approximate costs to produce survey. | No information available. |

**Overview**

The European Union legislation which establishes the Community trademark right and the procedures of the Office for Harmonization in the Internal Market (OHIM) does not contain any explicit provisions relating to survey evidence. However, guidance as to the evidential requirements such evidence must meet has been developed by the OHIM and the courts.

Survey evidence is commonly used for the following purposes:

1 to prove that genuine use has been made of a trademark in opposition and cancellation proceedings;

2 to prove that an earlier trademark upon which an opposition is founded has a reputation in the EU member state concerned (if a national registration) or the EU (if a Community registration); and

Exhibit H, Page 283

3   to prove that a trademark has become distinctive in relation to the goods or services for which registration is requested in consequence of the use which has been made of it (to overcome an absolute grounds objection).

**Official guidance and case law**

Market survey evidence as proof of use

Part 6 of the OHIM Manual of Trade Mark Practice (dealing with proof of use) states at page 37:

> *According to Rule 22(4) CTMIR [*Commission Regulation (EC) No 2868/95*], the evidence shall be filed in accordance with Rules 79 and 79a and shall, in principle, be confined to the submission of supporting documents and items such as packages, labels, price lists, catalogues, invoices, photographs, newspaper advertisements, and statements in writing as referred to in Article 78 (1)(f) CTMR [*Council Regulation (EC) No 207/2009*]. Rule 22(4) CTMIR also allows market surveys and quotations of the mark in lists and publications of associations of the relevant profession as suitable means of evidence: OD 89/1999 *Bilatin/Viractin* (DE); OD 892/1999 *Quantor/Kontor* 7(EN).*
>
> *The requirement of proof of use always raises the question of the probative value of the submitted material. The evidence must at least have a certain degree of reliability. As a general rule, the OHIM considers material produced by third parties as being of a higher probative value than material produced by the owner himself or by his representative. Reference of the opponent to internal print-outs or hypothetical surveys or orders is particularly problematic. However, where material must regularly be produced for use by the public and/or authorities according to statutory rules, for instance, company law and/or Stock Exchange Regulations, and where it may be assumed that such material is subject to certain official verification, its probative value is certainly higher than ordinary "personal" material produced by the opponent."*

Market survey evidence within opposition proceedings

Part 5 of the OHIM Manual (dealing with opposing a Community trademark application on the basis that the earlier trademark has a reputation in an EU member state or the EU as a whole, as the case may be), provides the following guidance regarding survey evidence.

At page 16:

> *A similar question arises in the case of evidence that post-dates the filing date of the CTM application. Even though such evidence will not usually be sufficient on its own to prove that the mark had acquired a reputation when the CTM was filed, it is not appropriate to reject it as irrelevant either. Given that reputation is usually built up over a period of years and cannot simply be switched on and off, and that certain kinds of evidence (e.g. opinion polls, affidavits) are not necessarily available before the relevant date, as they are usually prepared only after the dispute arises, such evidence must be*

53

*evaluated on the basis of its contents and in conjunction with the rest of the evidence. For example, an opinion poll conducted after the material time but showing a sufficiently high degree of recognition might be sufficient to prove that the mark had acquired a reputation on the relevant date if it is also shown that the market conditions have not changed (e.g., the same level of sales and advertising expenditure was maintained before such opinion poll was carried out).*

Examples:

531/2001 *TELETHON/TELETOON (EN),*
2101/2001 *PYLORISET/Pyloritek*
1272/2002 *TOD'S(fig.)/TOD'S (EN)*

At page 29:

> *Opinion polls and market surveys are the most suitable means of evidence for providing information about the degree of knowledge of the mark, the market share it has, or the position it occupies in the market in relation to competitive products.*
>
> *The probative value of opinion polls and market surveys is determined by the status and degree of independence of the entity conducting it, by the relevance and the accuracy of the information it provides, and by the reliability of the applied method.*
>
> *More particularly, in evaluating the credibility of an opinion poll or market survey, the Office needs to know:*
>
> 1 *Whether or not it has been conducted by an independent and recognized research institute or company, in order to determine the reliability of the source of the evidence.*
>
> 2 *The number and profile (sex, age, occupation and background) of the interviewees, in order to evaluate whether the results of the survey are representative of the different kinds of potential consumers of the products in question. In principle, samples of 1000 – 2000 interviewees are considered sufficient, provided they are representative for the class of consumer concerned.*
>
> 3 *The method and circumstances under which the survey was carried out and the complete list of questions included in the questionnaire. It is also important to know how and in which order the questions were formulated, in order to ascertain whether the respondents have been confronted with leading questions.*

54

4 *Whether the percentage reflected in the survey corresponds to the total amount of persons questioned or only to those who actually replied.*

Examples:

1360/1999 CHARM/CHARMS (EN)
441/2002 BEBE/BÉBÉ (EN)
531/2001 TELETHON/TELETOON (EN)
1082/2001 KINDER/KINDER EM-EUKAL (EN)
1272/2002 TOD'S(fig.)/TOD'S (EN)

*Unless the above indications are present, the results of a market survey or opinion poll should not be considered of high probative value, and will not be in principle sufficient on their own to support a finding of reputation.*

*Likewise, if the above indications are given, but the reliability of source and method are questionable or the statistical sample is too small, or the questions were leading, the credibility of the evidence will be diminished accordingly. For example, a statistical sample consisting of 157 respondents, concerning swimwear in the Netherlands, has been considered quite small in relation to the overall population of that country.*

2273/2000 BEACHLIFE/BEACHLIFE (EN)

*Conversely, opinion polls and market surveys that* ***fulfill the above requirements*** *(independence and trustworthiness of source, reasonably large and widespread sample and reliable method) will be a* ***strong indication*** *of reputation, especially if they show a high degree of trademark awareness.*

531/2000 GALP/GALP (EN)
1389/1999 YVES ROCHER/YVES ROCHE (FR)
314/2000 SEMCO/SEMCO (EN)
3215/2000 MON CHERI/MONTXERI (EN)

At page 33:

*In general, the more diverse and complete the evidence is, the easier it will be to accept that the earlier mark has indeed acquired a reputation. For example, the following materials submitted in a case have been considered largely sufficient for establishing the reputation of the earlier mark:*

1 *background information about the history of the trademark and the marketing milestones since 1970;*
2 *an explanation of the advertising strategy with reference to the medium used and the audience rates reached (TV spots seen by 82% to 92% of the public in the relevant territory);*

3   *a video showing different publicity spots;*
4   *an assortment of advertisements in magazines;*
5   *photos of diverse sales points;*
6   *samples of packaging;*
7   *a study showing the development in market share from 1996 to 1998;*
8   *accounts of the marketing expenditure for the last 5 years;*
9   *three omnibus surveys (91%, over 1 282 people questioned);*
10  *an assortment of invoices from various years.*

Reputation was considered proved mainly through the combination of the information given by documents 1, 2, 7, 8 and 9.

2096/2001 *BUKO/BUKO (EN)*

Market survey evidence to prove acquired distinctiveness

Part B of the OHIM Manual provides the following guidance at page 54:

*Nature of evidence*

> *It is a matter for the applicant to decide on the nature of the evidence to present. While Article 76 (1) lists some examples it is not exhaustive. Examiners must be prepared to accept opinion polls, surveys, statements from the trade and consumer organizations, articles, brochures, samples, evidence of turnover and advertising and other types of promotion, of successful prosecution of infringers, of trademark registrations obtained, etc.*

*Assessment of the evidence*

> *When examining and deciding on the amount, nature etc. of use necessary the examiner must bear in mind the nature of the trade concerned, the manner in which the goods and services are provided and the relevant public, for example, whether they are specialized or for the general public. The extent to which the trademark is, on the face of it, lacking distinctive characteristics must be weighed against the evidence provided.*

*Opinion polls and surveys*

> *Well-conducted opinion polls, namely where the questions asked are relevant, and not leading, and the sample interviewed is properly chosen with no inbuilt bias are particularly persuasive. This applies in particular to such polls or surveys when they are carried out by independent and well-recognized organizations or institutions.*

Doctrine of the courts of the European Union

56

In *Windsurfing Chiemsee Produktions- und Vertriebs GmbH (WSC) v Boots- und Segelzubehör Walter Huber (C-108/97) and Franz Attenberger* (C-109/97), the highest European Union court, the Court of Justice of the European Union (formerly known as the European Court of Justice) held, at paragraph 53, that evidence may consist of an opinion poll (see also Case C-210/96 *Gut Springenheide and Tusky* [1998] ECR I-4657, paragraph 37).

More detailed guidance can be taken from several decisions of the General Court of the European Union (formerly known as the Court of First Instance)  Although no general rule or practice has been approved these cases are instructive and give some idea about the strictness of the CFI on this type of evidence.

In *Vitakraft-Werke Wührmann & Sohn GmbH & Co. KG v OHIM (Johnson's Veterinary Products Limited intervening),* Case T-277/04, the General Court held, at paras 38 to 39:

> Secondly, as regards the market surveys compiled in 1992 and 1997, it must be pointed out, first of all, that in order to have an unusually high level of distinctiveness as a result of the public's potential recognition of it, an earlier mark must, in any event, be familiar to the public on the filing date of the trademark application or, as the case may be, on the priority date relied on in support of that application (see, to that effect, Case T8/03 *El Corte Inglès v OHIM –Pucci (EMILIO PUCCI)* [2004] ECR II-4297, paragraphs 71 to 73, not appealed on those points). Nonetheless, it is not in principle inconceivable that a survey compiled some time before or after that date could contain useful indications, although it is clear that its evidential value is likely to vary depending on whether the period covered is close to or distant from the filing date or priority date of the trademark application at issue. Furthermore, its evidential value depends on the survey method used.
>
> In the present case the evidential value of the 1997 survey is weakened, as the Board of Appeal rightly observes, by the fact that the interviewees did not answer spontaneously, since the questionnaires used showed them the sign at issue and mentioned the goods. That finding is not called into question by the applicant's argument, first that it was necessary to specify the goods concerned to prevent the interviewees indicating trademarks for food intended for human consumption and, second, that a survey without any reference to the mark concerned leads to useful results only in cases where the marks enjoy a high degree of recognition ('berühmte Marken') (see paragraph 27 above). It would have been possible to mention to the interviewees the goods concerned without referring to the VITAKRAFT marks or to show them a list of different marks one of which was the earlier sign at issue .

In *BIC SA v OHIM,* Case T -262/04, the General Court held, at paragraphs 82 to 89:

> Lastly, so far as concerns the two surveys which were carried out by the applicant after the application for registration of the trademark had been filed, but during the administrative procedure, namely in July and November 2002, it must be noted that,

Exhibit H, Page 288

*according to the case law of the Court, evidence of the use of a mark which is adduced subsequent to the date of filing the application can be taken into account only if it enables the drawing of conclusions on the use of the mark as it was on that date (see, to that effect, the orders of the Court in Case C259/02 <u>La Mer Technology</u> [2004] ECR I-1159, paragraph 31, and Case C192/03 <u>P Alcon v OHIM</u> [2004] ECR I‑8993, paragraph 41).*

*In the present case the Court considers that it cannot be established from the surveys in question that the product in question was identified by the relevant public on the basis of the shape of the mark as originating from the BIC company rather than another company.*

*As for the survey of smokers in November 2002 in France, Italy, Ireland, Greece, Sweden and Portugal, the Court finds that a drawing or photograph of only BIC lighters, without any verbal or figurative features, was shown to the people who were questioned, and they were asked which mark they associated most with the image of that lighter. It cannot therefore be concluded that that survey shows that a significant proportion of French, Italian, Irish, Greek, Swedish and Portuguese consumers identifies, by means of the mark applied for, the product in question as originating from the BIC company rather than another company. It would have been another matter if different lighter shapes had been shown during the survey instead of the single shape of the trademark applied for. It would have been possible in that case to take into account the number of people who spontaneously and without being influenced attributed the picture of the shape in question to BIC.*

*Furthermore it must be pointed out that where the person questioned did not know how to respond, he or she was given a list of word marks (BIC, CLIPPER, TOKAÏ, CRICKET and others) and invited to select a response.*

*If it is true, as the applicant submits, that BIC was behind the creation of the market in disposable flint lighters in 1973 and is the market leader in lighters, then it was entirely logical and predictable that the first trademark that should come to mind would be the BIC mark, irrespective of the shape that was shown to those questioned. That was particularly relevant where the question put included a list of word marks which could be associated with the shape that was shown. In that regard it must be observed that the applicant itself admitted at the hearing that the responses to the question put could indeed have been influenced in that last scenario.*

*The same considerations apply in respect of the survey – again of smokers – carried out in Spain in July 2002. In that survey, an image of the shape of the MiniBIC J5 lighter, which is simply a smaller version of the shape of the trademark applied for, was shown to the people surveyed, together with a list of different word marks (BIC, CLIPPER, BRIO or TOKAÏ), in order to find out which mark they associated with the image shown. It cannot therefore be concluded that that survey shows that a significant proportion of Spanish consumers identifies the product at issue as originating from BIC and distinguishes that product from the products of other undertakings.*

58

> *In addition, the Court finds that the image of the lighter shown to the Spanish consumers who participated in that survey shows the lighter from the front and not from an angle, so that the people surveyed would not have been able to recognize the oval shape of the tank, although this is, according to the applicant, one of the three characteristics which distinguishes BIC lighters from other lighters on the market.*

> *It follows from all the foregoing considerations that the Board of Appeal was right to consider that the applicant had not shown that the trademark applied for in the present case had acquired distinctive character through the use which had been made of it in a significant part of the Community.*

The General Court has found that the evidence is insufficiently representative of the average consumer on some other occasions, for example, in *Castellblanch, SA v OHIM*, Case T-29/04, it held, at paragraphs 65 to 68:

> *It is apparent from the Gallup survey that the mark CRISTAL enjoys almost the same renown as the mark Dom Pérignon both in France and in Italy and the United Kingdom.*
> *The Gallup survey studied the 'reputation of prestige champagne vintages in France, Italy and in the United Kingdom' in February 1999. It is apparent from the part entitled 'Context, objectives and methodology' that the intervener's representatives wished to carry out a brand awareness survey of champagne of the mark CRISTAL 'among hotels, restaurants and upscale wine cellars' and that the 'information was collected from wine waiters or chief cellarmen in hotels, restaurants and upscale wine cellars'. In each of the countries studied 100 interviews were carried out.*

> *It must be noted that the survey shows the renown of the mark CRISTAL for only a part of the relevant public. It did not look into the renown of the mark CRISTAL amongst average consumers, but amongst professional consumers who, moreover, are highly specialized in the field. In addition, the other documents produced by the intervener also show renown only for a specialized public, since they are mostly extracts from specialist newspapers in the wine-producing business. It cannot be established from those documents that the mark CRISTAL enjoys a reputation amongst average French consumers".*

In some other cases, due to the heterogeneous nature of the EU market, and the number of different languages in the EU, attempts have been made to prove how the population of each country will pronounce a mark.

In *Devinlec Développement Innovation Leclerc SA v OHIM*, Case T-1147/03, having noted at paragraph 52:

> *As regards the phonetic comparison of the signs, the intervener submits that the syllable 'quan', which is common to them, will probably be pronounced differently by the average reference consumer. In addition, standard French*

59

*pronunciation puts the emphasis on the final syllables – which are radically different – of the signs. The intervener also disputes the results of the opinion survey produced by the applicant, in particular as regards whether it is truly representative and as regards the absence of any information on the level of education of those interviewed. On that latter point, the intervener states that such information would have been relevant in order to establish what proportion of consumers would pronounce the verbal element of the mark applied for taking into account the Latin origin of the word and therefore would pronounce it differently from the word 'quantième'.* "

the General Court went on to hold at paragraphs 88 to 89:

*Next, it should be noted that, first, as the Board of Appeal found, the meaning of the verbal elements of the signs will not be understood immediately by the average French consumer, in particular on account of the technical and specialized fields in which those terms are used. Admittedly, as the Board of Appeal states, it is possible that the average consumer perceives the word 'quantum' as a scientific term. However, that does not imply that he will ascribe to it a particular meaning.*

*Nevertheless, as the intervener rightly stated at the hearing, it is also appropriate, in that respect, to attach some importance to the objective circumstances in which the marks may be present on the market (see BUDMEN, cited in paragraph 74 above, paragraph 57, and Joined Cases T-117/03 to T-119/03 and T-171/03 New Look v OHIM – Naulover (NLSPORT, NLJEANS, NLACTIVE and NLCollection [2004] ECR II-0000, paragraph 49), in particular the circumstances in which watches and clocks are marketed. Those goods are generally sold through a salesperson who, in particular, will lavish advice on the buyer and will probably explain the technical details and design of the goods in question. In those circumstances, it is possible for the average consumer to be aware of the meaning of the verbal element 'quantième' in the earlier mark, which is particularly used in the watch and clock trade.*

*That is also the reason why, on the conceptual level, the results of the survey cited above, produced by the applicant, cannot be accorded as much importance as the latter claims. Although it is true that, of the number of persons questioned who ascribed a meaning to both words, more than 69% of the replies for the word 'quantième' and more than 45% of the replies for word 'quantum' referred to the notion of quantity, that survey, carried out at the home of each person questioned, did not take account of the objective circumstances in which the respective marks are present, or may be present, on the market.*

But the General Court does not always reject surveys, as in the well-known case of *Ampafrance SA v OHIM,* Case T-164/03, the General Court held at paragraphs 78 to 83:

*The documents in the case show that the IMAS survey was carried out in the months of October and November 1995. According to the document containing the survey, its purpose was to assess the rating of the trademark bebe among the German population. In*

60

*all, 2,017 people over the age of 16 were questioned orally. The results were set out in the form of percentages by reference to four different criteria: the total number of people questioned, gender, age (16 to 29, 30 to 49, over 50) and where they lived.*

*It should be pointed out that the applicant is wrong in asserting that no information is given about the composition of the group of people questioned. As has been stated, they were people aged 16 and over, men and women, divided into three separate age brackets, and living in almost all of the different Länder. Although the breakdown into those different categories is not given, there is nothing to show that those categories are not representative of the opinion of the average German consumer. Moreover, in the present case, a group of 2,017 people questioned should be regarded as being large enough to be representative.*

*Nor is it a matter of 'very rough percentages' as the applicant claims, since the results show, as OHIM contends, that the trademark bebe does indeed have a high degree of distinctive character. The results of the survey show that the trademark bebe was recognized by a significant section of the public on the German market before the application for a Community trademark was filed. According to Tables I and III of the survey, 64% of the people questioned recognized, that is to say, had already read or heard, the word 'bebe' in relation to body and face care preparations. Among women, 80% recognized the word. According to Tables II and IV, 66% of people who recognized the word (68% of women) thought that the term was used by a single manufacturer.*

*As regards the wording of the questions, which the applicant claims was not unbiased, it should be pointed out that, although the questions mentioned the word 'bebe', there is no reason to challenge the objective nature of the survey.*

*As regards the applicant's argument that the finding of the Board of Appeal that '66% of the population thought that the designation "bebe" [was] used by only one special producer' is incorrect, suffice it to say, as the Board of Appeal itself found, that 64% of the population recognized the word 'bebe' and that the 66% could therefore relate only to the section of the population who recognized the word. Despite the ambiguity of the wording used by the Board of Appeal, the latter did not therefore err in that regard.*

*The IMAS survey is therefore sufficient to show that the trademark bebe had a high degree of distinctive character on account of its reputation in Germany at the time the trademark application was filed.*

The General Court and OHIM are free, however, to interpret survey results. In *Audi AG v OHIM*, T-16, the survey filed by the applicant had an opposite effect. In this case the General Court held at paragraphs 73 and 74:

*The examiner based her decision on the fact that only 22% of those questioned associated the mark applied for with a particular undertaking. That was apparent from the survey which the applicant itself produced. It was when making her final assessment of that fact in the light of Article 7(3) of Regulation No 40/94 that*

61

*the examiner found that the condition for acquisition of distinctive character through use was not satisfied in the present case.*

*In those circumstances, the examiner was under no obligation to hear the applicant as regards the assessment of the factual evidence which formed the basis for her decision.*

62

## **APPENDIX 18: RUSSIA**

| Jurisdiction: | Russia |
|---|---|
| Summary: | Survey evidence may be used and is more likely to be persuasive if it is prepared in accordance with the Russian Trade Mark Office's guidelines. |
| Official guidance: | Yes - Recommendations of the Patent Office for Surveys. |
| Relevant case law: | Some very limited and non-binding case law is available as examples. |
| Approximate costs to produce survey: | US$20,000. |

**Overview**

Market survey evidence can be and is used in trademark cases in Russia. The Russian Trade Marks Office, Rospatent, has issued Recommendations of the Patent Office for Surveys conducted for the purpose of registering the well-known status of trademarks.  A survey made according to the Recommendations is an excellent starting point and will almost certainly will be accepted as evidence in court proceedings.

A court will probably not question the survey results unless they are contested by the opposing party. A survey conducted by an independent specialist institution according to the Rospatent's requirements is likely to be accepted by the court. However, the estimated cost of such survey is about US$20,000 which may well exceed the overall cost of a case.  A less extensive survey may be accepted but the results of phone polls probably will not be accepted.

There are a number of decisions from various first and second instance civil courts that mention surveys as evidences used during the trademark registration procedure. However, these decisions are not binding.

63

**Official Guidance**

1   Recommendations of the Patent Office for Surveys conducted for the purpose of registering the well-known status of trademarks.

2   Decree of the Patent Office (Rospatent) No. 74 of 01-Jun-2001 (with amendments of 2 April 2004), Recommendations for conducting consumer surveys for the purpose of registering the well-known status of a trademark gives, among others, the following recommendations:

     i   the survey should be conducted by an institution specializing in the field of social research;

     ii   the survey should cover at least six cities of the Russian Federation. Preferably including Moscow and Saint Petersburg. Other cities depending on the circumstances of the case;

     iii   a number of respondents should be at least 500 in at least two cities and at least 125 in the remaining cities;

**Case Law**

The decree also contains recommendations for selection of questions.

1   Information letter of the Presidium of the Supreme Commercial Court of the Russian Federation No. 122 of 13-Dec-2007, A review of judicial practice in IP related matters provides that the likelihood of confusion may be proved by a survey.

2   Resolution of the Plenum of the Supreme Commercial Court of the Russian Federation No. 11 of 17-Feb-2011 provides clarifications on application of Art. 14.10 (Unlawful use of a trademark) of the Code of Administrative Offences, and, in particular, states that Consumer surveys may serve as an evidence of similarity between a contested designation and the trademark.

Exhibit H, Page 295

## APPENDIX 19: SPAIN

| | |
|---|---|
| Jurisdiction: | Spain |
| Summary: | Survey evidence is admissible and its probative value will be assessed by the court. |
| Official guidance: | None. |
| Relevant case law: | Yes, limited. |
| Approximate costs to produce survey: | No information available. |

**Overview**

Survey evidence is admissible and its probative value will be assessed by the court.

**Official guidance**

No official guidance exists.

**Case law**

*Decision of the Spanish CTM First Instance Court, of January 20th 2011 (GIN CASE)*

The court rejected that the use of color blue in gin was an infringement of the relevant trademark, because it had not acquired distinctiveness through use, as evidenced by a market survey brought forward by the claimant:

> *Conclusión que viene a ser corroborada por el resultado del **estudio** de **mercado** aportado por la demandada, sin que las limitaciones que puedan derivarse del universo encuestado (600 personas residentes en Madrid consumidores de alguna bebida alcohólica en el último año, con un porcentaje del 11% de ginebra) le invalide de forma absoluta, sin que puedan ser considerados más fiables los resultados de una encuesta entre 55 consumidores españoles de bebidas alcohólicas (referida en el doc num 28 de la demanda) destinada a establecer una comparativa con otras ginebras Premium y que en todo caso se limita a mencionar la importancia de la botella, lo cual es distinto a indicar que el color azul zafiro por se es distintivo, ni por su carácter técnico puede prevalecer sobre ella la recopilación de artículos y publicaciones (en prensa o Internet, doc num 33,34, 15, 17 y 35) que reflejan opiniones subjetivas sin ningún criterio científico u*

65

*objetivo evaluable, y cuyo fuerza probatoria es ciertamente relativa a los efectos pretendidos.*

[automatic translation] *Conclusion that comes to be corroborated by the results of the market study provided by the defendant, without the limitations that may result from respondent universe (600 persons residing in Madrid consuming any alcoholic drinks in the past year, with a percentage of 11% gin) will invalidate absolutely, but may not be considered more reliable the results of a survey of 55 Spanish consumers of alcoholic beverages (referred to in doc No. 28 of the application) intended to establish a comparison with other premium gins and in any case merely mentions the importance of the bottle, which is different to indicate that the sapphire blue one is distinctive for its technical and can prevail over her collection of articles and publications (in print or online, doc No. 33,34, 15, 17 and 35) that reflect subjective opinions with no scientific or objective measurable criteria, and which is certainly probative on the intended effects*

Here the market survey backfires because, as the court points out, it is based in the importance of the bottle, but not on the distinctiveness of blue.

*Decision of the Granada Cour of Appeal, Sección 3ª, ofe 28 Dic. 2007, rec. 348/2007*

Munich shoes, a survey was used to prove the degree of consumer knowledge of the trademark within sports shoes, which was challenged by the other party who produced another survey, which lowered the percentage of consumer knowledge. The court however considered that the trademark was well known in the sports shoes sector:

*En cuanto al dictamen de Auditoria que revela que entre 1.999-2.002 la actora habría tenido un volumen de ventas del modelo de calzado o zapatillas Gresca (sólo en España) que roza los dos millones y medio de euros y una facturación anual fluctuante sobre los 750.000 euros, sin embargo guarda silencio; respecto al **estudio** de **mercado** que dictamina que un 45% de la población destinataria o relacionada con el sector de calzado deportivo asocia y conoce la marca Gresca, lo tacha de parcial, o critica el campo de **estudio** elegido (calzado deportivo) frente a calzado en general, y se emplea en reivindicar la bondad del **estudio** aportado a su instancia que, desde un espectro más generalizado, revela que entre el 14 y el 19% de la población asocia o conoce la marca Gresca, para concluir su discurso impugnatorio reduciendo, sin ningún rigor, a menos de un 0,7% el conocimiento de la misma por el público en general, o censurando, tendenciosamente una pasividad probatoria del actor que ha destacado precisamente por lo contrario, hasta concluir, contra el criterio del juzgador de instancia y ahora de esta Sala que se ha reconocido notoriedad a una marca que por no corresponderle constituye vulneración de los principios registrales y de seguridad jurídica.*

[automatic translation] *As for the audit opinion between 1999-2002 reveals that the plaintiff would have had a turnover model shoes or slippers Gresca (only in Spain) that borders the two and a half million euros and an annual turnover of 750,000 fluctuating euros, however silent, regarding the market survey finds that 45% of the target population or sector-related and associated footwear Gresca know the brand, branded*

66

*him partial or criticizes the chosen field of study (sports shoes) versus footwear in general, and is used in the study claim brought goodness to your instance, from a more generalized spectrum reveals that between 14 and 19% of the population or know the brand associated Gresca to reducing contesting concluding his speech, without any rigor, less than 0.7% knowledge of it by the general public, or censoring, tendentiously probation passivity actor who stressed precisely the opposite, to conclude, against the discretion of the judge in court and now this Court has recognized that a brand reputation for not correspond constitutes infringement of the principles of legal certainty and registration.*

### Commercial Court N° 14 of Granada, Decision of 15 Oct. 2007, proc. 57/2006

The condition of well-known trademark was not proved, *inter alia*, because the party did not bring forward any market survey.

### Supreme Court, Third Chamber, of the Contencioso-administrativo, Sección 3ª, Decision of de 14 Jul. 2009, rec. 5902/2007

A Spanish company was refused the registration of the trademark "Agua Fresca de Rosas" (Fresh Rose Water) on the basis of lack of distinctiveness. To prove distinctiveness through use the company bought forward as evidence certificates from the Chambers of Commerce of Madrid, Barcelona, Sevilla and Valencia, as well as from the association for trademark defense, stating the well-known character of the trademark in question in the perfume sector, sales figures, advertising expenditure figures, as well as market surveys. The court found that the evidence did not prove that as a result of the use the average consumer actually perceived that the product came from a given company.

*En el presente supuesto a pesar del esfuerzo probatorio desarrollado por la parte recurrente no ha resultado acreditado de forma determinante que como consecuencia del **uso**, la **marca** solicitada "Agua Fresca de Rosas" haya adquirido distintividad en los sectores interesados, jabones, cosmética, perfumería y que en este caso el consumidor medio perciba efectivamente que el producto proviene de una empresa determinada, esto es, que identifique su origen empresarial. Entendemos que la documental aportada aún cuando acredita un cierto reconocimiento de la expresión y un gran número de ventas del producto, no es suficiente a los efectos de apreciar que se trata de un supuesto en que se ha adquirido el carácter distintivo por el **uso**, que exige, un **uso** intenso y significativo del signo de tal entidad que venga a identificar el producto "Agua Fresca de Rosas" en los sectores interesados o de referencia y su atribución a una exclusiva y única procedencia empresarial. Por consiguiente, no habiéndose justificado que el **uso** que se ha hecho de la **marca** tenga el carácter de intenso hasta el punto de adquirir la distintividad a la que se refiere el precepto indicado, procede la desestimación de la alegación expuesta.*

[automatic translation] *In this course despite the effort of evidence developed by the appellant has not proved a decisive result through use that the mark applied for "Agua*

Exhibit H, Page 298

*Fresca de Rosas" has acquired distinctiveness in the relevant sectors, soaps, cosmetics, perfumes and which in this case actually perceived by the average consumer that the product comes from a particular undertaking, i.e. business to identify their origin. We understand that although documentary credits provided some recognition of the speech and a large number of product sales is not enough to appreciate the effects that this is a case where it has acquired distinctive character through use, requires intensive use and significant sign of such entity to come to identify the product "Agua Fresca de Rosas" in the relevant class reference and its attribution to an exclusive and unique corporate source. Consequently, not having justified the use which has been made the brand has the character to the point of intense acquire distinctiveness refers to the precept that indicated, it should the dismissal of the complaint made.*

68

### APPENDIX 20: UK (REGISTRY) AND ENGLAND & WALES (COURT)

| | |
|---|---|
| Jurisdiction: | England & Wales – court proceedings<br><br>United Kingdom – registry proceedings |
| Summary: | Parties may rely on survey evidence if it is useful, impartial, objective and has a transparent methodology and data. Permission must be obtained beforehand in all circumstances except trademark prosecution. |
| Official guidance: | Tribunal Practice Notice (2/2012) – UK registry proceedings. |
| Relevant case law: | *Imperial Group plc & Another v. Philip Morris Limited & Another* [1984] RPC 293<br><br>*Marks and Spencer Plc v Interflora Inc & Another* [2012] EWCA civ 1501 |
| Approximate costs to produce survey: | No information available. |

**Overview**

In contentious proceedings in court or before the Trade Marks Registry, survey evidence is generally inadmissible unless permission has been granted in advance.  No permission is required to rely on survey evidence in non-contentious proceedings, for example during trademark prosecution when objections have been raised by the Registry that the mark lacks distinctiveness.

**Official guidance**

If a party wishes to rely on survey evidence it should seek permission to do so as early as possible.  The applicant should provide the court or Registry with:

       i) the results of any pilot survey;

       ii) evidence that any survey will comply with the Whitford Guidelines; and

69

iii) the cost of carrying out any pilot survey and the estimated cost of carrying out the further survey.

Permission will be granted only in rare cases where:

1    it is useful. To be useful, survey evidence must be probative, that is, it must be impartial, objective and have a transparent methodology and data.

2    it is justified. Its use is only justified where the court is unable to make its own assessment of the position and the costs are proportionate.

Contentious proceedings before the Registry must follow the guidance set out in Tribunal Practice Notice (2/2012). No permission is required where the issue is whether the mark has the necessary degree of distinctiveness for registration. In addition, where the cause of action lies in passing off rather than in trademark infringement, no permission may be necessary. This is because an action in passing off is to determine whether, in fact, there has been any actual deception. An action for trademark infringement requires a different assessment of whether the average consumer would be confused not whether some people have been confused.

**The Whitford Guidelines**

Survey evidence will not be useful and the costs not justified and therefore no permission granted , if it does not conform to the criteria set out in *Imperial Group plc & Another v. Philip Morris Limited & Another* [1984] RPC 293 (the "**Whitford Guidelines**"):

*If a survey is to have validity:*

*(a) the interviewees must be selected so as to represent a relevant cross-section of the public,*

*(b) the size must be statistically significant,*

*(c) it must be conducted fairly*

*(d) all the surveys carried out must be disclosed including the number carried out, how they were conducted, and the totality of the persons involved*

70

*(e) the totality of the answers given must be disclosed and made available to the defendant*

*(f) the questions must not be leading nor should they lead the person answering into a field of speculation he would never have embarked upon had the question not been put*

*(h) the exact answers and not some abbreviated form must be recorded*

*(i) the instructions to the interviewers as to how to carry out the survey must be disclosed; and*

*(j) where the answers are coded for computer input, the coding instructions must be disclosed.*

**Case law**

The leading judgment of the English Court of Appeal in *Marks and Spencer Plc v Interflora Inc & Another* [2012] EWCA civ 1501 examined the nature and role of survey evidence in detail.  It did so with a strong emphasis on the court's duty to actively manage cases in a way which was proportionate to the costs involved pursuant to Civil Procedure Rules 1.4(1), 1.4(2) and 32.1.

In respect of survey evidence the court referred to *A & E Television Networks LLC v Discovery Communications Europe Ltd* [2011] EWHC 1038 (Ch) which stated:

*It is wrong for costs to be wasted in conducting hopeless surveys, for the other party to have to waste costs dealing with that evidence, and for court time to be wasted in dealing with it at trial.*

The court therefore analyzed when the costs of permitting survey evidence to be adduced could be justified.  It noted the decision of the Court of Justice of the European Union in *Gut Springenheide GmbH v Oberkreisdirektor des Kreises Steinfurt—AMT für Lebensmittelüberwachung* (Case C-210/96) [1998] ECR I-4657.  In that case, at paragraphs 30 to 36, the CJEU said that courts in general ought to be able to assess any misleading effect of a

71

description or statement without ordering an expert's report or commissioning a consumer research poll.

[30] There have been several cases in which the Court of Justice has had to consider whether a description, trademark or promotional text is misleading under the provisions of the Treaty or of secondary legislation. Whenever the evidence and information before it seemed sufficient and the solution clear, it has settled the issue itself rather than leaving the final decision for the national court.

[31] In those cases, in order to determine whether the description, trademark or promotional description or statement in question was liable to mislead the purchaser, the Court took into account the presumed expectations of an average consumer who is reasonably well-informed and reasonably observant and circumspect, without ordering an expert's report or commissioning a consumer research poll.

[32] So, national courts ought, in general, to be able to assess, on the same conditions, any misleading effect of a description or statement designed to promote sales.

[33] It should be noted, further, that, in other cases in which it did not have the necessary information at its disposal or where the solution was not clear from the information before it, the Court has left it for the national court to decide whether the description, trademark or promotional description or statement in question was misleading or not.

[35] The Court has not therefore ruled out the possibility that, in certain circumstances at least, a national court might decide, in accordance with its own national law, to order an expert's opinion or commission a consumer research poll for the purpose of clarifying whether a promotional description or statement is misleading or not.

[36] In the absence of any Community provision on this point, it is for the national court, which may find it necessary to order such a survey, to determine, in accordance with its own national law, the percentage of consumers misled by a promotional description or

72

> *statement that, in its view, would be sufficiently significant in order to justify, where appropriate, banning its use.*

The Court of Justice's final conclusion was:

> *... in order to determine whether a statement or description designed to promote sales of eggs is liable to mislead the purchaser, in breach of Article 10(2)(e) of Regulation 1907/90, the national court must take into account the presumed expectations which it evokes in an average consumer who is reasonably well-informed and reasonably observant and circumspect. However, Community law does not preclude the possibility that, where the national court has particular difficulty in assessing the misleading nature of the statement or description in question, it may have recourse, under the conditions laid down by its own national law, to a consumer research poll or an expert's report as guidance for its judgment.*

The English court therefore concluded that survey evidence should only be used in the rare exception where there is *particular* difficulty in assessing the misleading nature of the statement or description in question.  It should not be routine.  Where the goods and services are ordinary and within the judge's own experience, survey evidence will offer no probative value to the dispute.  It cannot therefore be useful and the costs related to it cannot be justified.

Survey evidence might be useful and the costs justified where the court must make an assessment of the position in a foreign jurisdiction (such as in *White Horse Distillers Ltd v Gregson Associates Ltd* [1984] RPC 61 where Scotch whisky was being sold in Uruguay but a cause of action subsisted in England).

73

**APPENDIX 21: ISRAEL**

| | |
|---|---|
| Jurisdiction: | Israel |
| Summary: | Survey evidence is admissible and guidance is provided through relevant case law. |
| Official guidance: | None. |
| Relevant case law: | Yes several significant cases have considered the issue. |
| Approximate cost to produce survey: | No information available. |

**Overview**

Survey evidence is admissible provided it was collected in a scientific manner and, in particular:

1    the questions are relevant to the issue;

2    the questions do not overlap; and

3    the questions are exhaustive of the issue.

**Case law**

In an opposition to Israel Trademark Application No. 112645 - "*Zach-water returning the nature back to water*", July 12, 2004 filed by Shlomo Zach,  the opponent, Tenne Industries (1991) Ltd claimed that the trademark application was not eligible for registration, *inter alia*, because it did not meet the provisions of clauses 8(a) and 8(b) of the Trademarks Ordinance - 1972. Tenne asserted that the trademark lacked distinctive character due to the use of the idea 'returning to nature', which was a concept used by many companies.

Tenne claimed that Zach's alleged reputation in connection with the trademark application was not supported by enough evidence and was falsified.  Furthermore, Tenne claimed that they themselves acquired reputation in the trademark applied for.

Each of the parties conducted a consumer survey in order to support its claim that it had acquired the reputation in the trademark, and sought to challenge the validity of the survey conducted by the other party.

After referring to the rules for conducting a consumer survey in order to maintain survey validity, the registrar held that due to serious defects, both consumer surveys lacked any evidentiary value.  Due to this and other grounds, the registrar held that Zach did not prove that the slogan "returning the nature back to water" had acquired distinctiveness.  Therefore, the opposition was partially accepted to the extent that it included "Zach-water" but the certificate of registration was subject to a disclaimer of the slogan "returning the nature back to water" and each constituent word independently.

**Official guidance**

This decision set forth the following rules for conducting consumer surveys in Israel:

Rules for Conducting a Consumer Survey

A consumer survey being conducted must meet basic rules that were scientifically determined as "research methods". The essence of these rules is set forth below:

1   The drafted questions must be relevant to the research question/ problem raised.
2   There must be no overlap between the questions presented to interviewees.
3   The questions must provide a response to all aspects of the investigated problem – they must be exhaustive of the issue.

Rules of credibility and validity of prediction:

- Credibility - how much are we measuring a true and not incidental value, as far as the stability of the measurement is concerned, and the degree of mistake.

- Validity of prediction - how much does the measurement reflect the concept we are interested in measuring.

The types of questions that an interviewee can be asked in a consumer survey are as follows:

1   Open-ended question (unprompted exposure) - the interviewee is free to answer as he wishes.
2   Closed-ended question (prompted exposure) - the interviewee chooses the most correct answer in his view from among the possible answers.
3   Direct question - the interviewee is asked how he acts directly.
4   Consequence question - the interviewee is presented a question about other persons, and then how the interviewee thinks they would act or respond.

A consumer survey is exposed to many biases, some of which relate to the interviewee himself and some to the drafting of the question he is being asked. When conducting research, researchers must refrain as far as possible from biases in the questionnaire so that the research will be carried out in the most objective and credible manner.

Below are various types of biases:

75

1    Biases Relating to the Interviewee Himself

*Face validity* - to what extent the interviewee is able to understand the object of the research from the questionnaire and what the persons undertaking the research essentially want from him. As soon as an interviewee understands these facts, then bias will occur, since the interviewee will prefer to please or not to please by his answers the persons undertaking the research.

*Social desirability* - there is a tendency which is well-known to interviewees as humans beings to be like everyone else (the "herd effect") and therefore persons conducting objective research will prefer to refrain from drafting questions in which concepts are used such as "most people" or from drafting questions such as "everyone thinks such and such, what do you think?".

*The halo effect* - interviewees have a natural tendency to respond in a similar manner to questions and therefore on many occasions they will answer all the questions in the same way as they answer a specific question, if the purpose of the research is clear to them. This is irrespective of the content of the other questions they respond to. Therefore an interviewee must not know in advance or understand in the course of the research the order of the questions and how they should be answered. People have a natural tendency to use extreme values on the scale of responses, such as "I don't know" answers, which repeat themselves.

*Lack of enjoyment, disinterest/fatigue* - in such cases of mental and physical states of the interviewees, they will be evasive and will respond to many questions "I don't know".

2    Biases Originating in the Drafting of the Questions

*Ambiguity of the question* - in cases in which each interviewee will understand something else from the drafting of the question, it is reasonable to assume that a bias will occur. Therefore the questions should be drafted clearly, explicitly without being vague or ambiguous.

*Questions drafted in the negative form* - these are questions which research showed that the interviewees had difficulty contending with them. Therefore, questions such as "there are no people voting for party X, which party are you thinking of voting for?" These are questions where the chance of swaying the interviewee by such questions is extremely high.

*Presentation of one side as normative* - this is essentially the other side of the coin, a question such as "most of the public think this, what do you think?" will cause interviewees to favor this or that answer, on grounds unrelated to their personal view. Here too the chance of swaying the interviewee's answer is extremely high.

*Use of concepts of a highly emotional nature* - it is preferable not to use concepts of a highly emotional nature when drafting research questions. This is because these concepts have an added value in the hearts of interviewees, which is likely to bias their responses. An example of such a concept is the concept of "democracy": research has shown that this concept has a far-reaching effect on the responses of respondents.

76

*Making a certain factor prominent in drafting the question* - such a question is invalid since it puts the answer into the mouths of the interviewees.  Thus for example a question such as: "The list of candidates of party X contains a known candidate named Y, for which candidate do you think you will vote for in the coming elections?", is a tendentious and unobjective question.

*Bias originating in the drafting of the responses* - in closed questions, lack of balance in the responses is likely to cause the interviewee to be biased in his answers. To a question such as "To what extent are you satisfied with the bank with which you are working?", it is preferable not to provide four responses, where three are positive responses, such as "satisfied", "partly satisfied", "completely satisfied" and one is negative, such as "completely dissatisfied". This is because such a scale of responses will tilt the balance in favor of customer satisfaction and will increase the chance that the final response of all interviewees will be positive. With closed questions, the researcher conducting the research will prefer not to put the possible answer: "don't know" as one of the possible responses because in such case interviewees will tend to use this response, as their response of choice, irrespective of their true opinion.

<u>What are the Advisable Rules for Drafting Research Questions?</u>

We can obviously learn about what is permitted from what is prohibited. In the light of all the above biases, an objective conductor of research must be meticulous about certain points when drafting a research questionnaire. It should be emphasized that the structure of the questionnaire influences how the interviewee will respond, and there is constant fear that disclosing the objects of the research to the interviewee will cause him to be biased in his responses.

Furthermore, a telephone survey has several disadvantages which are important to emphasize, namely: the number of questions that an interviewee can be asked over the telephone is extremely limited because it is difficult, as an interviewer, to create a continuous connection with the interviewee, *inter alia*, because the interviewee is frequently required not to keep the telephone busy for a long period of time. Furthermore, the population responding to telephone surveys is mainly composed of young persons who prefer to respond more than elderly persons and women who statistically are more at home or near the telephone at work. All these components must be taken into account at the time of conclusion and presentation of the relevant findings. Accordingly, the questions which the person drafting the questionnaire creates must be as follows:

1   The questions must be drafted in a defined and clear manner and it is preferable not to use ambivalent words having more than one meaning.

2   It is preferable that the drafted question relates to one aspect only (one variable) which the persons conducting the research wish to examine, and not to several issues in each question, in order to prevent confusion of interviewees.

3   The questions must refrain from making any factor prominent in the body of the question, in order to maintain objectivity as far as is possible.

4   A balance should be made between the various alternatives offered in the wording of the question and refraining from presenting one of them as a norm.

5   Questions should be drafted as briefly as possible, and research questions should not be drafted in the negative form.

6   The interviewee should be given an opportunity to admit that he does not know how to respond, by adding responses such as: "I don't know", but not to an exaggerated degree.

<u>Market survey evidence as proof of use</u>

*CC (Tel-Aviv Distr.)* 814/97, 815/97 *General Mills, Inc. V Meshubash Food Industries Ltd et al* [2005].

In an action for passing off in respect of a similarly shaped salty corn snack, the plaintiff adduced a consumer survey conducted by way of computer-assisted personal interviews (CAPI) among Hebrew-speaking consumers, who were asked whether they used to eat salty snacks at least once a month and then were asked to identify the picture of the snack without packaging. The survey results were high consumer recognition of the snack shape. The defendant adduced expert opinion attacking the survey, both in terms of using CAPI and in terms of potential slant in questions and improper results. The court held that the plaintiff's CAPI-based survey evidence was acceptable and that it was objective and properly conducted, and demonstrated high consumer recognition of the shape. (The plaintiff however failed to show that the snack was identified with it as its source, and the claim was dismissed).

*CC (Central Distr.)* 31706-01-12 *Dan Design Center Ltd et al v B.R.A.P. Projects Ltd* (2012)

The plaintiff, operating a home design retail complex under the name DAN DESIGN CENTER and subsequently DESIGN CENTER, brought an action against the defendant, operating a home design retail complex under the name ONE DESIGN CENTER, both in the central part of the country. The plaintiff argued that DESIGN CENTER was a well-known mark enjoying goodwill among consumers and adduced a survey to show that consumer associate it with the plaintiff. The defendant argued that DESIGN CENTER was a generic word combination and attacked the survey for defects, inter alia, for being conducted during the plaintiff's intensive television advertising campaign and the choice/analysis of audience (taking as relevant audience such consumers from the central part of the country who made purchases at a home design center at a time when the only design center was that of the plaintiff).

The court determined that the alleged conclusions of the survey did not derive from the survey. The court further indicated that conducting such a survey while running a T.V. campaign (for services marketed under the trademark in question) at the same time, might influence the survey results, and this is a substantial root fault of the survey. The court found another basic fault in the survey in that case, in the fact that the survey population was geographically limited without justification. In addition, the court considered the survey defective due to the failure to adduce "raw" data collected at the time of the survey.

78

Eventually, the court held that the combination DESIGN CENTER was descriptive/generic and was not proven to have acquired a secondary meaning, and the plaintiff's claim was dismissed.

Also see below in respect of evidence of secondary meaning acquired as a result of use, in invalidity proceedings.

<u>Market survey evidence within opposition or invalidity proceedings</u>

Cases since 2004 (the *Mei Zach* decision):

<u>Invalidity proceedings</u>

Application for cancellation of trademarks 75775 and 75974 (TIROSH, with devices) by *<u>The Kerem Company Ltd v Winegrowers Cooperative Society of Rishon Lezion and Zichron Yaacov Wineries Ltd</u>* [2004]. Affirmed in *<u>CA 941/05 Winegrowers Cooperative Society of Rishon Lezion and Zichron Yaacov Wineries Ltd v The Kerem Company Ltd</u>* [2006]

In a cancellation proceeding before the Trademarks Registrar the registration of the mark (TIROSH) was attacked on the grounds of its generic or descriptive character as a dictionary word for the relevant product (Hebrew for "grape juice") and the registrant adduced a consumer survey regarding the acquisition of secondary meaning /distinctiveness by the word and its association with the registrant in consequence of extensive use.

The Registrar noted several points regarding the examination of surveys: (1) the need for caution due to a commissioned opinion; (2) failure to ask other relevant questions; (3) the wording of questions (presence or absence of a certain term may skew responses); (4) the need to ensure the expert related in his opinion to all questions and did not fail to address any data; (5) room for additional questions to eliminate influence of other market factors; (6) circumstances of conducting a survey (e.g. other series of questions in the survey).

The survey evidence was critiqued due to the expert's failure to include in his analysis a relevant question and data elicited in response thereto from respondents, and due to the improper wording of other questions as leading questions in that they presupposed that the word at issue was a trademark.

The Supreme Court affirmed the Registrar's decision, critiqued the survey evidence (in particular its analysis) and held that the survey not only failed to prove the word was not generic but in fact, if properly analyzed, showed it was generic.

The marks were, at both instances, ordered to be cancelled unless the registrant provides a disclaimer in respect of the word component, TIROSH, thus affirming the generic nature of the component TIROSH *per se*.

<u>Opposition proceedings</u>

79

*Walla! Communication Ltd et al v Red-Robe Ltd*, Opposition to the registration of trademark
178782 (WALLA FASHION, with device) [2012]

In an opposition proceeding before the Trademarks Registrar, the registration of the mark
(WALLA FASHION, with device) for clothing in class 25 was opposed by the owner of the
registered marks WALLA and WALLA! SHOPS for a variety of goods and services in several
classes (but not for clothing in class 25) and of several applications for composite marks
including the word WALLA!, on the grounds of likelihood of association with its allegedly well-
known mark WALLA. The opponent also operates a web portal which includes a content
channel "Walla Fashion" (in Hebrew) under the domain name fashion.walla.co.il.

The opponent adduced a consumer survey conducted among Hebrew-speaking women aged 16 –
30 consisting of two telephonic surveys containing aided-awareness questions (one regarding
WALLA and one regarding WALLA FASHION) and a survey of visual recognition based on
individual interviews, to support the opponent's claim of goodwill acquired by its mark and the
possible association of the propounded mark with it. The applicant argued, among others, that
the opponent's trademarks are not well-known trademarks, and do not have goodwill in the
fashion field among young women, and adduced an opinion of a survey expert attacking the
opponent's survey.

The Registrar reiterated the law that in order for the tribunal to rely on a survey, the survey must
be objective and properly conducted – in correctly identifying the survey audience, in
determining the proper questions and their wording,  in data collection and in processing the
results. He further reiterated the rules in Mei Zach regarding survey questions in that they should
be relevant, exhaustive of all aspects of respondents' position and reliability of responses.

The Registrar dismissed the applicant's expert's critique of the choice of audience and of the
questions (in that the questions allegedly implied that WALLA is an entity and in that
recognition in the actual context of clothing labels was not examined) and confirmed the
applicant's contrary position, that the reference to a certain mark in a test of unaided awareness,
devoid of any context, may indicate the existence of goodwill. The court thus held that the
questions were properly open-ended and properly devoid of context. The Registrar also did not
find fault with the telephonic surveys. In this regard the court mentioned two inherent *prima
facie* faults of telephonic surveys, namely: the typical impatience of the respondent in long
interviews, and the biased participation in the survey of the part of the general population which
to which technology is more easily available, however, the court held that in the present case
these faults did not affect the quality of the results,  as the interviews were short and the survey
was aimed at a relatively young age (16 - 30).The court thus accepted the results of the
opponent's survey evidence as reliably attesting to consumer recognition.

Market survey evidence to overcome objections to registration

Cases in registration proceedings since 2004 (the *Mei Zach* decision):

Application for the registration of trademarks *156076, 156077 (ONCE WEEKLY (and Hebrew
equivalent)) in the name of Merck Sharp and Dohme* (Israel 1996) Ltd (2007)

Exhibit H, Page 311

In a registration proceeding for trademark ONCE WEEKLY (and its Hebrew equivalent) requested in class 5 for preparations for the treatment of osteoporosis, registration was refused by the examiner on the grounds of the mark's lack of distinctive character and its being descriptive of the nature or quality of the goods (dosage).

To demonstrate the mark's distinctive character, the applicant adduced a consumer survey showing that the relevant consumers associate the combination ONCE WEEKLY with the applicant's drug FOSSALAN (which included the question "when you hear the name ONCE WEEKLY, what drug are you reminded of?").

The IP adjudicator of the IPTO, citing *Mei Zach* and *Tirosh* as to the rules for conducting a survey and its weight, held that the probative weight of the adduced survey was negligibly small due to the wording of the question in a way that led the respondents toward a specific answer (in suggesting that ONCE WEEKLY was the name of a brand) and did not examine whether the respondents thought the combination was a brand or a description of dosage, and also due to the fact that 90% of the respondents were treated with Fossalan.

The marks were refused registration.

Application for the registration of trademark 231231 *(THE DAY AFTER PILL (and Hebrew equivalent)) in the name of Trima, Israel Pharmaceutical Products Ltd* (2012)

In a registration proceeding for trademark THE DAY AFTER PILL (and its Hebrew equivalent) requested in class 5 for gynaecological preparations, registration was refused by the examiner on the grounds of the mark's lack of distinctive character and its being descriptive of the nature or quality of the goods (the drug's administration). The applicant is the exclusive distributor in Israel of the Postinor contraceptive.

To demonstrate the mark's alleged distinctive nature, the IP adjudicator of the IPTO, allowed the applicant to adduce a consumer survey aimed to show that the relevant consumers interpret the combination THE DAY AFTER PILL as indicating the applicant's drug POSTINOR, rather than a generic name for a contraceptive used after the contraception. The survey was not presented by way of an expert's affidavit, but rather by a letter from an advertising agency to the applicant's CEO. The court held that in the absence of an affidavit or an expert that may testify about conducting the survey, only little weight should be given to its results and conclusions. Furthermore, the survey was conducted online, among 420 Jewish women aged 16 to 40, and the court indicated that there was no explanation to the chosen size, nature and profile of the survey population.

The Registrar also held that the first question asked ("Have you heard of the day-after pill?") was not the question for which adducing the survey was originally permitted by the IP Adjudicator ("What was the day-after pill?") and that the survey did not achieve its purpose of examining whether the mark was suggestive or descriptive. Furthermore, being conducted shortly after the launch of the competitor's drug, the survey did not reflect the up-to-date and relevant perception of the public as to the meaning of the combination THE DAY AFTER PILL.

81

The Registrar thus held that the survey failed to meet in full the requirements of a consumer survey.

The mark was refused registration.

82

### APPENDIX 22: SOUTH AFRICA

| Jurisdiction: | South Africa |
|---|---|
| Summary: | Survey evidence is admissible but its probative value will depend on the integrity with which it is collected and presented. |
| Official guidance: | None, though the law of evidence applies generally. |
| Relevant case law: | Yes. |
| Approximate cost to produce survey: | No information available. |

**Overview**

Survey evidence is admissible provided it complies with South African legislation dealing with evidence generally, namely the Law of Evidence Amendment Act (strictly speaking, it qualifies as hearsay evidence).

**Case Law**

The following South African judgments have pronounced on the issue of survey evidence in trademark matters and are the most relevant:

*Hoechst Pharmaceuticals (Pty) Ltd v The Beauty Box (Pty) Ltd* 1987 2 SA 600 (A) – passing off - survey conducted to show public confusion existed - http://www.saflii.org/cgi-bin/disp.pl?file=za/cases/ZASCA/1987/5.html&query=hoechst%20beauty%20box

*Reckitt & Colman SA (Pty) Ltd v SC Johnson & Son (Pty) Ltd* 1993 2 SA 307 (A) – passing off - survey conducted to show public confusion existed - http://www.saflii.org/cgi-bin/disp.pl?file=za/cases/ZASCA/1991/181.html&query=hoechst%20beauty%20box

*McDonald's Corporation v Joburgers Drive-Inn Restaurant (Pty) Ltd* 1997 1 SA 1 (A) – trademark infringement; passing off; unlawful competition; trademark expungement - survey conducted to prove reputation and well-known status of trademark - http://www.saflii.org/cgi-bin/disp.pl?file=za/cases/ZASCA/1996/82.html&query=hoechst%20beauty%20box

*Beecham Group plc v Triomed (Pty) Ltd* [2002] 4 All SA 193 (SCA) – trademark infringement - survey conducted to determine level of recognition of trademark amongst pharmacists -

83

http://www.saflii.org/cgi-bin/disp.pl?file=za/cases/ZASCA/2002/109.html&query=beecham%20triomed

The effect of these judgments can be summarized as follows:

In principle, a properly formulated and conducted market survey is admissible even though the responses of the interviews are hearsay statements. The probative value of surveys depends on the nature of the facts to be proved. For example, survey evidence will have more probative value for proving that a mark is well-known than for proving confusion or deception amongst a significant number of people.

The following requirements have been laid down for survey evidence to be admissible and to have probative value:

1  It must be submitted to establish that certain opinions existed, and not the correctness of such opinions, i.e. to establish a state of mind of a class of persons or a portion of a class of persons;

2  The survey must be scientifically conducted amongst the class of persons relevant to the particular subject matter;

3  The survey should not be conducted under artificial conditions divorced from the "conditions of trade";

4  The questions must in no way be leading or misleading, but must be cast in such a way as to preclude a weighted or conditioned response;

5  The questions must be designed to provide answers to the real issues in the case.

(Source: Webster and Page – South African Law of Trade Marks Par 8.39)

84

**APPENDIX 23: INDIA**

| Jurisdiction: | India |
|---|---|
| Summary: | Survey evidence is admissible and there is increasing jurisprudence on its use. |
| Official guidance: | Draft guidelines are available and case law is developing the law in this area.  Further change in practice is likely. |
| Relevant case law: | Yes. |
| Approximate cost to produce survey: | No information available. |

**Overview**

Despite the lack of a statutory basis, survey evidence is used in prosecution before the Indian Trademarks Registry as well as in court proceedings in a broad range of trademark matters.  A significant body of case law has developed the position over the last two decades and provides guidance as to the manner of the recordal and collation of the data in order to improve its probative value. No permission is required to rely upon market survey evidence. However, the acceptance of the evidence depends upon the discretion of the hearing authority.

**Official Guidance**

Evidence of Distinctiveness

On the Trademarks Registry website the draft TMO manual (http://www.ipindia.nic.in/tmr...Manual/DraftManual_TMR_23January2009.pdf) provides guidance on the use of surveys to prove that the mark has acquired distinctiveness. It states:

1   Questionnaires need to indicate how interviewees have been selected as well as whether the respondents are actual or potential customers.  The survey will carry more weight if the interviewees represent a cross section of the 'relevant public' or trade.

2   The number of invited participants and actual respondents must be disclosed.

85

Exhibit H, Page 316

3    The name of the trademark holder should not be disclosed.

4    The representation of the sign at issue should be shown to respondents.

5    Precise responses should be taken and disclosed on the actual response sheets.

6    If a professional survey company is used, the survey location must be disclosed, along with exact instructions to interviewers, including coding instructions if the results were recorded on a computer.

7    It is often useful to show one or more other marks (e.g. fictional or actual third party marks) in the survey to act as a control sample. This helps separate recognition resulting from mere guesswork from real tangible identification.

8    The survey timing should relate to the period when the dispute arose so that the recognition if proven by the survey is timely.

**Case law**

There have been several reported cases where litigants have submitted market survey evidence as follows:

*Haw Par v Tiger Balm* (1996 PTC (16) 311, Madras High Court) (infringement case):Held that market survey evidence can be relied on by courts after recording evidence at trial, but not at the interlocutory stage and only after recording evidence at trial.
http://www.indiankanoon.org/doc/1291339/

*Time Warner v Das* (1997 (17) PTC 35, Delhi High Court) (infringement case): Held that market survey evidence filed by way of affidavits could be relied on at the interlocutory stage. The Court accepted that the channel Home Box Office, better known as HBO (which was not broadcast in India at the time) had a spillover  reputation in India. The Court restrained a channel from using the mark CBO (Cable Box Office). HBO had submitted surveys demonstrating likelihood of consumer confusion.
http://www.indiankanoon.org/doc/596385/

*Samsonite v Vijay Sales* (1998 PTC 372, Delhi High Court) (infringement case): Held that a market survey has to be tested at trial where witnesses are subject to cross-examination.
http://indiankanoon.org/doc/279539/

*Dart Industries v Techno Plast* (2007 (35) PTC 285, Delhi High Court) (infringement case):  In this case, the makers of Tupperware sued a competitor selling cheaper goods for designs infringement and passing off.  The Delhi High Court referred to a market survey but declined to grant an injunction on the basis that there was no point-of-sale confusion.

86

http://indiankanoon.org/doc/1138401/

_Ayushakti Ayurved Pvt. Ltd. A ... vs Hindustan Lever Limited_ reported at 2003 (5) BomCR 523 –
Held: market survey report can be submitted as evidence before the Court. See
http://www.indiankanoon.org/doc/1521371/

_Fedders North American vs. Show line & ors. Decided on 12.05.2006_ reported at 2006 (32) PTC
573 Del Held: Delhi High Court distinguished the ruling in Time Warner to the extent that the
survey report in Time Warner was supported by an affidavit. Reading of the two judgment would
clarify that for a survey report to be accepted as evidence without it being hit by provisions of
Evidence Act, 1872, all survey reports should be supported by affidavit when presented to
Courts. See http://indiankanoon.org/doc/1269197 /

_Himalaya Drug Co. Vs. SBL Limited_ decided on 03.06.3010 Held: Delhi High Court was asked
to rule on confusion created by rival mark based on market survey report as evidence. The Court
holds that such market survey report should essentially establish that there is confusion in mind
of consumers and the question asked should reflect the actual confusion. See
http://www.indiankanoon.org/doc/1888307/

_Brooke Bond Lipton India Ltd. vs Girnar Exports And Anr._ decided on 7 July, 2006 reported at
2006 (33) PTC 412 IPAB Held: the appellant sought to rely on market survey report to establish
distinctiveness, goodwill or reputation. The IPAB held that for survey report to be relied as
evidence the same should be available on the date of filing of application for trademark
registration. See http://indiankanoon.org/doc/432100/

_Prestige Housewares India Limited vs. Gupta Light House_ decided on 5th July, 2007 - In the instant case the Board
holds that for a _bona fide_ and honest adoption of a mark the prospective proprietor should conduct market survey.
See _http://www.ipab.tn.nic.in/Orders/91-2007.htm_

_Donaldson Filtration Deutschland GmbH. Vs. Ultrafilter (India) Pvt. Ltd., decided on_ 12.09.2008 Held: the
respondent company has led market survey conducted by it as evidence. The Board was pleased to hold that even
though the respondent has registered the trademark "Ultra filter" but as its own market survey shows that the same
brand was available from prior to day of registration, the registration of such trademark would not give the
respondent exclusivity and registration is not sustainable.  See _http://www.ipab.tn.nic.in/Orders/143-2008.htm_

_Orchid Health Care Vs. Aglowmed Limited_ [AIR 2010 Pat 46], 'survey evidence' was relied
upon for proving prior use. In this case, although the 'trial court' upheld the validity of the
survey and relied upon it to decide the matter, the 'appeal court' held the survey report to be
inaccurate. No guidance was provided in the said case.

_P.P. Hamsa Vs. Syed Agencies_ [MANU/KE/0609/1990] Held: survey evidence cannot be
assessed unless the questions asked and answers given are recorded and those conducting the
survey are subject to cross-examination.

Cases where the presiding authority has refused to take note of the market survey to ascertain the
existence of a mark in the market in Rectification and Opposition proceedings include:

Exhibit H, Page 318

*Caradon M.K. Electric Ltd. Vs. Memory Electric Co. & Registrar Of Trade Marks* [TRA/112/04/TM/DEL]

*N.G. Subbaraya Shetty Vs. T.V. Venugopal & The Registrar Of Trade Marks* [OA/3/2008/TM/CH]

*Cadilla Laboratories Ltd. Vs. Raptakos Brett & Co. Ltd."* [2002(25)PTC776(Reg)]

*Prestige Housewares India Limited and Anr. Vs. Gupta Light House and Anr.[ 2007(35)*PTC876(IPAB)] Held: the 'Intellectual Property Appellate Board' took note that the defendant has not done any market survey to ascertain the availability of a mark.

*Marico Ltd. Vs. Agro Tech Food* [2010(43) PTC 39 (Del)], confirmed in a review appeal before a division bench, has noted the absence of survey evidence to prove acquired distinctiveness in market. The Court has further opined:

*"At times even consumer surveys are not persuasive evidence; much would depend on the sample chosen and the nature of the questions asked."*

In *Stokely Van Camp, Inc. and Anr. Vs. Heinz India Private Limited* [2010 (44) PTC 381(Del)] the court held as follows:

*"There is no evidence in the form of consumer survey or otherwise which would at least prima facie have me believe that the registered mark "Rehydrate Replenish Refuel" has achieved trademark significance- in as much as the use of the expression brings to mind the trade origin of the product."*

The court while deciding the interlocutory application for interim injunction held the survey to be unacceptable as the concerned parties were not put to cross examination and the survey was conducted post filing the suit.

88

## APPENDIX 24: JAPAN

| | |
|---|---|
| Jurisdiction: | Japan |
| Summary: | Very recent case law developments indicate that survey evidence may be accepted under certain strict circumstances. |
| Official guidance: | None. |
| Relevant case law: | Limited. |
| Approximate cost to produce survey: | No information available. |

**Overview**

In the past 20 years, many parties sought to rely on market surveys in trademark cases. However, almost all were rejected by courts on the basis that a survey was a manner of soliciting a favorable answer for one party. The courts' approach has now changed.

Surveys can now be used to demonstrate the distinctiveness of a trademark or likelihood of confusion, but the former has been more common in Japan. There is no specific law or jurisprudence in relation to surveys, but judges have given guidance in cases.

**Case law**

In the recent bottle shape trademark cases of Yakult, Case H22 (Gyoke) No. 10169 - Ref: (http://www.yuasa-hara.co.jp/english/news/pdf/ipnews032.pdf) and Coca-Cola (Gyo-Ke) 10215/2007, (http://www.yuasa-hara.co.jp/english/news/pdf/ipnews025.pdf) and Case H22 (Gyo-Ke) No. 10169 (http://www.fujimarks.jp/english/pdf/sp01_017.pdf), the courts accepted surveys as fair evidence of distinctiveness.

In late 2010 in Yakult, the leading case on this issue, the plaintiff, after many failures, was finally granted a 3D trademark registration, based primarily on its survey evidence. Yakult had had previous surveys rejected for being too leading, but finally the Tokyo IP High Court accepted 2 Yakult surveys indicating a 98% level of recognition of the Yakult bottle. Critical was the lack of mention of Yakult in the survey questions, which allowed consumers to decide uninfluenced.

Subsequently, lawyers have commented that surveys can now be more widely used.  Some lawyers have said that this allows more use of surveys but others say that the case does not mean

89

that the courts are relaxing criteria for accepting surveys. Thus, the courts most likely remain conservative about survey evidence, however, careful methodology for the market survey may lead to a court accepting it. Factors such as the manner of interview, number of samples, a location where a survey is done, the point of the questions, proportion of gender, age, jobs of interviewees etc may all be examined.

Parties should assume a court will look carefully at the methodology of the survey to assess if it was done in a fair manner without influencing an interviewee.

## APPENDIX 25: MALAYSIA

| | |
|---|---|
| Jurisdiction: | Malaysia |
| Summary: | Survey evidence is admissible but its probative value will depend on the integrity of the data and manner in which it is collected. |
| Official guidance: | None other than case law. |
| Relevant case law: | Yes – substantial.<br><br>*Imperial Group plc v Philip Morris Ltd* ([1984] RPC 293 (English case) |
| Approximate cost to produce survey: | No information available |

**Overview**

No specific legislation and/or official guidance have been issued in Malaysia for market survey evidence in respect of trademark matters.  However, the courts have developed a body of very persuasive case law as to how such evidence should be obtained and presented.  Indeed, market survey evidence is often rejected by the Malaysian courts because it fails to comply with the minimum criteria laid down in the *Imperial Group* case.

**Case Law**

Malaysia largely follows UK rules on survey evidence, especially the principles laid down in the English case *of Imperial Group plc v Philip Morris Ltd* ([1984] RPC 293. These are:

1    *the interviewees must be selected so as to represent a relevant cross-section of the public;*

2    *the size must be statistically significant;*

3    *it must be conducted fairly;*

4    *all the surveys carried out must be disclosed including the number carried out, how they were conducted, and the total of the persons involved;*

Exhibit H, Page 322

5    *the totality of the answers given must be disclosed and made available to the defendant;*

6    *the questions must not be leading nor should they lead the person answering into a field of speculation he would never have embarked upon had the question not been put;*

7    *the exact answers and not some abbreviated from must be recorded;*

8    *the instructions to the interviewers as to how to carry out the survey must be disclosed; and*

9    *where the answers are coded for computer input, the coding instructions must be disclosed.*

There is a body of Malaysian case law that deals with the use of market survey evidence

*Lim Yew Sing v Hummel International Sports & Leisure A/S* [1996] 4 CLJ 784
Effect: Apart from reaffirming criteria laid down in the UK case of *Imperial Group plc. v Philip Morris Ltd:-*
Imperative that market researchers be called as a witness. Failing which, deemed hearsay evidence and therefore inadmissible.  Fairly reflect the factual position at the time when the application to expunge was made. Instructions given to surveyors must be shown. Survey must be signed. Persons conducting survey must be identified.

*Service Master (M) Sdn Bhd v MHL Servicemaster Sdn Bhd* (1998) 1 CLJ 459
Effect:
Relevant cross section of public to be covered in the survey. Questions and answers must be recorded properly for the court's evaluation. Questions must not be speculative or lead the interviewee into "a field of speculation that he would have never embarked upon"

*Sanbos (M) Sdn Bhd v Tiong Mak Liquor Trading (M) Sdn Bhd* [2008] 3 MLJ 100
Effect:
No leading questions. Survey should be conducted before commencement of civil suit. Answers to be recorded verbatim. Requirement that interviewees be called to give evidence selected.

*Consitex SA v TCL Marketing Sdn Bhd SA*  [2008] 8 CLJ 444
Effect:
No leading questions. Questions must not be biased. Accurate or verbatim recording of the answers required. Interviewees should be called as a witness. Adverse inference against the plaintiff for failure to call these interviewees to testify. Questions should not be in one language (in this case questions were in English only).

*Ginvera Marketing Enterprise Sdn Bhd v Tohtonku Sdn Bhd* [2010] LNS 619
Effect:

Survey must be carried out before commencement of legal proceedings. Interviewer must give evidence. No leading questions. Survey forms must be tendered as part of the evidence.

There is no requirement that specific permission be obtained for reliance on market survey evidence. A Malaysian litigant (usually, the Plaintiff/Applicant) can exercise the option to commission the conduct of a market survey for subsequent use in Court proceedings; such survey is duly subjected to the rules of court and the Evidence Act 1950.

In *Ginvera Marketing Enterprise Sdn Bhd v. Tohtonku Sdn. Bhd.,* [2011] 6 CLJ 799 [2010] 1 LNS 619, the court had noted that the survey to verify whether there was any confusion in the market only after the suit was filed by the plaintiff. The court did not accept the findings of the survey as it appears more like to introduce the plaintiff's to the interviewees and try to get them to associate the product to the plaintiff. (Please refer to page 808).

In *Consitex SA v. TCL Marketing Sdn. Bhd.* [2008] 8 CLJ 444, the court had rejected the market survey evidence on various reasons and the more pertinent ones are that the interviewees were not called to the court to testify and the language used during the interview process. The court had indicated that as English is only the second language in Malaysia, the questions should be posed in the national language as well to avoid any ambiguity.

93

**APPENDIX 26: AUSTRALIA**

| | |
|---|---|
| Jurisdiction: | Australia |
| Summary: | Substantial guidance is available to ensure survey evidence is admissible. |
| Official guidance: | Practice Note 11. |
| Relevant case law: | *Arnotts Ltd v Trade Practices Commission*<br><br>*Interlego AG and Lego Australia Pty Ltd v Croner Trading Pty Ltd*<br><br>*Centurion Roller Shutters Pty Ltd v Automatic Technology (Australia) Pty Ltd*<br><br>*Cadbury Schweppes Pty Ltd v Darrel Lea Chocolate Shops Pty Ltd*<br><br>*Leo Pharmaceutical Products Ltd A/S v ACP Masthead Nominees Pty Ltd* |
| Approximate cost to produce survey: | No information available |

**Overview**

Survey evidence may be used in a broad range of trademark matters. However, a failure to follow the official guidance as to the preparation and conduct of the survey means the evidence is unlikely to be relevant, transparent, representative and objective and therefore will be given little weight. The courts encourage an open and co-operative approach to the use of survey evidence.  Failure to follow guidance and raise issues at an early stage may lead to costs sanctions being imposed.

**Case law**

Historical use of survey evidence in Australia

There are three separate causes of action that can arise in an Australian trademark case and survey evidence could potentially be relevant to each, namely:

94

1    statutory trademark infringement arising under the *Trade Marks Act 1995* (Cth);

2    passing off (i.e., common law trademark infringement); and

3    breach of the misleading and deceptive conduct/misrepresentation provisions in sections 52 and 53 of the *Trade Practices Act 1974* (Cth) ("**TPA**").

Deception and confusion *is a common element* in each cause of action. A plaintiff who alleges passing off must prove that consumers will be misled into thinking that products marketed by the defendant are the goods of the plaintiff.

Under sections 52 and 53 of the TPA a plaintiff must show that the public was misled or deceived in trade or commerce into attributing the source of the respondent's goods to the applicant. Finally, under the *Trade Marks Act 1995* (Cth) questions of identity, deception and confusion often arise. Survey evidence has historically been led in such cases, but up until the case of *Arnotts Ltd v Trade Practices Commission*[467] the evidence had invariably been held inadmissible[478] on the grounds that it is hearsay[489]. Hence a general reluctance to rely on survey evidence existed in Australia[490].

However, in 1994 the Full Federal Court in *Arnotts* exercised its discretion under O 33, r 3 of the Federal Court Rules and held that survey evidence was admissible and was not subject to objection on the basis that it was hearsay. This case constituted a reversal in relation to the reception of survey evidence in Australian litigation generally[501].

This reversal was cemented with the decision of Sheppard J in *Interlego AG and Lego Australia Pty Ltd v Croner Trading Pty Ltd*[512], who declared that as a result of the *Arnotts* decision, survey evidence was now admissible whatever the prior doubts on this point were[523]. His Honor predicted that following the decision

> *there will be numbers of cases in which it will be tendered and relied upon*[534].

As a general proposition, the *Arnotts* case indicated that:

> *information is preferable to intuition. Where the state of public knowledge of, or attitudes to, some subject is a relevant factor in the Court's adjudication of any issue, it is better to admit than to preclude evidence on those matters*[545].

---

[46 57] (1990) 97 ALR 555.

[47 58] James W Dwyer, Benjamin F Katekar, 'Information is Preferable to Intuition: But Will Survey Evidence In Trademark Cases Provide Any' (1994) 5(1) *Australian Intellectual Property Journal*, 37, 42. See also James Farmer, 'The Admissibility of Survey Evidence in Intellectual Property Cases' (1984) *University of New South Wales Law Journal* 57, 59-60.

[48 59] Ibid, 42.

[49 60] *Interlego AG and Lego Australia Pty Ltd v Croner Trading Pty Ltd*, (1991) ATPR 41-124, 50,325 see also Caron Beaton-Wells, *Proof of Antitrust Markets*, 207.

[50 61] Caron Beaton-Wells, *Proof of Antitrust Markets*, 190.

[51 62] (1991) ATPR 41-124.

[52 63] Warren Pengilley, 'Admissibility of Survey Evidence: The Fight over Toy Blocks' October 1991 4(9) *Australian Intellectual Property Bulletin*, 85-87, 86.

[53 64] *Interlego AG and Lego Australia Pty Ltd v Croner Trading Pty Ltd*, (1991) ATPR 41-124, at 50,325 [122].

Exhibit H, Page 326

General limits post-*Arnotts*

Although the full court in *Arnotts* cleared the way for the use of survey evidence, the weight generally given to such evidence was not great and courts appeared to require some further guidance.

In *Interlego*, survey evidence was used as evidence that consumers were misled or deceived into believing that Tyco products, from the nature of their packaging, had an association with Lego products[5 55 6]. The surveys were conducted at supermarkets: interviewees were stopped and shown the Tyco product and asked questions about it. Interlego argued that little if any weight should be given to these surveys as they were not conducted with people who had actually bought the products, nor were they conducted in a shop where the relevant products were actually bought.  Interlego argued that such evidence could not be indicative of impressions of the public in the market place[6567]. Sheppard J agreed, giving the evidence no weight.

Sheppard J cited significant passages from the *Arnotts* case as well as the Manual for Complex Litigation published by the Federal Judicial Center of the United States.  These passages stressed the importance of sampling methods, sample sizes, disclosure in advance of the methodology to the other side and the framing of the interview questions in adducing the weight to be given to survey evidence[6578]. Sheppard J went on to suggest that the Court should promulgate a practice note which will usually apply in relation to survey evidence[6589].

**Official guidance**

Practice Note 11

The concerns of the Court in *Interlego* were addressed on 8 April 1994 when the Federal Court of Australia published Practice Note 11 on survey evidence.

The Practice Note recognizes that:

*There are many problems in obtaining acceptable survey evidence including the use of relevant and unambiguous questions and whether the actual conduct of the survey (including methodology) is satisfactory*[7590]

The note sets out the following procedure to be followed:

1   Notice should be given in writing by the party seeking to have the survey conducted to the other parties to the proceeding.

2   The notice should give an outline of :

---

[5465] *Arnotts Ltd v Trade Practices Commission* (1990) 97 ALR 555, 606-607.

[5566] Dwyer, above n 60, 39.

[5667] *Interlego AG and Lego Australia Pty Ltd v Croner Trading Pty Ltd*, (1991) ATPR 41-124,  52,834.

[5768] Beaton-Wells, *above n 63*, 199.

[5869] *Interlego G and Lego Australia Pty Ltd v Croner Trading Pty Ltd*, (1991) ATPR 41-124,  52,832-52,833.

[5970] Federal Court Practice Note No 11, *Survey Evidence* (8 April; 1994).

96

a   the purpose of the proposed survey;

b   the issue to which it is to be directed;

c   the proposed form and methodology;

d   the particular questions that will be asked;

e   the introductory statements or instructions that will be given to the persons conducting the survey; and

f   other controls to be used in the interrogation process.

3   The parties should attempt to resolve any disagreement concerning the manner in which the survey is to be conducted and any of the matters mentioned in 2) above.

4   The matter of the survey should be raised with the Court at the directions hearing as soon as possible after the steps mentioned above have been taken.

The Practice Note does not set out conditions for the admissibility of survey evidence. Rather, it sets out a procedure which may diminish the risk of the survey being rejected or given little or no weight at trial. However, the Court expects that the procedure in Practice Note 11 will usually be followed, subject to any directions it may make[6071].

In _Centurion Roller Shutters Pty Ltd v Automatic Technology (Australia) Pty Ltd_[6172], a case involving alleged misleading and deceptive conduct, French J (as he then was) determined the effect of Practice Note 11 on the conduct of surveys and the admissibility of survey evidence in the Federal Court. His Honor highlighted that the purpose of Practice Note 11 was to ensure that objections to survey evidence are brought at an early stage[6273]. This has been brought out in practice.

It could be said that Practice Note 11 has in fact caused disputes as to the design, methodology and scope of surveys to be brought, heard and determined at an interlocutory stage, rather than at trial[6374]. Of course, with this has come a commensurate increase in interlocutory disputes regarding compliance with the Practice Note procedure[6475].

French J held in _Centurion_ that a prospective ruling on admissibility of a proposed survey could never succeed, as admissibility may involve factual questions which can only be resolved at trial. Rather, the purpose of the Practice Note is to minimize the wasting of time at trial through challenges to the form, method and scope of a survey which could have been raised earlier[6576].

---

[6071] Federal Court Practice Note No 11, Survey Evidence (8 April 1994). See also Warren Pengilley, 'Survey evidence in the Federal Court: the Effect of Practice Note 11' (May/June 2000) 16(2) _Australian & New Zealand Trade Practices Bulletin_, 22.

[6172] (1999) ATPR 41-731.

[6273] Warren Pengilley, 'Survey evidence in the Federal Court: the Effect of Practice Note 11' (May/June 2000) 16(2) _Australian & New Zealand Trade Practices Bulletin_, 22.

[6374] Beaton-Wells, above n 63, 207. See _Gas Corporation v PhaseTwo Nominees Pty Ltd_ (1998) ATPR 41-731 at 43,473.

[6475] Ibid, 208. See _Eveready Australia Ltd v Gillette Australia Pty Ltd_ (1999) ATPR 41-279.

[6576] See Pengilley, above n 75, 23.

Exhibit H, Page 328

Further, his Honor stated that a failure to raise an issue under the procedure set out in Practice Note 11 which is later raised at trial is likely to result in an adverse costs order[7667].

French J also raised the point that a failure to follow the procedure in Practice Note 11 may result in the court not allowing at trial objections relating to the survey evidence.  The Practice Note should encourage a co-operative approach to the use of survey evidence and it would be inconsistent with the wording of the Practice Note for the court to preclude a party from adducing evidence other than from a survey conducted in accordance with the Practice Note.

Parties which choose to ignore Practice Note 11 expose themselves to a risk of severe criticism and adverse cost penalties as found out by Cadbury in *Cadbury Schweppes Pty Ltd v Darrel Lea Chocolate Shops Pty Ltd*[8670] when it was wholly unsuccessful.

Although its survey was heavily criticized and given little weight for a number of reasons,[8681], Heerey J highlighted the fact that no explanation was proffered for Cadbury's non-compliance with Practice Note 11, noting that this had been a deliberate choice by Cadbury and its advisors[8692].  On the ninth day of the trial cross-examination of the survey designer highlighted deficiencies in this survey and Cadbury shortly thereafter brought an application seeking an adjournment to have a further survey conducted, this time complying with Practice Note 11.  This application was refused[8703].

Example Orders with respect to Practice Note 11

In *Centurion Roller Shutters Pty Ltd v Automatic Technology (Australia) Pty Ltd*[8714], French J ordered that the non-surveying party must provide particulars of any objections it had to the draft survey within approximately two and a half weeks of the interlocutory judgment.  His Honor also ordered that the parties were free to raise any objection to the form of the survey three weeks after the judgment at a case-management conference[8725].

Of particular importance to successful compliance with Practice Note 11 are a number of observations that French J made that guide the parties as to the form and methodology of the survey questions.

His Honor noted that some of the questions which suggested circumstances under which doors had failed were leading, and that despite the difficulties in developing a non-leading question that talks to the same point, a redesigned question would carry more weight.

His Honor also observed that the introduction of the surveyor to the interviewees as the representative of a particular party may generate in the interviewees the impression that the survey was in fact a marketing exercise.

---

[6677] Ibid, 23.

[6780] (2006) 69 IPR 23.

[6881] Ibid, [76]-[80] Inadequate survey sample, the sample was conducted in a clinical environment and the survey did not address the direct issue.

[6982] Ibid, Heerey J at [70].

[7083] Ibid, Heerey J at [78]-[79].

[7184] (1999) ATPR 41-731.

[7285] See also Pengilley, above n 75, 23.

Exhibit H, Page 329

The survey was conducted by telephone and his Honor observed that it was unlikely to be ruled inadmissible purely on this basis.

Finally, French J flagged the issue that some questions were introduced in such a manner that they required answers inconsistent with these introductions.

<u>Difficulties Complying With Practice Note 11</u>

As yet, there is no real evidence that Practice Note 11, and the procedure it establishes, has improved the likelihood that survey evidence will be given any more probative value than was previously the case[8736]. In fact there is some evidence that it may be having a deterrent effect.

In the trademark case *CA Henschke & Co v Rosemount Estates Pty Ltd*[8747] the applicant noted that the difficulty in complying with the Practice Note's requirements was a significant reason for their decision not to adduce survey evidence[8758] given

> *[t]he difficulties in conducting an appropriate survey in the time available and in accordance with this Court's Practice Note No 11*[89]

This is the view generally held by practitioners – there is little incentive in trying to rely on survey evidence because of the difficulties attendant with compliance with Practice Note 11.

<u>Ensuring A Survey Is Awarded The Best Probative Value</u>

### Purpose of the Survey

The Federal Court has drawn a distinction between survey evidence obtained specifically for the purposes of litigation and survey evidence obtained in the ordinary course of business[9760]. Burchett J in *Shoshana Pty Ltd v 10th Cantanae Pty Ltd,*[9,771] a misleading/deceptive conduct case, noted that survey evidence obtained for the purposes of litigation has a high risk of having used improper methodology and containing biased questioning[9782].

### Survey Methodology

*Full Disclosure*

Australian courts have paid considerable attention to the methodology of a survey[9793]. The trademark case of *Leo Pharmaceutical Products Ltd A/S v ACP Masthead Nominees Pty Ltd*[9804] highlighted that full disclosure of the questions asked of the interviewees is necessary as is full

---

[7386] Beaton-Wells, above n 63, 207.

[7487] (2000) ATPR 46-199.

[7588] Beaton-Wells, above n 63, 207.

[7690] *Shoshana Pty Ltd v 10th Cantanae Pty Ltd* (1987) 79 ALR 249, Burchett J. See also Chris Sgourakis, Marnie Sylvester, 'Survey Evidence: Improving Probative Value in IP and Trade Practices Cases' (May 2005) 18(1) *Australian Intellectual Property Law Bulletin* 1.

[7791] (1987) 79 ALR 249.

[7892] Ibid, Burchett J, 264-265.

[7993] Chris Sgourakis, Marnie Sylvester, 'Survey Evidence: Improving Probative Value in IP and Trade Practices Cases' (May 2005) 18(1) *Australian Intellectual Property Law Bulletin* 1, 2.

[8094] [2004] ATMO 48.

disclosure of how the interviewer is introduced, whether an independent survey firm was used and whether there was any prior relationship between the interviewer and interviewee[9815].

A failure or general reluctance to disclose the full materials relevant to a survey can reduce the court's willingness to allocate probative value to the evidence[9826]. This includes invoking legal professional privilege in respect to the remainder of material involved in a survey,[9837] and failing to reveal the names and details of interviewees[9848].

*Survey must address the key issues*

This concern is especially important in trademark disputes where the nature of the confusion or deception to be proved is often narrowly defined.  In *Kellogg Company v PB Foods Ltd*[9859] a survey was submitted that the word "toucan" was associated with the applicant.  However, the survey was conducted a number of years after the time of filing PB's trademark application and the Court held that less weight should be given to the survey evidence as at the time of the application less emphasis had been placed on the word "toucan" in the relevant advertising[10860]. Further, the survey did not address whether consumers who saw the word on a juice container would be confused as to the origin of the goods, rather it dealt with whether consumers associated the word "toucan" with breakfast cereal[10871]. Lindgren J noted that this survey did not address the critical issue in the case[10882].

*Adequate Sample*

To be of any value, the sample of interviewees must be a representative cross-section of the public with whom the proceedings are concerned[10893]. As an example a survey in a case relating alcoholic beverages should be carried out on persons likely to purchase alcoholic beverages. Further, the results must be statistically significant[10904] and from a survey of an adequate sample size.

*Survey Environment*

---

[8195] Leo Pharmaceutical Products Ltd A/S v ACP Masthead Nominees Pty Ltd [2004] ATMO 48. See also Sgourakis and Sylvester, above n 95 2-3.

[8296] Ibid, 3.

[8397] *Chase Manhattan Overseas Corp v Chase Corp* (1985) 63 ALR 345.

[8498] *Auckland Regional Authority v Mutual Rental Cars (Auckland Airport) Ltd* [1987] 2 NZLR 647.

[8599] [1999] FCA 1610.

[86100] *Kellogg Company v PB Foods Ltd* y [1999] FCA 1610, Lindgren J, [115]-[116].  See also Sgourakis and Sylvester, above n 95, 3.

[87101] *Kellogg Company v PB Foods Ltd*  [1999] FCA 1610, Lindgren J, [113].

[88102] *Kellogg Company v PB Foods Ltd* [1999] FCA 1610, Lindgren J, [115]-[116].  See also Sgourakis and Sylvester, above n 95, 3.

[89103] *ConAgra Inc v McCain (Foods Australia) Pty Ltd* (1992) 23 IPR 193.  See also *Cadbury Schweppes Pty Ltd v Darrel Lea Chocolate Shops Pty Ltd* (No 4) (2006) 69 IPR 23, Heerey J at [76].  See also Sgourakis and Sylvester, above n 95, 3.

[90104] *Sterling Pharmaceuticals Pty Ltd v Johnson & Johnson Australia Pty Ltd*   , See also *Multix Pty Ltd*  where a hearing officer of the Trade Marks Office held that 20 people was an inadequate sample size.

As discussed above in reference to the *Interlego* case, the general survey environment is an important factor towards its probative value.  In that case a question based on a hypothetical situation created too great a contrast between the interview and the market situation[10915]. The timing and location of a survey are also important considerations.

In the misleading/deceptive conduct case *United Telecasters Sydney v Pan Hotels International Pty Ltd*[10926] surveys were conducted in two separate locations at two different times, one before advertising had commenced, and one after.  Franki J expressed concern about the method, mode and timing of these questions[10937].

That said, in *Centurion* the fact that survey interviews were conducted by telephone was insufficient to render the evidence inadmissible on that alone.

*Formulation of Questions*

Although survey evidence is no longer held inadmissible on the basis of hearsay, it is still the case that little weight, if any, will be given to surveys that use open or leading questions.

Further, in *Broderbund Software Inc v Computermate Products (Aust) Pty Ltd*[10948] Beaumont J noted that it was relevant that a leading question arose early in a survey (the second question) because latter questions sought to build on the answer to that question.  However, Williams J, in *Levi Strauss v Kimbry Investments*[10 95 9] gave weight to survey evidence in a trademark infringement case that asked interviewees to "*name brands of jeans they could think of*" despite the fact that the question channeled responses to questions specific to Levi's.  His Honor held that at some point the survey questions must focus to some extent on the relevant issue[11960].

*Independent Survey Firms*

In *Multix Pty Ltd*[11971] the hearing officer of the Trade Marks Office placed little weight on a survey prepared by the applicant's trademark attorneys.

---

[91105] Sgourakis and Sylvester, above n 95, 3.

[92106] (1978) ATPR 40-085.

[93107] Sgourakis and Sylvester, above n 95, 3.

[94108] (1991) 22 IPR 215.

[95109] (1993) 28 IPR 249.

[96110] *Levi Strauss v Kimbyr Investments* (1993) 28 IPR 249, 281.

[97111] [2004] ATMO 51 (30 September 2004).  See also Sgourakis and Sylvester, above n 95, 3  for discussion noting that even surveys conducted by market leading survey firms can be flawed.

101

**APPENDIX 27: NEW ZEALAND**

| Jurisdiction: | New Zealand |
|---|---|
| Summary: | Survey evidence is admissible. |
| Official guidance: | Case law has developed the law over the last three decades. |
| Relevant case law: | *Auckland Regional Authority v Mutual Rental Cars (Auckland Airports) Ltd (No 2)*<br><br>*Imperial Group Ltd v Philip Morris & Co Ltd* (English case)<br><br>*Levi Strauss & Co v Kimbyr Investments Ltd* |
| Approximate cost to produce survey: | No information available |

**Overview**

Despite the absence of any express provisions in New Zealand's trademark legislation, market survey evidence will often be relevant in overcoming objections to registration and in opposition, invalidity or infringement proceedings. No permission is required to rely on market survey evidence but if it is to be relied upon in court proceedings there may be questions about whether the evidence is admissible. New Zealand judges are particularly concerned with the selection of survey participants, and the integrity of the questions asked.

**Case Law**

*Auckland Regional Authority v Mutual Rental Cars (Auckland Airports) Ltd (No 2)* [1987] 2 NZLR 647 (HC)

In New Zealand's leading decision on the admissibility of survey evidence, Barker J determined that the criteria set forth by Whitford J in the English case of *Imperial Group Ltd v Philip Morris & Co Ltd* [1984] RPC 293 (HC) for analyzing the admissibility of survey evidence provides a valuable measuring stick for survey evidence. Barker J's summary of Whitford J's criteria had 9 points:

1    *the interviewees must be selected so as to represent a relevant cross-section of the public;*

102

2    *the size must be statistically significant;*

3    *it must be conducted fairly;*

4    *all the surveys carried out must be disclosed including the number carried out, how they were conducted, and the total of the persons involved;*

5    *the totality of the answers given must be disclosed and made available to the defendant;*

6    *the questions must not be leading nor should they lead the person answering into a field of speculation he would never have embarked upon had the question not been put;*

7    *the exact answers and not some abbreviated from must be recorded;*

8    *the instructions to the interviewers as to how to carry out the survey must be disclosed; and*

9    *where the answers are coded for computer input, the coding instructions must be disclosed.*

Survey evidence which fails to meet these criteria is not necessarily inadmissible in New Zealand.

In *Levi Strauss & Co v Kimbyr Investments Ltd* [1994] 1 NZLR 332 (HC) referring to the decision in *Auckland Regional Authority v Mutual Rental Cars (Auckland Airport) Limited* [1987] 2 NZLR 647, the New Zealand High Court found that survey evidence will be admissible if:

i    the interviewees were selected so as to represent a cross-section of the relevant public; and

ii   the precise instructions to the interviewers as to how to carry out their survey were disclosed.

Williams J found that even if surveys are admissible, the value of the answers and their importance as evidence depends on the "structural integrity and fairness" of the questionnaire as a whole, and the individual questions.  This case also determined the level of comprehension required for a survey to be representative of a relevant cross section of the public. It did not need to be "nationwide", a survey of 500 people undertaken across New Zealand's seven major cities was "sufficiently comprehensive."

*Patience & Nicholson (NZ) Ltd v Cyclone Hardware Pty Ltd* [2001] 3 NZLR 490 (HC)

Exhibit H, Page 334

http://www.nzlii.org/cgi-bin/sinodisp/nz/cases/NZCA/2001/28.html?query=title(Patience

In this case, the defendant objected that the plaintiff had used its customer list for the survey. Rodney Hansen J found the survey system was flawed, but the survey was admissible because it complied with the code of standards of the New Zealand Market Research Society. However, Rodney Hansen J did deem the value of evidence to have diminished. On appeal, Cooke P emphasised that accepting survey evidence that focuses too much on the marketing device in question is difficult.

*Klissers Farmhouse Bakeries v Harvest Bakeries Ltd (No 2)* [1985] 2 NZLR 143 (HC)
http://www.nzlii.org/cgi-bin/download.cgi/cgi-bin/download.cgi/download/nz/cases/NZHC/1985/220.pdf

This case was important in relation to the nature of survey questions. Davison CJ rejected surveys that were deemed deceptive. The surveys were purported to show that potential customers were deceived into believing they were purchasing the plaintiff's bread. Davison CJ held the photographs in the surveys were unduly focused on the get-up that the case revolved around.

*Customhouse Boats Ltd v Salthouse Brothers Ltd* [1976] 1 NZLR 36 (SC)

Mahon J found that market surveys were admissible, even if the respondents to the questionnaires had not signed sworn affidavits confirming their evidence. This was New Zealand's first significant decision surrounding the admissibility of surveys as evidence. Mahon J's decision was approved in *Bevan Investments Ltd v Blackhall and Struthers (No 2)* [1978] 2 NZLR 97 (CA)

**Official guidance**

Market survey evidence to overcome objections to registration and within opposition or invalidity proceedings


There is some, limited guidance on survey evidence used to attempt to convince the Commissioner of Trade Marks that the relevant trademark is distinctive enough to warrant registration. This guidance is found in paragraph 2.2.6 of Chapter 5A "Overcoming Section 18" of the Intellectual Property Office of New Zealand (IPONZ) Practice Guidelines:
http://www.iponz.govt.nz/cms/trade      marks/practice-guidelines-index/practice-guidelines/05a-overcoming-section-18.

*DB Breweries Limited v Society of Beer Advocats, Inc* [2011] NZIPOTM 19 was a widely publicized and controversial decision. It involved an application to the New Zealand Intellectual Property Office for a declaration of invalidity. A survey was undertaken of 500 people around New Zealand by a reputable market research company. Assistant Commissioner Jones found that the survey was properly constructed and admissible. Assistant Commissioner Jones appeared to place considerable weight on the survey evidence and found that it established that the trademark had no relevant meaning in the New Zealand market other than in relation to the trademark owner's product and it had not become a generic term. Assistant Commissioner Jones decided not to grant a declaration of invalidity. A copy of that decision can be found via this hyperlink:

104

http://www.nzlii.org/cgi-bin/sinodisp/nz/cases/NZIPOTM/2011/19.html?query=db%20breweries

*Waitomo Adventures Limited v BWR Resources Limited* [2002] BCL 566 is a case which considered use of survey evidence in invalidity proceedings where the plaintiff sought to have the defendant's trademark expunged from the trademarks register because the relevant trademark was descriptive and lacked distinctiveness. Justice Randerson in the New Zealand High Court decided not to attach significant weight to the survey evidence because the survey did not cover an appropriate section of the public.

*Royal New Zealand Yacht Squadron v Daks Simpson Group plc* [2002] NZAR 187 (HC)
It was found that even though an Intellectual Property Office of New Zealand hearings officer can consider evidence that may be inadmissible in a court, they should not rely on survey evidence that does not follow the guidelines set out in the decisions above.

Exhibit H, Page 336

## APPENDIX 28: OTHER JURISDICTIONS

It was generally observed that survey evidence is very infrequently used in litigation matters in a number of countries where enquiries were made including: Turkey, Korea, China and Taiwan.

As a result, the subcommittee chose not to devote additional resources to in-depth research in these jurisdictions unless it could locate clear jurisprudence based on a relatively significant number of cases. It should be added that if survey use increases this report could be updated.

<u>**Sample Questions To Obtain Further Information In Each Jurisdiction**</u>

This report was compiled based on responses to the following questions.

**1**   Please state the jurisdiction to which the following answers will apply

**2**   **Market survey evidence as proof of use**

   a   Has any legislation or official guidance been issued in connection with the use of market survey evidence in trademark matters?  If so, please state the date, name and effect of the guidance and provide hyperlinks where possible.

   b   Is there any relevant case law which provides guidance on the use of market survey evidence in trademark matters?  If so, please state the dates, names, circumstances and effect of the cases and provide hyperlinks where possible.

   c   Is permission required to rely on market survey evidence?  If so, under what circumstances is permission likely to be granted?

2   **Market survey evidence within opposition or invalidity proceedings**

   a   Has any legislation or official guidance been issued in connection with the use of market survey evidence in trademark matters?  If so, please state the date, name and effect of the guidance and provide hyperlinks where possible.

   b   Is there any relevant case law which provides guidance on the use of market survey evidence in trademark matters?  If so, please state the dates, names, circumstances and effect of the cases and provide hyperlinks where possible.

   c   Is permission required to rely on market survey evidence?  If so, under what circumstances is permission likely to be granted?

3   **Market survey evidence to overcome objections on absolute grounds**

   a   Has any legislation or official guidance been issued in connection with the use of market survey evidence in trademark matters?  If so, please state the date, name and effect of the guidance and provide hyperlinks where possible.

   b   Is there any relevant case law which provides guidance on the use of market survey evidence in trademark matters?  If so, please state the dates, names, circumstances and effect of the cases and provide hyperlinks where possible.

   c   Is permission required to rely on market survey evidence?  If so, under what circumstances is permission likely to be granted?

Exhibit H, Page 338

### INTA COURTS & TRIBUNALS SUBCOMMITTEE MEMBERS 2008-2009

| Name | Company Name | Location |
|------|--------------|----------|
| Beth Alquist | Day Pitney | Hartford, CT |
| Giovanni Casucci | Casucci Law | Milan, Italy |
| Peter Chalk | Blake Dawson Waldron | Melbourne, Australia |
| Luis Cavaleiro de Ferreira | Leonel Alves' Law Firm | Macau, China |
| Nuno Cruz | J. Pereira da Cruz | Lisbon, Portugal |
| Gerard Delile | Salans | Paris, France |
| Patti DeSimone | Alberto-Culver Co. | Melrose Park, IL |
| Todd Deveau | Thomas Kayden Horstemeyer & Risley | Atlanta, GA |
| Claudio DiGangi *(staff liaison)* | INTA | New York, NY |
| Tom Donovan | Barnes & Thornburg | Chicago, IL |
| Burkhart Goebel | Lovells | Madrid, Spain |
| Jim Gumina | McDonnell Boehnen Hulbert & Berghoff | Chicago, IL |
| Patty Hogan | Keating Muething & Klekamp | Cincinnati, OH |
| Mike Hurst *(chair)* | Keating Muething & Klekamp | Cincinnati, OH |
| Sam Ibrahim | Buchanan Ingersoll & Rooney | Alexandria, VA |

108

| | | |
|---|---|---|
| Greg Kaihoi | General Mills | Minneapolis, MN |
| David Kane | Locke Lord | New York, NY |
| Ludwig Kouker | Boehmert & Boehmert | Bremen, Germany |
| Pascal Lamothe | Joseph Lee | Kowloon, Hong Kong |
| David Lorenz | Powley & Gibson | New York, NY |
| Greg Madera | Fish & Richardson | Boston, MA |
| Ignacio Marques | Baker & McKenzie | Barcelona, Spain |
| Fabrizio Miazzetto | Bardehle Pagenberg Dost Alternburg | Alicante, Spain |
| Luiz Montaury | Montaury Pimenta Machado & Lioce | Rio de Janeiro, Brazil |
| Aaron Montero | E-Point | San Jose, Costa Rica |
| Avi Ordo | S. Horowitz & Co. | Tel Aviv, Israel |
| Eric Osterberg | Fox Rothschild | Stamford, CT |
| Damaso Pardo | Perez Alati Grondona Benites… | Buenos Aires, Argentina |
| Scott Pivnick | Pillsbury Winthrop Shaw Pittman | Washington, D.C. |
| Mike Rodenbaugh | Rodenbaugh Law | San Francisco, CA |
| Elisa Santucci | Bhering Adv. | Rio de Janeiro, Brazil |
| Andrew Simpson | Knobbe Martens | Irvine, CA |

109

| Paul Supnik | Law Office of - | Beverly Hills, CA |
| Ignacio Temino | Abril Abogados | Madrid, Spain |
| Kat Treiber | Cooley Godward | San Francisco, CA |
| Anthony Trenton | Denton Wilde Sapte | London, England |
| Agustin Velazquez | Mijares, Angoitia Cortes y Fuentes | Mexico City, Mexico |
| Diego Vieira | Daniel Advogados | Rio de Janeiro, Brazil |
| Courtenay Williams | Pollonais, Blanc de la Bastide & Jacelon | Port of Spain, Trinidad |
| Julian Zegelman | Hoge Fenton | San Jose, CA |

Exhibit H, Page 341

### INTA COURTS & TRIBUNALS SUBCOMMITTEE MEMBERS TASK FORCE 2 2010-2011

| Name | Firm / Company | City, State / Country |
|---|---|---|
| Nick Redfearn | Rouse (Subcommittee Chair) | Hong Kong |
| Beth Alquist | Day Pitney LLP (task force chair) | Hartford, CT, USA |
| Dr. jur Ludwig Kouker | Boehmert & Boehmert | Bremen, Germany |
| Lemke Christian | Heissner & Struck | Hamburg, Germany |
| Fabrizio Miazzetto | Salvador Ferrandis & Partners | Madrid SPAIN |
| Chiang Ling  Li | Jones Day | Hong Kong |
| James C. Gumina | McDonnell  Boehnen  Hulbert  & Berghoff LLP | Chicago, IL, USA |
| Betty Morgan | The Morgan Law Firm P.C. | Atlanta GA, USA |
| Maarten Haak | Hoogenraad & Haak | Amsterdam,the Netherlands |
| Scott J. Pivnick | Pillsbury | Washington, DC, USA |
| Elisa  Santucci | Castello Santucci | Rio de Janeiro, Brazil |
| Paul D. Supnik | Paul D. Supnik | Beverly Hills, CA, USA |
| Rafaela  Borges Walter Carneiro | Dannemann Siemsen | Rio de Janeiro, Brazil |

Exhibit H, Page 342

| Lisa Parker Gates | Baker McKenzie | Chicago, USA |
| Su Siew Ling | Tay & Partners | Kuala Lumpur Malaysia |

Exhibit H, Page 343

**INTA COURTS & TRIBUNALS SUBCOMMITTEE MEMBERS TASK FORCE 2 2012-2013**

| Name | Company Name | Location |
|------|--------------|----------|
| Robert Cumming | Appleyard Lees | UK |
| Richard Plaistowe | Mills & Reeve | UK |
| Lee Eulgen | Neal, Gerber & Eisenberg LLP | USA |
| Nick Rose | Field Fisher Waterhouse | UK |
| Sym Otike-Odibi | Johnson Bryant | Nigeria |
| Ludwig Kouker | Boehmert & Boehmert | Germany |
| Courtney Farkas | Kirkland & Ellis | USA |
| Jorge Oria | Abril Abogados | Spain |
| Jose Luis Arnaut | CMS Rui Pena & Arnaut | Portugal |
| Voldemars Osmans | Agency Tria Robit | Latvia |

113

### Acknowledgements

The Subcommittee would like to recognize the contributions of the following individuals who have led this project:

| 2012 to 2013 term | Robert Cumming, Richard Plaistowe, Lee Eulgen |
|---|---|
| 2010 to 2011 term | Beth Alquist, Nick Redfearn, Elisa Santucci |
| 2008 to 2009 term | Peter Chalk, Patti DeSimone, Patty Hogan, Mike Hurst, Dave Lorenz, Luiz Montaury, Avi Ordo, Scott Pivnick, Elisa Santucci, Paul Supnick, Ignacio Temino and Agustin Velazquez. |

In addition the following provided assistance for some sections of the report:

| Name of Representative | Name of Firm | Country |
|---|---|---|
| Raquel Flanzbaum | Mitrani, Caballero, Rosso Alba Francia, Ojam & Ruiz Moreno | Argentina |
| Elisa Santucci | Castello & Santucci | Brazil |
| Felipe Claro | Claro Y Cia | Chile |
| Jorge Chávarro | Cavelier Abogados | Colombia |
| Kristel Faith | Arias & Muñoz | Costa Rica |
| Morena Zavaleta | Arias & Muñoz | El Salvador |
| Virginia Servent Palmieri | Arias & Muñoz | Guatemala |
| Morena Zavaleta | ARIAS & MUÑOZ | Honduras |

114

| Alejandro Cárdenas Eychenne | Martinez Del Campo Obregón & Fernandez Del Valle | Mexico |
|---|---|---|
| Angélica Arguello | Arias & Muñoz | Nicaragua |
| Jaime Durand | Garcia Sayan Abogados | Peru |
| Agustina Fernández | Fernández Secco & Asociados | Uruguay |
| Cristina Imparato | Glaham Abogados | Venezuela |
| Ranjan Narula | RNA | India |
| Tomohiro Nakamura | Konishi & Nakamura | Japan |
| Isilay Cengiz | Grup Ofis Patents & Trademarks | Turkey |
| August Zhang | Rouse | China |
| Voldemars Osmans | Agency Tria Robit | Latvia |
| Susana Saldaña | Bufete Candanedo | Panama |
| Shane D. Hardy & Steven N. Kennedy | Cassels Brock & Blackwell LLP | Canada |
| María Celeste Pinto | Clarke Modet & Co Venezuela | Venezuela |
| Helena Nino Kiriakidis | Clarke, Modet & C° Colombia | Columbia |
| Guillermo Alcaraz | Clarke, Modet & Co. Argentina | Argentina |
| Leticia Natividad Rangel | Clarke, Modet & Co. Mexico | Mexico |
| Claudia Fernandini | Clarke, Modet & Co. Peru | Peru |

115

| Claudia Fernandini | Clarke, Modet& Co. Brazil | Brazil |
|---|---|---|
| Francisco Capetillo Traeger | Cuesta, Llaca y Esquivel | Mexico |
| Daniela De Pasquale | D & P – Legal Support for Ideas | Italy |
| Reinhold Gregorowski | de Chalains Trademark and Patent Attorneys | South Africa |
| Dr Jakob Guhn | Fisher Waterhouse LLP | Germany |
| Helena Nino Kiriakidis | Clarke, Modet & Cº Colombia | Columbia |
| Guillermo Alcaraz | Clarke, Modet & Co. Argentina | Argentina |
| Leticia Natividad Rangel | Clarke, Modet & Co. Mexico | Mexico |
| Claudia Fernandini | Clarke, Modet & Co. Peru | Peru |
| Claudia Fernandini | Clarke, Modet& Co. Brazil | Brazil |
| Sujata Chaudhri | IP Gurus | India |
| Divya Balasundaram | Manu Law Associates | India |
| José Mauro Decoussau Machado | Pinheiro Neto Advogados | Brazil |
| Ronit Barzik-Soffer & Sonia Shnyder | Reinhold Cohn Group | Israel |
| David Colb | Sanford T. Colb & Co. | Israel |
| Marita Dargallo Nieto | Sol Muntañola Abogados | Spain |

116

Exhibit H, Page 347

| Charles Webster & Megan Reimers | Spoor & Fisher | South Africa |
|---|---|---|
| Charlene Sell | Wynn Williams | New Zealand |

117